IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

HARRY C. FLEEGLE,

                      Petitioner,         Civil Action No.
      v.                               9:08-CV-0771 (TJM/DEP)

JAMES CONWAY, Superintendent,
Attica Correctional Facility,

                      Respondent.

_____

APPEARANCES:

FOR PETITIONER:

HARRY C. FLEEGLE, *Pro Se*
01-A-2864
Attica Correctional Facility
Box 149
Attica, NY 14011

FOR RESPONDENT:

HON. ANDREW M. CUOMO      ALYSON J. GILL, ESQ.
Office of Attorney General      ASHLYN H. DANNELLY, ESQ.
State of New York             Assistant Attorneys General
120 Broadway
New York, NY 10271

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Petitioner Harry C. Fleegle, a New York State prison inmate as a result of a 2003 conviction for rape and sexual abuse, has commenced this proceeding seeking federal habeas intervention pursuant to 28 U.S.C. § 2254.  Although reciting in considerable detail the eleven arguments raised in the state appellate courts in support of an appeal of his conviction, in both his initial petition and a subsequently filed amended pleading, Fleegle appears to assert only a single ground for habeas intervention, arguing that he was denied effective assistance of counsel prior to and during his trial.

Two earlier orders issued in this matter signaled the court's view that based upon the relevant chronology outlined, Fleegle's claims could be time-barred.  Since the issuance of those orders respondent has answered the petition, as amended, seeking its dismissal as untimely.

Having carefully reviewed the record and determined that Fleegle's petition was not filed within the prescribed time period and that there is no basis for tolling, equitable or otherwise, of any portion of the time between the date on which his conviction became final and the filing of his petition to avoid the effect of the applicable one-year statute of limitations, I recommend that the petition be dismissed.

2

I.   BACKGROUND

Petitioner's conviction results from a series of four incidents occurring between August of 1995 and December of 1997 at his home in Ogdensburg, New York, where he resided at the time with his girlfriend and her son and fourteen year old daughter, C.V.[1]  It is alleged that on those occasions petitioner placed his hands on C.V.'s breasts and forced her to have sexual intercourse with him while the two of them were home alone.

The incidents giving rise to petitioner's conviction were not reported to law enforcement officials until March, 2000.  Petitioner was subsequently arrested in August of 2000, and was indicted by a St. Lawrence County Grand Jury and charged with thirty-one counts each of first degree sexual abuse, first degree rape, third degree rape, and sodomy in the first and third degrees.  Following dismissal of various of those counts petitioner was tried on the remaining charges, resulting in a jury verdict convicting him of six counts of sexual abuse in the first degree, six

---

[1]   Under New York law, "[t]he identity of any victim of a sex offense . . . shall be confidential.  No . . . court file or other documents, in the custody or possession of any public officer or employee, which identifies such a victim shall be made available for public inspection."  N.Y. Civ. Rights Law § 50-b.  In light of this provision, and in order to insure her privacy, the victim in this case will be referred to herein as "C.W.".  *See Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 109 n.4 (2d Cir.), *cert. denied,* 531 U.S. 873, 121 S. Ct. 175 (2000).

3

counts of first degree rape, six counts of rape in the third degree, and five counts each of first and third degree sodomy.  The resulting conviction was reversed on appeal by the New York State Supreme Court Appellate Division, Third Department, however, based upon a series of perceived trial court errors and a finding that petitioner had received ineffective assistance of counsel at trial, and the matter was remanded for a new trial. *People v. Fleegle*, 295 A.D.2d 760, 745 N.Y.S.2d 224 (3d Dep't 2002).

Following the remand the trial court dismissed the remaining twenty-eight counts of the indictment, with leave to present the case to a new grand jury.  Petitioner was subsequently re-indicted by a St. Lawrence County Grand Jury on November 19, 2002 and charged with six counts of first degree sexual abuse, four counts each of first and third degree rape, and one count each of first and third degree sodomy.

A second trial was held in connection with the new charges, commencing on July 8, 2003, with County Court Judge Eugene L. Nicandri presiding.  At the conclusion of that second trial petitioner was again convicted and found guilty of four counts of first degree rape, four counts of rape in the third degree, and five counts of first degree sexual abuse, and was subsequently sentenced on August 4, 2003 principally to an

indeterminate term of imprisonment of between twenty-six and one-half and fifty-seven years.

Petitioner appealed from that second judgment of conviction, with the assistance of counsel.  In his appeal Feegle advanced eleven separate grounds for reversal, arguing that 1) he was denied the right to trial before a fair and impartial jury, based upon two distinct events occurring during the course of the trial; 2)  his right to a fair trial was further denied based upon the trial judge's failure to recuse himself following the reversal of his earlier conviction; 3) his retrial for certain of the crimes charged represented a double jeopardy; 4) the prosecution committed misconduct during the course of the trial; 5) certain of the charges set forth in the indictment against the petitioner were duplicitous; 6) the court's ruling regarding the use of prior bad acts was improper; 7) the trial court failed to appropriately charge lesser included offenses; 8) the evidence adduced at trial was insufficient to support a portion of the jury's verdict; 9) various of the counts of the indictment should have been dismissed as inclusory concurrent counts; 10) the petitioner was denied effective assistance of counsel; and 11) the sentence imposed was unduly harsh and excessive.

On July 14, 2005, the Appellate Division issued a decision in which,

with the exception of reversal in connection with one count of sexual abuse in the first degree, the court unanimously affirmed petitioner's conviction, as modified.   *People v. Fleegle,* 20 A.D.3d 684, 798 N.Y.S.2d 244 (3d Dep't 2005).   In that decision, the Third Department held first that the jury fairness issue was not properly preserved and opted not to address the claim in the interest of justice. 20 A.D.3d at 685, 798 N.Y.S.2d at 226. Turning to the argument regarding recusal, the appellate court concluded that the trial judge's decision not to recuse himself did not represent an abuse of discretion.  *Id.* at 686, at 227.

The court next addressed petitioner's double jeopardy argument, concluding that one of the counts was premised upon different conduct than asserted in the original indictment and a corresponding bill of particulars; as a result, the court reversed the conviction as to that count, which charged sexual abuse in the first degree based upon a December 15, 1997 incident. The court otherwise found, however, that no double jeopardy violation had occurred.  *Id.*  Next, the court rejected defendant's argument that certain of the counts were duplicitous, concluding that each count charged a separate, discrete offense pertaining to a definitive time frame.  *Id.*  The court also summarily rejected petitioner's argument

regarding inclusory concurrent counts.

The last substantive issue addressed by the appeals court concerned the sufficiency of evidence at trial, the court concluding that the evidence adduced, which "included, among other things, the detailed testimony of the victim regarding the acts perpetrated upon her by defendant . . .[and] the testimony of both the victim and her brother [which] established the abusive behavior and threatening atmosphere created by and employed by defendant", amply sufficed to support the jury's verdict. *Fleegle,* 20 A.D.3d at 687, 798 N.Y.S.2d at 228.  The Appellate Division closed by noting that petitioner's "remaining contentions have been considered and found unpersuasive." *Id.*  Leave to appeal the Appellate Division's decision to the New York Court of Appeals was denied on September 2, 2005, *People v. Fleegle,* 5 N.Y.3d 828, 804 N.Y.S.2d 42 (2005) (Table), and petitioner's application for a writ of *certiorari* was denied by the United States Supreme Court on May 22, 2006.  *Fleegle v. New York*, 547 U.S. 1152, 126 S. Ct. 2297 (2006).

## II.   PROCEDURAL HISTORY

Fleegle's petition, which is dated March 1, 2008, was filed on June 23, 2008 in the Western District of New York.  Dkt. No. 1.  Appropriately

named as the respondent in Fleegle's petition is the superintendent of the correctional facility in which he is currently being held.

Following a transfer of the matter to this court, on August 18, 2008 Senior District Judge Thomas J. McAvoy issued an order identifying a potential timeliness issue, based upon the chronology laid out in the petition, and dismissing the petition as facially untimely, with leave to amend.  Dkt. No. 6.  In that order, the court specifically directed petitioner to include reference in his amended petition to any state court post-conviction motions filed to challenge his conviction and sentence, and to provide information concerning any such proceedings.  *Id.*

Fleegle filed an amended petition with the court on September 11, 2008.  Dkt. No. 7.  Like the original, Feegle's amended petition contains a single claim, alleging that he received ineffective assistance of counsel at trial, and additionally asserting that he is actually innocent of the various crimes for which he was convicted.  *Id.*  While the text of the amended petition fails to make reference to the filing of any state court post-conviction motions, attached to the amended petition are excerpts of what appear to be papers prepared in support of a motion to vacate his judgment of conviction under New York Criminal Procedure Law § 440.10.

8

*See id.,* Attachment.

After reviewing Fleegle's amended petition, by order dated December 2, 2008, I directed respondent to submit an answer, limited to addressing the issue of timeliness, including any potential grounds for tolling, and specifically directed that the respondent refrain from producing the relevant state court records until directed to do so.  Dkt. No. 8.  A text order was subsequently entered on April 13, 2010 instructing respondent's counsel to retrieve and forward those state court records, which have now been received by the court.  Dkt. Nos. 20, 21.

The threshold procedural issue of the timeliness of Fleegle's petition, which is now ripe for determination, is now before me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3.  *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Statute of Limitations

In 1996 Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), bringing about sweeping reform of the prison inmate litigation landscape.  The measures introduced by the AEDPA included significant

new restrictions on the power of the federal courts to grant habeas relief to state court prisoners under 28 U.S.C. § 2254.  One such restriction resulted from creation of a one-year limitation period for filing such habeas petitions.  28 U.S.C. § 2244(d)(1); *Cook v. New York State Div. of Parole*, 321 F.3d 274, 279-80 (2d Cir. 2003).  The AEDPA statute of limitations provision was enacted to "reduce[ ] the potential for delay on the road to finality by restricting the time that a prospective federal habeas petitioner has in which to seek federal habeas review."  *Duncan v. Walker*, 533 U.S. 167, 179, 121 S. Ct. 2120, 2128 (2001).

The provision establishing the one-year limitation offers specific guidance regarding measurement of the prescribed period, providing that it

> shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to

10

cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

For purposes of the AEDPA statute of limitations, petitioner's judgment of conviction became final on May 22, 2006 upon denial of his petition for a writ of *certiorari*.  28 U.S.C. § 2244(d)(1)(A); *see Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001).  Absent a finding of a cognizable basis for tolling the governing statute of limitations, Fleegle therefore had only one year from that date, or until May 22, 2007, to file a timely habeas petition.  Giving the petitioner the benefit of the prison mailbox rule, *Tracy v. Freshwater*, No. 5:01-CV-0500, 2008 WL 850594, at *1 (N.D.N.Y. Mar. 28, 2008) (McCurn, S.J.) *(citing Houston v. Lack*, 487 U.S. 266, 276, 108 S. Ct. 2379, 2385 (1988)), for the purposes of the statute of limitations calculus, the earliest filing date he could claim is March 1, 2008, the date of his petition.[2]  Even with the benefit of that date, Fleegle's petition is untimely unless all or a portion of the intervening period may properly be excluded.

---

[2]      Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

B.    Tolling For Pendency Of State Court Post-Conviction
      Proceedings

Under the AEDPA the one-year governing limitation period is tolled

during the pendency of a properly filed application for state post-conviction

or other collateral review.[3]  28 U.S.C. § 2244(d)(2); *see Rhines v. Weber,*

544 U.S. 269, 274, 125 S.Ct. 1528, 1533 (2005).  This tolling provision

> balances the interests served by the exhaustion
> requirement and the limitation period.  Section
> 2244(d)(2) promotes the exhaustion of state
> remedies by protecting a state prisoner's ability
> later to apply for federal habeas relief while state
> remedies are being pursued.  At the same time, the
> provision limits the harm to the interest in finality by
> according tolling effect only to "properly filed
> application[s] for State post-conviction or other
> collateral review."

*Duncan v. Walker*, 533 U.S. 167, 179-80, 121 S. Ct. 2120, 2128 (2001).

The record is equivocal as to petitioner's efforts to file his section

440.10 motion.  Annexed to Fleegle's amended petition, although

somewhat disorganized and seemingly incomplete, are papers related to

such a motion, including excerpts from an affidavit of the petitioner

---

[3]    It should be noted that this savings provision only operates to toll the statute of limitations during the pendency of a properly filed state court proceeding; it does not require resetting of the one-year clock or confer a new one-year limitation period upon conclusion of a state court collateral review proceeding qualifying under that provision. *See Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000); *see also Bethea v. Girdich,* 293 F.3d 577, 578 (2d Cir. 2002).

purporting to support such an application, as well as a signed but undated and unsworn signature page.  *See* Amended Petition (Dkt. No. 7), Attachment.  Included as an exhibit to petitioner's reply memorandum is a notarized letter from Evelyn I. Fleegle, the petitioner's wife, in which she avers that she mailed two copies of petitioner's section 440.10 motion on May 1, 2007 to the St. Lawrence County District Attorney and the St. Lawrence County Court.  Reply Memorandum (Dkt. No. 15) Exh. 1.  In that letter, Ms. Fleegle also notes having telephoned both the St. Lawrence County Court and the District Attorney on several occasions and having been told on those occasions that the documents were never received.

In a declaration submitted by respondent's counsel, Ashlyn Dannelly, Esq., in response to Fleegle's petition; counsel states that she has contacted both the trial court and the St. Lawrence County District Attorney's office, and that neither has any record of Fleegle having filed a section 440.10 motion to vacate his judgment of conviction.  Dannelly Decl. (Dkt. No. 13-1) ¶¶ 2-3.

In order to entitle a petitioner to the benefit of the section 2244(d)(2) tolling provision, his or her application for state-post conviction relief for collateral review must have been properly filed.  28 U.S.C. § 2244(d)(2);

*Artuz v. Bennett*, 531 U.S. 4, 8, 121 S. Ct. 361, 363 (2000); *see also*

*Hurley v. Moore,* 233 F.3d 1295, 1297-98 (11th Cir. 2000).  "An application

is 'filed,' as that term is commonly understood, when it is delivered to and

accepted by, the appropriate court officer for placement into the official

record."  *Artuz*, 531  U.S. at 8, 121 S. Ct. at 363 (citations omitted).  In

*Artuz*, the Supreme Court went on to note that a "an application is 'properly

filed' when its delivery and acceptance are in compliance with the

applicable laws and rules governing filings."   *Artuz,* 531 U.S. at 8, 121 S.

Ct. at 364.

There is no evidence now before the court to suggest that the

petitioner's section 440.10 motion was in compliance with all applicable

requirements of state law, or that it was actually accepted for filing.  The

motion is not dated or notarized, and does not purport to represent a

complete set of documents, as required by applicable provisions of New

York law.[4]

The burden of establishing entitlement to the benefit of a basis for

---

[4]     New York Criminal Procedure Law § 440.10 provides that "anytime after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the [following] ground[s]..." N.Y. Crim. Proc. Law § 440.10(1). Such a motion must be supported by sworn allegations of fact.  *People v. Oliveri*, 29 A.D. 3d 330, 331, 814 N.Y.S.2d 435, 437 (1st Dep't 2006); *see also People v. Wagner*, 9 Misc. 3d 131(A), 808 N.Y.S.2d 920 (Table) (N.Y. Sup.Ct. App. Term 2005).

tolling of the limitations period rests squarely with the petitioner. *Bolarwinwa v. Williams,* 593 F.3d 226, 231 (2d Cir. 2010).  In this instance, there is no evidence now before the court to establish that a motion to vacate petitioner's judgment of conviction pursuant to section 440.10 was ever filed with the trial court.  Accordingly, petitioner is not entitled to the benefit of the tolling provision set forth in section 2244(d)(2).  *Goedeke v. McBride*, 437 F. Supp.2d 590, 595-96 (S.D.W. Va. 2006) (submission of a partially completed state habeas petition to the trial judge which was not docketed does not constitute a "properly filed" state court proceeding within the meaning of section 2244(d)(2)); *Harvey v. People of the City of New York*, 435 F.Supp.2d 175, 178-79 (E.D.N.Y. 2006) (petitioner's unsubstantiated claim of having filed a post-conviction motion not appearing on the official state court records was not properly filed and hence did not serve to toll the limitations period under section 2244(d)(2)).

C.   Equitable Tolling

To overcome the apparent untimeliness of his petition, Fleegle could ostensibly attempt to invoke equitable tolling.  Equitable tolling, however, applies "only in the 'rare and exceptional circumstance[ ].' " *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (quoting *Turner v. Johnson*, 177

F.3d 390, 391-92 (5th Cir.1999)) (alteration in original); *see also Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004) (citing *Smith*); *Corrigan v. Barbery*, 371 F.Supp.2d 325, 330 (W.D.N.Y. 2005) (citing *Smith*); *Austin v. Duncan*, 2005 WL 2030742, at *3 (N.D.N.Y. 2005) (citing *Smith*).  When applied in habeas corpus settings, it has been held that equitable tolling of the AEDPA's statute of limitations is only available when "extraordinary circumstances" prevent a prisoner from filing a timely habeas petition. *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 1814 (2005) (citation omitted); *see also Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir. 2000) (quoting *Smith*, 208 F.3d at 17); *Menefee*, 391 F.3d at 154; *Spaulding v. Cunningham*, No. 04-CV-2965, 2005 WL 1890398, at *3 (E.D.N.Y. Aug. 4, 2005); *Agramonte v. Walsh*, 00CV892, 2002 WL 1364086, at *1 (E.D.N.Y. June 20, 2002).  "To merit application of equitable tolling, the petitioner must demonstrate that he acted with reasonable diligence during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances beyond his control prevented successful filing during that time."  *Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir. 2001) (internal quotation and citation omitted), *cert. denied*, 535 U.S. 1017, 122 S.Ct. 606 (2002); *see also Warren*, 219 F.3d

at 113 (citing *Smith*); *West v. Hamill*, No. 04-CV-2393, 2005 WL 1861735, at *1 (E.D.N.Y. Aug. 1, 2005) (citing *Smith*)

This is not a case in which unfair and unusual circumstances warranting invocation of the equitable tolling doctrine are presented. Fleegle nowhere alleges that he was precluded from filing a timely petition based upon actions or circumstances beyond his control. I therefore recommend against a finding of equitable tolling in this instance.

D.   Actual Innocence

Another potentially available exception to the one-year statute of limitations involves a claim of actual innocence. The Second Circuit has not yet staked out a formal position regarding whether the United States Constitution requires that an "actual innocence" exception be engrafted into the AEDPA's statute of limitations. *See Whitley v. Senkowski,* 317 F.3d 223, 225 (2d Cir. 2003); *Warren v. Artus*, Nos. 9:05 CV 1032, 2007 WL 1017112, at *9 (N.D.N.Y. Mar. 30, 2007( (Kahn, D.J. & Peebles, M.J.). That court has nonetheless directed that district courts consider the claim of actual innocence before dismissing a habeas petition as untimely. *Id.; see also Menefee,* 391 F.3d at 161. A showing of actual innocence requires more than merely arguing that the jury's finding of guilt is against

17

the weight of the evidence; to establish actual innocence, a petitioner must

present "new reliable evidence that was not presented at trial and show

that it is more likely than not that no reasonable juror would have found him

[or her] guilty beyond a reasonable doubt. *Whitley,* 317 F.3d at 225; *see*

*also Medina v. McGinnis*, No. 04 Civ 26, 2004 WL 2088578 at *27

(S.D.N.Y. Sept. 20, 2004).

Among the submissions filed with the court by Fleegle in support of

his petition is an affidavit from an individual identified as Kindra Purser, in

which she asserts that in the summer of 2003 E.V., the victim's brother,

stated that the victim had "made up the stories about petitioner [having

sexually abused her]".  See Amended Petition (Dkt. No. 7  p. 11),

Attachment. As presented, that statement constitutes double hearsay, and

it is unlikely that the trial court would have permitted Ms. Purser, who was

not a witness at trial, to testify concerning the matters stated in her

affidavit.  While it is arguable that the statement made by the victim could

constitute a declaration against interest, given that it plainly contradicts

sworn testimony given during the course of the trial, there does not appear

to be any hearsay exception that would apply to the statement made by the

victim's brother to the affiant and permit the affiant to testify regarding it at

18

trial.

This notwithstanding, in light of the proffered affidavit and the claim that the victim's testimony was perjured, I have reviewed the record in this case with an eye toward determining the strength of the prosecution's case against the petitioner and whether, armed with this information, a reasonable juror could probably reach a verdict of guilty. *Menefee*, 391 F.3d at 163. As the Appellate Division noted, the evidence at trial included detailed testimony of the victim regarding the acts giving rise to petitioner's conviction, as well as testimony from both the victim and her brother describing the abusive behavior and threatening atmosphere existing within the household with Fleegle present.

During her testimony the victim described in detail the events occurring on August 14, 1995, when the petitioner forcibly engaged in sex with her, and told her that he was a Vietnam veteran and could kill anybody with his two hands. TT 343-46, 362. The victim also described in detail the incidents occurring on December 20, 1996 when petitioner, at the time fifty-four years old, engaged in forcible sexual contact with the fifteen year old victim. TT 288, 355-62, 389. Petitioner similarly described the events of December 15, 1997, involving another incident of forcible sexual contact

19

and the petitioner confiding in the victim that he would kill her and her brother if she ever told anybody, *see* TT 358-62, and of December 22, 1997, involving another rape.  TT 360-62.

In addition to testifying in detail regarding these incidents, the victim was able to provide additional facts permitting at least a certain degree of corroboration.  During her testimony, the victim described the petitioner's penis as being circumcised, and stated that he has a mole in his lower private area, one which cannot be seen when he has his pants on.  TT 354.  These facts were confirmed through the testimony of petitioner's wife, who also testified that she had never discussed petitioner's private anatomy with the victim.  TT 394-95.  The victim also testified that during the course of the incident on December 22, 1997 the petitioner was wearing a pinkish colored spiked ring around his penis, while having sexual intercourse with her.  TT 361.  Once again the petitioner's ownership and use of such a ring was corroborated by the petitioner's wife, who indicated that Fleegle had purchased the ring at a sex shop.  TT 395.

In the face of this evidence, and notwithstanding the affidavit submitted in support of his petition, I find that Fleegle has failed to establish a credible claim of actual innocence.  I therefore recommend

against a finding that all or a portion of intervening period between the date

his conviction became final and the filing of his petition in this matter be

tolled on this basis.

    E.    <u>Certificate of Appealability</u>

In order for a state prisoner to appeal a final order denying habeas

relief, he or she must receive a certificate of appealability ("COA"). 28

U.S.C. § 2253(c)(1)(A); *see also* Fed. R. App. P. 22(b) ("unless a circuit

justice or a circuit or district judge issues a certificate of appealability under

28 U.S.C. § 2253(c)", an appeal may not be taken from the denial of a

habeas petitioner under section 2254). A COA may only issue "if the

applicant has made a substantial showing of the denial of a constitutional

right." 28 U.S.C. § 2253(c)(2).

In a case such as this, where dismissal of a petition is based on a

procedural ground, a petitioner is eligible for a COA upon a showing "that

jurists of reason would find it debatable whether the petition states a valid

claim of the denial of a constitutional right, and that jurists of reason would

find it debatable whether the district court was correct in its procedural

ruling." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604

(2000); *see also Bethea*, 293 F.3d, 577-78. As can be seen, this standard

is comprised of two prongs, one of which is directed on the constitutional claims set forth in the petition, while the other focuses upon the basis for the court's procedural holding. *Slack,* 529 U.S. at 484-85, 120 S.Ct. at 1604.

The court is unable to address the strength of petitioner's ineffective assistance argument, based largely upon the fact that Fleegle's petition does provide meaningful illumination regarding that ground. *See* Amended Petition (Dkt. No. 7) ¶ 153. The ineffective assistance of counsel argument raised to the Appellate Division, however, provides some potential insight into the potential claim. None of the actions of counsel cited in support of that claim appear to be sufficiently egregious to meet the prevailing standard under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In any event, I am convinced that reasonable jurists could not disagree over the application of the one-year statute of limitations and the resulting finding that Fleegle's petition is time-barred. Accordingly, I recommend against the issuance of a certificate of appealability in this case.

IV.   SUMMARY AND RECOMMENDATION

The petition in this matter was filed significantly beyond expiration of

22

the one-year governing statute of limitations under the AEDPA.  Having

concluded that there is no basis to find tolling of any of the period between

when petitioner's conviction became final and the filing of his petition, it is

therefore hereby respectfully

RECOMMENDED that the petition in this matter is DISMISSED as

untimely; and it is further

RECOMMENDED, based upon my finding that Fleegle has not made

a "substantial showing of the denial of a constitutional right" pursuant to 28

U.S.C. § 2253(c)(2), that a certificate of appealability not issue with respect

to any of the claims set forth in his petition.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court within FOURTEEN days of service of this report.

 FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

23

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     August 5, 2010
           Syracuse, NY



Not Reported in F.Supp.2d, 2008 WL 850594 (N.D.N.Y.)
(Cite as: 2008 WL 850594 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Patrick TRACY, Plaintiff,
v.
Patrick J. FRESHWATER; Peter Meskill, Tompkins
County Sheriff, and the Tompkins County Sheriff's
Department, Defendants.
No. 5:01-CV-0500(NPM/GHL).

March 28, 2008.

Patrick Tracy, Terre Haute, IN, pro se.

County of Tompkins, Jonathan Wood, County Attorney,
of Counsel, Ithaca, NY, for Defendants.

MEMORANDUM DECISION AND ORDER

NEAL P. McCURN, Senior District Judge.

*1 On July 31, 2007, this Court FN1 issued an Order
granting summary judgment in favor of Defendants.
Plaintiff, proceeding *pro se,* now moves for
reconsideration of or relief from that decision under
Federal Rule of Civil Procedure 59(e).

> FN1. By order (Dkt. No. 176) dated March 28,
> 2008, this case. previously assigned to Senior
> Judge Howard G. Munson, was reassigned to
> Senior Judge Neal P. McCurn.

First, the court needs to determine if this motion has been
properly presented under Fed.R.Civ.P. 59(e)-"[m]otion to
alter or amend judgment-or Fed.R.Civ.P. 60(b)"[r]elief

from judgment or order". The Second Circuit Court of
Appeals has long held that a post-judgment motion made
within 10 days of entry of judgment that seeks
reconsideration of matters properly encompassed within a
decision on the merits is a motion under Rule 59(e). *Jones
v. UNUM Life Insurance Co. of America,* 223 F.3d 130,
137 (2d Cir.2000). "[M]otions filed after the 10-day
period, no matter how styled, are to be treated as Rule
60(b)(1) motions seeking relief from the judgment.
*Feldberg v. Quechee Lakes Corp.,* 463 F.3d 195, 198-99
(2d Cir.2006). The docket sheet in the instant case shows
that Defendants' motion for summary judgment was
granted on July 31, 2007, and Plaintiff's present Rule 59e
motion was filed on August 20, 2007. While these entries
clearly indicate that Plaintiff's motion was not timely filed,
nevertheless, the prison mail box rule provided a timely
filing of Plaintiff's motion.

The prison mailbox rule provides that a *pro se* inmate's
motion is deemed filed on the date it is given to prison
officials. *Houston v. Lack,* 487 U.S. 266, 276, 108 S.Ct.
2379, 101 L.Ed.2d 245 (1988) (establishing the prison
mailbox rule) In cases where it is unclear when the inmate
gave his petition to prison officials, courts have assumed
that the petitioner submitted the petition on the same date
it was purportedly signed and dated. *Porter v. Greiner,*
2005 WL 3344828, at *7 (E.D.N.Y. Nov. 18, 2005);
*Corrigan v. Barbery,* 371 F.Supp.2d 325, 328 n. 4
(W.D.N.Y.2005); *Pack v. Artuz,* 348 F.Supp.2d 63, 66 n.
2 (S.D.N.Y.2004). The rule is premised on the *pro se*
inmate's lack of control-his dependence on the prison mail
system and lack of counsel to assure timely filing with the
court. *Garraway v. Broome County,* 2006 WL 931729, at
*3 (N.D.N.Y. Apr. 7, 2006).

Plaintiff's proof of service document was sworn to, signed
by Plaintiff on July 13, 2007, placed in a First Class
postage paid correctly addressed envelopes and placed in
the institutional mail box at his correctional institution.
The ten day time limit for filing a Rule 59(e) motion had
not expired on that date because the intermediate
Saturdays and Sundays are excluded where the time period
allowed is less than eleven days. (Rule 6(a) Fed.R.Civ.P.
Ergo, Plaintiff's Rule 59(e) motion was timely filed.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 850594 (N.D.N.Y.)
(Cite as: 2008 WL 850594 (N.D.N.Y.))

While some courts hold that a Rule 59(e) motion to alter or amend the judgment can be brought only after a trial, "[m]ost courts, however, including those in this circuit, allow a motion to amend a grant of summary judgment to be brought under Rule 59(e)." *Patel v. Lutheran Medical Center, Inc.,* 775 F.Supp. 592, 596 (E.D.N.Y.1991)

**\*2** Rule 59(e) is not an appropriate vehicle for a party dissatisfied with a court's ruling to secure a rehearing on the merits with respect to issues already decided, *USA Certified Merchants, LLC v. Koebel,* 273 F.Supp.2d 501, 503 (S.D.N.Y.2003); *Griffin Industries, Inc. v.. Petrojam, Ltd.,* 72 F.Supp.2d 365, 368 (S.D.N.Y.1999), or to advance " 'new facts, issues or arguments not previously presented to the court.' " *Wechsler v. Hunt Health Systems, Ltd.,* 186 F.Supp.2d 402, 410 (S.D.N.Y.2002). In other words, "[a] party seeking reconsideration 'is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings.' " *Polsby v. St. Martin's Press, Inc.,* 2000 WL 98057, at \*1 (S.D.N .Y. Jan. 18, 2000). Thus, Rule 59(e) should be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court," *Williams v. New York City Department of Corrections,* 9 F.R.D. 78, 83 (S.D.N.Y.2003), and "to prevent the rule from being used as a substitute for appealing a final judgment." *USA Certified Merchants,* 273 F.Supp.2d at 503.

"Reconsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.' " *Montanile v. National Broadcasting Company,* 216 F.Supp.2d 341, 342 (S.D.N.Y.2002) (quoting In re *Health Management Systems Inc. Securities. Litigation.,* 113 F.Supp.2d 613, 614 (S.D.N.Y.2000)).

In his motion for reconsideration, Plaintiff does not assert that this court overlooked or misapplied any controlling legal authority. Rather, he seeks to relitigate the same issues presented to this court before when he objected to the Magistrate Judge's Report and Recommendation. The strict requirements for reconsideration under Rule 59(e) are specifically designed to preclude this type of

reargument. *Sutherland v. New York State Department of Law,* 1999 WL 600522, at \*1 (S.D.N.Y. Aug. 10, 1999), "A Rule 59(e) motion is a not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved."

Accordingly, the Plaintiff's motion for reconsideration is denied.

It is so ORDERED:

N.D.N.Y.,2008.
Tracy v. Freshwater
Not Reported in F.Supp.2d, 2008 WL 850594 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2030742 (W.D.N.Y.)
(Cite as: 2005 WL 2030742 (W.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Derrel AUSTIN aka Derrel Moore, 96-B-0336
Petitioner,
v.
George DUNCAN, Superintendent, Great Meadow
Correctional Facility, Respondent.
**No. 02-CV-0732S(SC).**

Aug. 23, 2005.

Derrel Austin, Alden, NY, pro se.

Steven Meyer, Erie County District Attorney's Office,
Buffalo, NY, for Respondent.

DECISION AND ORDER

SKRETNY, J.

*BACKGROUND*

**\*1** Petitioner Derrel Austin ("Austin"), acting *pro se,*
seeks relief pursuant to 28 U.S.C. § 2254,FN1 alleging that
his conviction in Supreme Court, Erie County, State of
New York, on October 27, 1995, was unconstitutionally
obtained and that he received an excessive sentence.
Austin's conviction and sentence were affirmed by the
New York Supreme Court Appellate Division, Fourth
Department on March 13, 1998,FN2 and leave to appeal
was denied by the New York Court of Appeals on June 18,
1998.FN3

FN1. Austin's *habeas corpus* petition was filed

on October 15, 2002 (Docket No. 1).

FN2. *People v. Austin,* 248 A.D.2d 968, 670
N.Y.S.2d 157 (4th Dep't 1998). In its decision
affirming petitioner's conviction, the Appellate
Division held that no prejudicial error had
occurred at trial and petitioner's sentence was not
excessive:

[D]efendant contends that Supreme Court
erred in permitting the prosecutor to
cross-examine him regarding his involvement
in a homicide for which he was not charged
that occurred after the crimes for which he was
on trial. While the prosecutor has the right to
impeach defendant's credibility with
contradictory statements concerning other
criminal activity, the prosecutor must be
cautious not to prejudice defendant's right to a
fair trial. Under the facts of this case and in
light of the overwhelming proof of defendant's
guilt, we conclude that reversal is not required
in this instance (*see, People v. Crimmins,* 36
N.Y.2d 230, 242, 367 N.Y.S.2d 213, 326
N.E.2d 787 (1975)).

The sentence is not unduly harsh or severe ...
(*see,* CPL 470.15[6][b] ). We have examined
defendant's remaining contentions and
conclude that they are without merit.

FN3. *People v. Austin,* 92 N.Y.2d 857, 677
N.Y.S.2d 77 (1998) (Table).

By Order of this Court, filed October 23, 2002 (Docket
No. 3), Austin was advised that his petition appeared
untimely and was directed to file information addressing
the issue of timeliness under 29 U.S.C. § 2244(d)(1),
which imposes a one-year statute of limitations on the
filing of § 2254 *habeas* petitions. The limitations period
is counted from-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2030742 (W.D.N.Y.)
(Cite as: 2005 WL 2030742 (W.D.N.Y.))

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the [United States] Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. §§ 2244(d)(1) and (2), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or the "Act"), Pub.L. No. 104-132, 110 Stat. 1214, effective April 24, 1996.

On November 5, 2002, petitioner filed his response (Docket No. 4). The Court found that petitioner had failed to provide sufficient information to make a determination on timeliness and, because petitioner is *pro se*, allowed him to file an additional response explaining the reasons for his delay in appealing the state court's denial of a collateral attack on his conviction (Docket No. 5).

Petitioner filed his additional response on December 16, 2002 (Docket No. 6) and, by Order filed on December 20, 2002, the Court deemed the petition timely under 28 U.S.C. § 2244(d)(1). The Order does not state whether the petition, which is untimely on its face, was "deemed

timely" based upon an application of statutory tolling under § 2244(d)(2), or equitable tolling.

Respondent filed an answer and memorandum of law on January 30, 2003, arguing that the petition must be denied because of untimeliness and on other grounds (Docket Nos. 8 and 9).

**\*2** It is well established that a district court's interlocutory orders and rulings are subject to modification by the court at any time prior to final judgment. *In re United States,* 733 F.2d 10, 13 (2d Cir.1984). This Court has examined respondent's timeliness arguments and Austin's submissions and, as explained fully below, now finds that the petition must be dismissed as untimely.

*DISCUSSION*

As already noted, Austin's application for leave to appeal to the New York Court of Appeals was denied on June 18, 1998. Thus, his conviction became final on September 16, 1998, the day on which his time to seek direct review by writ of certiorari to the United States Supreme Court expired. *Walker v. Artuz,* 208 F.3d 357, 358 (2d Cir.2000), *rev'd on other grounds sub nom. Duncan v. Walker,* 533 U.S. 167, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). Austin did not file this *habeas corpus* petition until October 15, 2002, over four years after his conviction became final. On its face, then, the petition was filed well beyond the one-year statute of limitations period established by the AEDPA. However, the limitations period is tolled for the time during which a properly filed application for State post-conviction or other collateral review is pending, 28 U.S.C. § 2244(d)(2), and may be equitably tolled in the rare and exceptional circumstance. *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.2000) (quoting *Turner v. Johnson,* 177 F.3d 390, 391-92 (5th Cir.), *cert. denied,* 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 389 (1999)). Therefore, the timeliness of the petition depends, in the first instance, on the extent to which any post-conviction applications or motions tolled the statute of limitations.

On April 6, 1999, Austin filed a N.Y. CRIM. PROC. LAW § 440.10 motion to vacate his conviction. The 201

Not Reported in F.Supp.2d, 2005 WL 2030742 (W.D.N.Y.)
(Cite as: 2005 WL 2030742 (W.D.N.Y.))

days that elapsed between Austin's conviction becoming final and his filing of the § 440.10 motion are not subject to tolling because no properly filed application for post-conviction or other collateral review was pending during that period. Statutory tolling did commence with Austin's filing of his § 440.10 motion, which was subsequently denied by the Fourth Department on May 26, 2000. Austin had 30 days thereafter in which to file an application seeking leave to appeal, but did not do so. Thus, the limitations period was tolled from April 6, 1999 through June 26, 2000.[FN4] Bennett v. Artuz, 199 F.3d 116, 120 (2d Cir.1999) (holding that, under 28 U.S.C. § 2244(d)(2), a state-court application "is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures"), aff'd, 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000).

> FN4. The 30 days expired on June 25, 2000, a Sunday, thereby affording Austin one additional day to seek leave.

Austin then had 164 days remaining on the one-year limitations period, which expired on December 7, 2000. No further state-court application for post-conviction or other collateral review was filed prior to the expiration of the limitations period. Austin's habeas petition, which was not filed until October 15, 2002, is therefore untimely.[FN5]

> FN5. In August 2001, prior to filing his habeas petition, Austin requested an extension of time to appeal the denial of his § 440.10 motion, which request was granted on November 9, 2001. Austin sought leave to appeal on or about December 5, 2001, and leave was denied on June 19, 2002. While the Court acknowledges this further post-conviction proceeding, we note that the time in which to seek habeas relief had expired some eight months prior and any tolling attendant to this further proceeding is of no effect. See Bethea v. Girdich, 293 F.3d 577, 578-79 (2d Cir.2002) (neither state-court applications for collateral relief nor motions to extend the time to appeal can "restart" the AEDPA limitations period) (citations omitted).

*3 Austin contends that the Court should consider his petition despite its statutory untimeliness because: (1) the requirements of state exhaustion made it impossible for him to submit his habeas petition sooner; (2) he lacked education and knowledge; (3) he was confined to his cell without access to the facility's law library; (4) he was arrested at the age of 16; and (5) he is actually innocent (Docket Nos. 4 and 6).

Equitable tolling, such as is urged by Austin, is applied by the courts only in "rare and exceptional" circumstances where judged necessary as a matter of fairness. Smith, 208 F.3d at 17-18. The mere existence of extraordinary circumstances is not sufficient; those circumstances must have actually prevented the petitioner from filing his habeas petition on time. Valverde v. Stinson, 224 F.3d 129, 133 (2d Cir.2000) (citation omitted), cert. denied, 536 U.S. 925, 122 S.Ct. 2593, 153 L.Ed.2d 782 (2002). In addition, a party seeking equitable tolling must have acted with reasonable diligence throughout the period he seeks to toll. Smith, 208 F.3d at 17. The burden is on the petitioner to demonstrate that he has met the high standard required before the Court may consider applying equitable tolling. Hizbullahankhamon v. Walker, 255 F.3d 65, 75 (2d Cir.2001), cert. denied, 536 U.S. 925, 122 S.Ct. 2593, 153 L.Ed.2d 782 (2002) ("[P]etitioner [must] 'demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances.' ") (quoting Valverde, 224, F.3d at 134).

Here, Austin has not identified any "extraordinary circumstance" which made it impossible to file his petition within the one-year time period. His claims are discussed seriatim.

(1) There was no way possible for me to have submitted petition any sooner ... without running the risk of being barred for failing to first exhaust my state remedies.... (Docket No. 4)

Statutory tolling expressly permits the exhaustion of state remedies without time penalty and this assertion fails to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2030742 (W.D.N.Y.)
(Cite as: 2005 WL 2030742 (W.D.N.Y.))

present a colorable argument, much less an extraordinary circumstance. *Smith,* 208 F.3d at 17 (the proper calculation of § 2244(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending).

(2) With my seventh grade education, I had no way of knowing I had to appeal this judgment in order to exhaust my state remedies. (Docket No. 6)

Austin's level of education, a circumstance shared by many inmates, is not a rare and exceptional one that would justify the application of equitable tolling. *Francis v. Miller,* 198 F.Supp.2d 232, 235 (E.D.N.Y.2002) (noting that limited education, ignorance of the law and legal procedure, lack of funds, limited access to legal assistance, and limited use of the prison library are not so "exceptional" as to merit equitable tolling); *Fennell v. Artuz,* 14 F.Supp.2d 374, 377 (S.D.N.Y.1999) (the "excuse" of being uneducated and unfamiliar with legal research and legal procedures does not warrant equitable tolling since virtually all inmates can make the same claim).

**\*4** (3) When I received the [May 26, 2000] judgment I was confined to my cell and denied access to the facilities [sic] law library.... Upon being released from confinement I was able to once again properly access the facility law library where I found out I couldn't proceed to the Federal courts because I failed to appeal my judgement [sic] of my 440 motion. (Docket No. 6)

Although Austin had two opportunities to provide the Court with information as to why his petition should not be dismissed as untimely, he did not specify the amount of time he was confined to his cell, nor did he otherwise indicate how this confinement prevented him from timely filing his petition. Austin does not claim to have been deprived of all access to legal materials during cell confinement, but only access to the law library. Moreover, because he provided no information about the duration of his cell confinement, Austin has not demonstrated that he acted with reasonable diligence to pursue his claims once he was returned to standard confinement.

"In general, the difficulties attendant on prison life, such as transfers between facilities, solitary confinement, lockdowns, restricted access to the law library, and an inability to secure court documents, do not by themselves qualify as extraordinary circumstances." *Corrigan v. Barbery,* 371 F.Supp.2d 325, 330 (W.D.N.Y.2005) (citations omitted); *see also, Francis,* 198 F.Supp.2d at 235. Austin has not identified the existence of circumstances outside the "difficulties attendant on prison life" and equitable tolling is not warranted.

(4) I was arrested at the age of 16 yrs. old, everything I know I learned in prison.... When I was 16 I had no way of knowing the seriousness of this case.... (Docket No. 6)

Youth alone is not sufficient to demonstrate that Austin was hampered or hindered in his ability to file a timely petition. *Minnifield v. Gomez,* 3:01CV1396, 2004 U.S. Dist. LEXIS 5513, at *7-8 (D.Conn. Mar. 29, 2004) ("The mere fact that a person is sixteen or seventeen years of age is not an extraordinary impediment to filing a timely petition in federal court."), *aff'd,* 2005 U.S.App. LEXIS 10492 (2d Cir. June 6, 2005).

Austin was arrested in 1994. This means that when his judgment became final on June 18, 1998, he was at least nineteen, and perhaps twenty, years old. Austin offers no explanation as to how his age then prevented him from determining that he had until December 7, 2000 to file a timely *habeas* petition. In short, Austin has not established the existence of an extraordinary circumstance that would warrant equitable tolling.

(5) I'm here for a crime I didn't commit [sic] and can prove it *now* if I'm given a chance. (Docket No. 6)

A district court faced with an untimely petition "in which the petitioner asserts his or her actual innocence [must first] determine, in each case, whether the petitioner has presented a credible claim of actual innocence before ruling on the legal issues" of equitable tolling and reasonable diligence. *Doe v. Menefee,* 391 F.3d 147, 161 (2d Cir.2004) (*citing Whitley v. Senkowski,* 317 F.3d 223, 225 (2d Cir.2003)). Under the demanding standard established by the United States Supreme Court, a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2030742 (W.D.N.Y.)
(Cite as: 2005 WL 2030742 (W.D.N.Y.))

petitioner seeking tolling based on actual innocence "must support his claim 'with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." ' *Menefee,* 3391 F.3d at 161 (*quoting Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)).

**\*5** Austin has not advanced *any* evidence in support of his conclusory assertion of actual innocence and therefore cannot obtain equitable tolling on this basis.

### CONCLUSION

The petition is untimely and the Court finds no merit in petitioner's arguments in support of equitable tolling. Accordingly, the petition is dismissed. In addition, because the issues raised here are not the type of issues that a court could resolve in a different manner, and because these issues are not debatable among jurists of reason, the Court concludes that petitioner has failed to make a substantial showing of the denial of a constitutional right, 28 U.S.C. § 2253(c)(2), and accordingly the Court denies a certificate of appealability.

The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with the United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

### ORDER

IT HEREBY IS ORDERED, that the petition is

DISMISSED;

FURTHER, that a certificate of appealability is DENIED;

FURTHER, that leave to appeal as a poor person is DENIED; and

FURTHER, that the Clerk of this Court is directed to take the necessary steps to close this case.

SO ORDERED.

W.D.N.Y.,2005.
Austin v. Duncan
Not Reported in F.Supp.2d, 2005 WL 2030742 (W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 1890398 (E.D.N.Y.)
(Cite as: 2005 WL 1890398 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne SPAULDING, Petitioner,
v.
Raymond J. CUNNINGHAM, Superintendent,
Respondent.
**No. 04-CV-2965.**

Aug. 4, 2005.

Wayne Spaulding, Woodbourne, NY, pro se.

Danielle L. Attias, Michelle Maerov, Luke Martland, NYS Office of the Attorney General, New York, NY, New York State Attorney Generals Office, Queens County District Attorneys Office, for Respondent.

MEMORANDUM AND ORDER

DEARIE, J.

**\*1** Petitioner *pro se* seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons stated in respondent's opposition papers and set forth below, the petition is untimely and is dismissed.

Background

On May 30, 1995, petitioner entered Leroy Wilkenson's home without permission, brandishing a gun. Petitioner bound and gagged Wilkenson, threatened to kill him and robbed him of money and jewelry. Wilkenson recognized petitioner because several years earlier petitioner had done tiling work in Wilkenson's kitchen. Wilkenson identified petitioner from a single photograph taken after petitioner's arrest. Petitioner was convicted after a jury trial of first degree robbery and second degree unlawful imprisonment.

On June 28, 1996, petitioner was sentenced to an indeterminate term of imprisonment of eight and one-third to twenty-five years for robbery and one year for unlawful imprisonment, to run concurrently. In October 1999, petitioner appealed. He argued that he was arrested without probable cause, the identification procedure was unduly suggestive, the evidence was insufficient and the sentence was excessive. On April 3, 2000, the conviction was affirmed. *See People v. Spaulding,* 271 A.D.2d 463, 705 N.Y.S.2d 392 (N.Y.App.Div.2000). Petitioner's request for leave to appeal to the New York Court of Appeals was denied on July 17, 2000. *See People v. Spaulding,* 95 N.Y.2d 858, 714 N.Y.S.2d 9, 736 N.E.2d 870 (N.Y.2000). Petitioner did not file a petition for a writ of certiorari to the Supreme Court.

On July 3, 2002, petitioner filed a motion for a writ of error *coram nobis* in the Appellate Division. He claimed that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for not informing petitioner of his right to be present at sidebar conferences during jury selection. On October 7, 2002, the motion was denied. *People v. Spaulding,* 298 A.D.2d 414, 751 N.Y.S.2d 404 (N.Y.App.Div.2002). Leave to appeal was denied on January 30, 2003. *People v. Spaulding,* 99 N.Y.2d 585, 755 N.Y.S.2d 721, 785 N.E.2d 743 (N.Y.2003).

On November 12, 2002, petitioner moved in the Appellate Division to renew and reargue his application for a writ of error *coram nobis* based on information received on September 16, 2002 in response to Freedom of Information Act ("FOIL") requests that, according to petitioner, supported an additional claim of ineffective assistance of appellate counsel. Petitioner contended that had appellate counsel adequately reviewed the pre-trial hearing minutes, police reports, and trial transcripts, he would have raised a claim of ineffective assistance of trial counsel for counsel's failure to adequately address discrepancies between trial testimony and police reports with respect to whether the victim gave one of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1890398 (E.D.N.Y.)
(Cite as: 2005 WL 1890398 (E.D.N.Y.))

investigating detectives petitioner's business card. Specifically, petitioner argued that trial counsel was ineffective for failing to recognize and argue that the prosecution elicited false testimony with respect to receipt of the business card, failing to request a missing witness charge with respect to the investigating detective who testified only at the pre-trial hearing about the business card, and failing to object to the admission of hearsay testimony regarding the police investigation. Petitioner's motion was denied on February 19, 2003. He applied for leave to appeal the denial, and the application was dismissed by the Court of Appeals on April 11, 2003. His application for reconsideration was denied on May 22, 2003. On May 5, 2003, petitioner moved in the Appellate Division to reargue the denial of his motion to reargue. That application was denied on August 11, 2003.

**\*2** On September 29, 2003, petitioner brought a motion pursuant to New York Criminal Procedure Law § 440 to vacate his conviction, raising the same ineffective assistance of trial counsel claims underlying his application to renew and reargue his motion for a writ of error *coram nobis.* On February 2, 2004, petitioner's motion was denied as procedurally barred. In the alternative, the court found the claims meritless, noting that the Appellate Division also had rejected petitioner's claims.

The instant petition is dated May 19, 2004 and was received by the Court on May 26, 2004. Petitioner largely raises the same ineffective assistance of appellate counsel claim he raised in state court. In addition, petitioner argues that the Appellate Division wrongly denied his request to submit a *pro se* supplemental brief on direct appeal that would have included claims that the indictment was defective and that the trial court failed to properly instruct the jury on each element of the offense.

Discussion

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), effective April 24, 1996, created a one-year statute of limitations period for filing a petition for a writ of habeas corpus. 28 U.S.C. § 2244(d)(1). Generally, the one year period runs from the date the challenged state conviction becomes final. *See* 28 U.S.C.

§ 2244(d)(1)(A). Petitioner's conviction became final upon the expiration of the 90 day period for seeking a writ of certiorari from the July 17, 2000 decision of the New York Court of Appeals denying leave to appeal. *See Williams v. Artuz,* 237 F.3d 147, 150-51 (2d Cir.2001). Thus, the statute of limitations began to run in October of 2000. Absent tolling, the period expired in October of 2001, and the petition is untimely by over two and one-half years.

Pursuant to 28 U.S.C. § 2244(d)(2), "[t]he time during which a properly filed application for State post-conviction or other collateral review ... is pending shall not be counted" against the limitations period. Petitioner's many post-conviction applications were all filed after the statute of limitations period expired in October 2001. As a result, none of them tolled the limitations period. *See Smith v. McGinnis,* 208 F.3d 13, 16-17 & n. 2 (2d Cir.2000) (time during which state applications are pending is excluded, but pending applications do not reset start of limitations period).

As respondent fully addresses, any argument that the one-year limitation period began to run later than October of 2001 because of petitioner's claims of newly discovered evidence in the FOIL documents fails. *See* 28 U.S.C. § 2244(d)(1)(D) ("limitation period shall run from the latest of ... the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence"). Specifically, petitioner contends that the FOIL documents contained newly discovered evidence that false testimony was elicited regarding an investigating detective's receipt of petitioner's business card, thereby supporting his claim that appellate counsel was ineffective for failing to raise an ineffective assistance of trial counsel claim. As respondent points out, the documents petitioner relies on existed in June of 1995, and petitioner offers no explanation for not requesting them before March 2002.

**\*3** Courts may equitably toll the limitations period only in the "rare and exceptional circumstance." *Smith,* 208 F.3d at 17. To be entitled to equitable tolling, a petitioner must "show that extraordinary circumstances prevented him from filing his petition on time." *Id.* (citation omitted). Petitioner claims that his delay in filing was due to his lack of legal expertise, his *pro se* status, and his focus on filing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1890398 (E.D.N.Y.)
(Cite as: 2005 WL 1890398 (E.D.N.Y.))

state post-conviction motions. These do not constitute "extraordinary circumstances." *See, e.g., id.* at 18 (neither exhaustion of state remedies nor *pro se* status warrants equitable tolling).

In reply to respondent's opposition, petitioner asserts simply that "by his arguments [he] raises an issue of [a]ctual [i]nnocence." (Traverse at ¶ 6.) Whether "constitutional considerations require an actual innocence exception to the AEDPA's statute of limitations," *Whitley v. Senkowski,* 317 F.3d 223, 225 (2d Cir.2003), remains an open question in the Second Circuit. *See Doe v. Menefee,* 391 F.3d 147, 161 (2d Cir.2004). Petitioner has not presented a credible claim of actual innocence. Therefore, the Court need not address the issue. *Id.* Accordingly, the petition is dismissed as untimely.

Conclusion

For the reasons stated above, the application for a writ of habeas corpus is denied, and the petition is dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue. In addition, this Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

E.D.N.Y.,2005.
Spaulding v. Cunningham
Not Reported in F.Supp.2d, 2005 WL 1890398 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 1364086 (E.D.N.Y.)
(Cite as: 2002 WL 1364086 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
Ricardo AGRAMONTE, Petitioner,
v.
James J. WALSH, Respondent.
**No. 00 CV 892(NG).**

June 20, 2002.

Before Judge NINA GERSHON.

ORDER

GERSHON, J.

**\*1** Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 dated February 5, 2000. By order dated April 5, 2000, I dismissed the petition as untimely under 28 U.S.C. § 2254(d)(1) because, even tolling the time that state relief applications were pending, *see Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.), *cert. denied,* 531 U.S. 840 (2000), petition did not file his petition for a writ of habeas corpus until three years and two and a half months after his conviction became final. The Court of Appeals for the Second Circuit remanded the case to allow petitioner notice and an opportunity to be heard with regard to the timeliness of his petition in light of *Acosta v. Artuz,* 221 F.3d 117 (2d Cir.2000). Petitioner now has been provided the opportunity to show why his petition should not be dismissed as untimely, but petitioner has failed to demonstrate that the one year limitation period in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d)(1), should be equitably tolled.

Equitable tolling applies only in "rare and exceptional circumstances." *Smith,* 208 F.3d at 17. In order to equitably toll AEDPA's one year limitation period, a petitioner "must show that extraordinary circumstances prevented him from filing his petition on time. In addition, the party seeking equitable tolling must have acted with reasonable diligence throughout the period he seeks to toll." *Id.* The term "prevented" requires the petitioner to "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Hizbullahankhamon v. Walker,* 255 F.3d 65, 75 (2d Cir.2001), *cert. denied,* 2002 WL 1306135 (June 17, 2002); *Valverde v. Stinson,* 224 F.3d 129, 134 (2d Cir.2000).

First, petitioner's claim that the "loss" of his legal papers justifies equitable tolling lacks merit. The Court of Appeals for the Second Circuit has held that the confiscation of a prisoner's only draft habeas corpus petition and related papers by corrections officers shortly before the end of AEDPA's period of limitation may justify equitable tolling. *See Valverde,* 224 F.3d at 133. Here, petitioner makes no claim that his papers were intentionally confiscated; he claims that they were lost through negligence. More importantly, he does not claim that the loss occurred shortly before the end of the one year time period. On an Inmate Grievance Complaint form, petitioner indicates that his legal papers were lost in October 1996, before petitioner's conviction became final on November 26, 1996.

Petitioner has not shown that he acted with reasonable diligence after his papers were lost; he did not file his petition for a writ of habeas corpus for about four years and three months after his papers were lost. Petitioner claims that he was not able to recover the lost papers until April 26, 1998, when he received copies from his family. However, petitioner has not shown that he acted with reasonable diligence in waiting two and a half years to obtain copies of the papers from his family. Petitioner also fails to show that he acted with reasonable diligence after receiving the papers. Even tolling the time during which state relief applications were pending, he waited over a year and a month after he received the

Not Reported in F.Supp.2d, 2002 WL 1364086 (E.D.N.Y.)
(Cite as: 2002 WL 1364086 (E.D.N.Y.))

papers to file his petition for a writ of habeas corpus.

**\*2** Nor does petitioner's claim that an inmate who was assisting him informed petitioner that there was no time-limit on filing a petition for a writ of habeas corpus justify equitable tolling. The affidavit from the inmate advisor does not support petitioner's contention. The inmate advisor merely states that he advised petitioner that he should file a motion pursuant to Section 440.10 prior to filing a petition for a writ of habeas corpus; he does not indicate that he told petitioner that there was no time-limit for filing his writ of habeas corpus. In any event, petitioner's reliance on bad advice from an inmate assistant is not an extraordinary circumstance that justifies equitable tolling. *See Chan v. United States,* 2000 WL 1843290 at \*2 (E.D.N.Y.2000); *Roman v. Artuz,* 2000 WL 1201392 (S.D.N.Y.2000).

Finally, petitioner's alleged lack of English proficiency and lack of legal assistance do not justify equitable tolling. These limitations, under which numerous inmate petitioners suffer, do not amount to extraordinary circumstances. *See Tan v. Bennett,* 2001 WL 823869 (S.D.N.Y.2001); *Stokes v. Miller,* 2000 WL 1121364 (S.D.N.Y.2000); *Mendez v. Artuz,* 2000 WL 991336 (S.D.N.Y.2000); *Martinez v. U.S.,* 2000 WL 863121 (S.D.N.Y.2000).

In sum, the petition is dismissed as time-barred as petitioner has failed to show that AEDPA's one year limitation period should be equitably tolled.

The Clerk of Court is directed to close this case.

As petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied.

E.D.N.Y.,2002.
Agramonte v. Walsh
Not Reported in F.Supp.2d, 2002 WL 1364086 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 1861735 (E.D.N.Y.)
(Cite as: 2005 WL 1861735 (E.D.N.Y.))

H
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Ernest WEST Petitioner
v.
HAMILL, Acting Superintendent, Livingston
Correctional Facility, Respondent.
**No. 04-CV-2393 (CBA).**

Aug. 1, 2005.

Bernard V. Kleinman, White Plains, NY, for Petitioner.

Ellen C. Abbot, Queens County District Atty's Office, Queens, NY, for Respondent.

*NOT FOR PUBLICATION MEMORANDUM & ORDER*

AMON, J.

**\*1** Petitioner Ernest West, represented by counsel, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition is dismissed as untimely.

*BACKGROUND*

On the morning of November 17, 1991, Charles Caruth, a car service driver who knew West from West's previous employment with Caruth's car service, picked up West and an accomplice and drove them to Queens. West then stole Caruth's car and $200 by threatening Caruth with what Caruth believed to be a gun. Two days later, West was arrested while driving Caruth's car, and Caruth subsequently identified him in a lineup.

West was convicted at jury trial of robbery in the first and second degrees, criminal possession of stolen property in the third degree, and the unauthorized use of a vehicle in the third degree. On February 25, 1993, he was sentenced to concurrent indeterminate prison terms of twelve and one-half to twenty-five years on the first-degree robbery count, three and one-half to seven years on the possession of stolen property count, and a term of one year for the unauthorized use of a vehicle count.

On February 14, 1995, the Appellate Division, Second Department unanimously affirmed West's conviction. *People v. West,* 622 N.Y.S.2d 572, 212 A.D.2d 651 (2d Dept.1995). On March 31, 1995, the New York State Court of Appeals denied West's application for leave to appeal. *People v. West,* 85 N.Y.2d 916, 650 N.E.2d 1341, 627 N.Y.S.2d 339 (1995).

In or around December 1999,[FN1] West filed a motion for a writ of error *coram nobis,* which was denied by the Appellate Division on March 27, 2000. *People v. West,* 705 N.Y.S.2d 278, 270 A.D.2d 509. West then filed a motion to reargue his appeal on April 25, 2000 and a motion to reargue the denial of his motion for a writ of error *coram nobis* on July 18, 2000. In a decision dated August 25, 2000, West's motion to reargue his appeal was denied. On October 26, 2000, West's motion to reargue the denial of his motion for a writ of error *coram nobis* was also denied.

> FN1. Although there is some question as to the exact date of this motion, all parties concede that the motion was filed in or around December 1999.

West filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on June 1, 2004. West claims that he was (1) denied his Sixth Amendment right to be present during all phases of the trial, (2) denied the effective assistance of appellate counsel, and (3) denied his Fifth Amendment right not be compelled to testify

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1861735 (E.D.N.Y.)
(Cite as: 2005 WL 1861735 (E.D.N.Y.))

against himself based on the People's cross examination of him. Respondent argues that West's motion should be denied as untimely.

*DISCUSSION*

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), there is a one-year statute of limitations for habeas corpus petitions filed after the date of the AEDPA's enactment, April 24, 1996. 28 U.S.C. § 2244(d)(1).FN2 However, prisoners whose conviction became final prior to the effective date of the AEDPA are accorded a period of one year after the effective date of AEDPA in which to file a first § 2254 petition. *Ross v. Artuz,* 150 F.3d 97, 103 (2d Cir.1998). AEDPA also provides for tolling of the one-year statute of limitations under certain circumstances. In particular, the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). Furthermore, equitable tolling may apply if a petitioner is able to show that "extraordinary circumstances prevented [him] from filing his petition on time," and that "[petitioner] acted with reasonable diligence throughout the period he seeks to toll. *Smith v. McGinnis,* 208 F.3d 13, 17 (2000), *cert. denied,* 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 63 (2000).

    FN2. The statute provides that the limitations period shall run from the latest of the following:

    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing such State action;

    (C) the date on which the constitutional right

asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence.

    28 U.S.C. § 2244(d)(1).

**\*2** A defendant's conviction becomes final when "a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." *Griffith v. Kentucky,* 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *see also* 28 U.S.C. § 2244(d)(1)(A). In this case, the Appellate Division unanimously affirmed West's conviction, and the New York Court of Appeals denied leave to appeal on March 31, 1995. *People v. West,* 85 N.Y.2d 916, 650 N.E.2d 1341, 627 N.Y.S.2d 339 (1995). West's conviction became final ninety days thereafter, after the expiration of the period in which he could have petitioned for a writ of certiorari from the United States Supreme Court. *Fernandez v. Artuz,* 402 F.3d 111, 112 (2d Cir.2005). Since West's conviction became final well before AEDPA took effect on April 24, 1996, the one year grace period for filing habeas corpus petitions pursuant to § 2254 established in *Ross v. Artuz* applies in this case. The grace period expired on April 24, 1997. *Ross,* 150 F.3d at 103. West filed the current petition on June 1, 2004, over seven years too late. Although West filed post-conviction motions in state court, he did not do so until after the grace period expired on April 24, 1997, and therefore is not entitled to statutory tolling under § 2244(d)(2).FN3 West is therefore barred from instituting this action at this time absent circumstances meriting equitable tolling.

    FN3. West does not argue that he is entitled to statutory tolling.

A petitioner seeking habeas relief bears the burden of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1861735 (E.D.N.Y.)
(Cite as: 2005 WL 1861735 (E.D.N.Y.))

establishing the propriety of equitable tolling. *Boos v. Runyan,* 201 F.3d 178, 185 (2d Cir.2000). Further, a "conclusory and vague claim, without a particularized description ... is manifestly insufficient to justify any further inquiry into tolling." *Id.* In this case, West's only proffered basis for seeking equitable tolling is that (1) he "has not been granted an impartial review of his legitimate claims ... of ineffective assistance of counsel, and his other claims raised in the initial appellate papers," (2) he "is unable to proceed without the assistance of counsel, and the actions of both the lower court and his counsel merit a tolling of the statute," and (3) "a manifest injustice will occur if the Court refuses to hear his petition." (Petitioner's Memorandum of Law at 7.) These conclusory assertions are insufficient to meet West's burden on this claim. West has not provided any factual basis to establish that he was subjected to extraordinary circumstances that prevented him from filing his petition on time, nor has he provided any evidence to indicate that he acted with reasonable diligence during the period of time that he seeks to toll. West's assertion that he is unable to proceed without legal counsel is unavailing, as lack of legal representation does not merit equitable tolling. *See McGinnis,* 208 F.3d at 18 (petitioner's *pro se* status throughout most of the period of limitations does not merit equitable tolling); *see also Turner v. Johnson,* 177 F.3d 390, 392 (5th Cir.1999), *cert. denied,* 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 389 (1999) ("[N]either a plaintiff's unfamiliarity with the legal process nor his lack of representation during the applicable filing period merits equitable tolling"). As West has failed to state any basis upon which the period of limitations may be equitably tolled, this petition is untimely and must be dismissed.

### CONCLUSION

**\*3** For the reasons set forth above, West's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied as untimely. A certificate of appealability will not issue, as West has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court is directed to enter judgment in accordance with this Order and to close the case.

SO ORDERED.

E.D.N.Y.,2005.
West v. Hamill
Not Reported in F.Supp.2d, 2005 WL 1861735 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Robert WARREN, Petitioner,
v.
Dale ARTUS, Superintendent of Clinton Correctional
Facility, Respondent.
**No. 9:05-CV-1032 (LEK/DEP).**

March 30, 2007.

Robert Warren, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New
York, Malancha Chanda, Esq., Assistant Attorney
General, of counsel, New York, NY, for Respondent.

*DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**I. Background**

**\*1** Petitioner Robert Warren ("Petitioner") filed his *pro se*
Petition for habeas corpus in this matter, on August 15,
2005. *See* Petition (Dkt. No. 1). Respondent filed a
Motion to dismiss the Petition on July 31, 2006. *See*
Motion (Dkt. No. 10). Petitioner filed his Petition while an
inmate at Clinton Correctional Facility, in Dannemora,
New York. The Clinton Correctional Facility address is
the address currently listed for Petitioner on the Docket
of this case, and is the last address of record for Petitioner.

On February 20, 2007, a Court Notice was filed informing
the parties of the availability of the option to consent to

the jurisdiction of the assigned United States Magistrate
Judge for all further proceedings. *See* Court Notice (Dkt.
No. 12). The copy of the Notice that was mailed to
Petitioner, however, was returned as undeliverable, with
a notation on the envelope that Petitioner was not at the
prison, as he had been paroled. *See* Dkt. No. 13.

In addition, searching the Inmate Locator maintained by
the New York State Department of Correctional
Services-using Petitioner's Department ID Number
98-A-5547-the Court has determined that Petitioner was
discharged on October 23, 2006. *See* N.Y.S. DOCS
Inmate Population Information Search website *at*
http://nysdocslookup.docs.state.ny.us/kinqw00 (last visited
Mar. 27, 2007).

In the March 2006 Order of this Court, Petitioner was
clearly warned that: **"Petitioner is also required to
promptly notify the Clerk's Office and counsel for
Respondent of any change in his address; his failure to
do so will result in the dismissal of this action".** *See*
March 2006 Order (Dkt. No. 6) at 3 (emphasis in
original).

Furthermore, a Report and Recommendation was filed on
March 12, 2007, by the Honorable David E. Peebles,
United States Magistrate Judge, pursuant to 28 U.S.C. §
636(b) and L.R. 72.4 of the Northern District of New
York. *See* Report-Rec. (Dkt. No. 22). Said
Report-Recommendation recommends granting
Respondent's Motion to dismiss, and dismissing
Petitioner's Petition. *Id.* Within ten days, excluding
weekends and holidays, after a party has been served with
a copy of a Magistrate Judge's Report-Recommendation,
the party "may serve and file specific, written objections
to the proposed findings and recommendations,"
FED.R.CIV.P. 72(b), in compliance with L.R. 72.1. No
objections have been raised in the allotted time with
respect to Judge Peebles' Report-Recommendation.
Respondent has, however, filed a Letter Request asking
this Court to adopt Judge Peebles'
Report-Recommendation in its entirety. *See* Resp's Letter
Request (Dkt. No. 16). In addition, after examining the
record, the Court has determined that the Report and
Recommendation is not subject to attack for plain error or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

manifest injustice.

Therefore, after review of the Report-Recommendation, and for the reasons that follow, this Court **adopts** Judge Peebles' Report-Recommendation **in its entirety,** Respondent's Motion is **granted,** Petitioner's habeas Petition is **dismissed,** and this case is **closed.**

## II. Discussion

**\*2** United States Courts are vested with broad discretion to impose sanctions for non-compliance with court orders, and those sanctions can include the severe sanction of dismissing a case. *See Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC,* No. 01 Civ. 6600(RLC), 2005 WL 3370542, at *1 (S.D.N.Y. Dec. 12, 2005) ("Moreover, the court has the inherent authority to dismiss a case when a party disobeys any of its orders.") (citing *Chambers v. Nasco, Inc.,* 501 U.S. 32, 45 (1991)). *Southridge* addressed discovery orders, but there is also no difference for non-compliance with any other court order. *See Dumpson v. Goord,* No. 00-CV-6039 CJS, 2004 WL 1638183 (W.D.N.Y. Jul. 22, 2004) (Court ordered one of the plaintiffs to provide address where he could be reached; plaintiff failed to comply; plaintiff was dismissed from the case). Rule 41(b) of the *Federal Rules of Civil Procedure* addresses not only a plaintiff's failure to prosecute, but also a plaintiff's "failure ... to comply with these rules or any order of court". FED.R.CIV.P. 41(b). *See also Dumpson,* 2004 WL 1638183, at *2 ("a court may *sua sponte* dismiss a plaintiff's action for failure to comply with an order of the court.... Such decisions are committed to the Court's sound discretion.... *Pro se* plaintiffs are entitled to a degree of leniency, but this 'should not extend to the disregard of a judge's plain directives.' ") (citing, *inter alia, Costello v. United States,* 365 U.S. 265, 286-87 (1961); *Lucas v. Miles,* 84 F.3d 532, 538 (2d Cir.1996)).

Both attorneys and *pro se* litigants are required to immediately notify the Court and their adversaries of any change in their address or contact information. *See* N.D.N.Y. L.R. 10.1(b)(2). "Failure to notify the Court of a change of address in accordance with L.R. 10.1(b) may result in the dismissal of any pending action." N.D.N.Y. L.R. 41.2(b). "The demand that plaintiffs provide contact information is no esoteric rule of civil procedure, but rather the obvious minimal requirement for pursuing a lawsuit." *Dumpson,* 2004 WL 1638183, at *3.

Moreover, as then-District Judge Pooler stated:

It is neither feasible nor legally required that the clerks of the district courts undertake independently to maintain current addresses on all parties to pending actions. It is incumbent upon litigants to inform the clerk of address changes, for it is manifest that communications between the clerk and the parties or their counsel will be conducted principally by mail. In addition to keeping the clerk informed of any change of address, parties are obliged to make timely status inquiries. Address changes normally would be reflected by those inquiries if made in writing.

*Dansby v. Albany County Corr. Facility Staff,* No. 95-CV-1525, 1996 WL 172699, at *1 (N.D.N.Y. Apr. 10, 1996) (Pooler, D.J.) (quoting *Perkins v. King,* No. 84-3310, slip op. at 4 (5th Cir. May 19, 1985) (other citations omitted)); *see, generally,* N.D.N.Y. L.R. 41.2(b).

**\*3** The Second Circuit in *LeSane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206 (2d Cir.2001), held that:

*pro se* plaintiffs should be granted special leniency regarding procedural matters.... Finally, "this court has repeatedly detailed factors ... to be considered before dismissal for failure to comply with a court order," and these factors significantly cabin a district court's discretion under Rule 41(b), so that "deference is due to the district court's decision to dismiss a *pro se* litigant's complaint only when the circumstances are sufficiently extreme."... Specifically, a district court contemplating dismissing a plaintiff's case, under Rule 41(b), for failure to prosecute must consider: "[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has take[n] care to strik[e] the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard ... and [5] whether

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

the judge has adequately assessed the efficacy of lesser sanctions."

_LeSane,_ 239 F.3d at 209 (citing and quoting _Lucas,_ 84 F.3d at 535; _Alvarez v. Simmons Mkt. Research Bureau, Inc.,_ 839 F.2d 930, 932 (2d Cir.1988)).

This Court has evaluated the factors as set forth by the Second Circuit. Petitioner's inaction and failure to update his address has spanned several months. Petitioner has clearly failed to comply with an Order of the Court (March 2006-_see_ Dkt. No. 6) and with Local Rule 10.1(b)(2) in failing to update his address. Petitioner's own failure to update his address has frustrated this Court's ability to contact him. The Court finds that it would be futile to make any further attempts to contact Petitioner. _See, generally,_ _Bottom v. Cooper,_ No. 03-CV-6493L, 2005 WL 2496052 (W.D .N.Y. Oct. 7, 2005).

Given the law and factors discussed above, Petitioner's failures in this matter warrant the imposition of the sanction of dismissal.

### III. Conclusion

Based on the foregoing discussion, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 14) is **APPROVED and ADOPTED in its ENTIRETY;** and it is further

**ORDERED,** that Respondent's Motion to dismiss (Dkt. No. 10) is **GRANTED;** and it is further

**ORDERED,** that Petitioner's Petition for a writ of habeas corpus (Dkt. No. 1) is **DISMISSED** both for the reasons contained in Judge Peebles' Report-Recommendation and due to Petitioner's failure to update his address as required by this District's Local Rules and a prior Order of the Court. The Clerk of the Court shall **CLOSE Case Number 9:05-CV-1032 (LEK/DEP);** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

_REPORT AND RECOMMENDATION_

DAVID E. PEEBLES, U.S. Magistrate Judge.

**\*4** Petitioner Robert Warren, who at the time of filing was a prison inmate as a result of a 1998 St. Lawrence County conviction of six separate offenses based upon a guilty plea entered in satisfaction of nine pending indictments, has commenced this proceeding seeking federal habeas relief, pursuant to 28 U.S.C. § 2254. In his petition, Warren asserts that the cumulative sentence imposed in connection with his crimes of conviction, and upheld on appeal, resulted in his serving two sentences for the same offense.

In response to Warren's petition respondent has moved seeking its dismissal, arguing that its filing was untimely under the governing limitation provision, and that there is no basis to find equitable tolling or otherwise excuse its lateness. Respondent's motion also addresses the merits of Warren's petition, asserting that the state courts' rejection of his double jeopardy claim was neither contrary to nor an unreasonable application of governing clearly established Supreme Court precedent.[FN1]

> FN1. While moving for pre-answer dismissal of a section 2254 petition is generally not a favored practice, there is authority to support a respondent's choice to make such a motion under appropriate circumstances. _See_ _McLeod v. Moscicki,_ No. 02 Civ. 9335, 2003 WL 22427757, at \*3 (S.D.N.Y. Oct. 22, 2003) (allowing a Rule 12(b)(6) motion under similar circumstances, and citing cases); _see also, e.g.,_ _Valverde v. Stinson,_ 224 F.3d 129, 136 (2d Cir.2000) (discussing motion to dismiss on basis of section 2244 without comment on procedural propriety); _Garcia v. Portuondo,_ 334 F.Supp.2d 446, 450 (S.D.N.Y.2004) (same).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

Having carefully reviewed the parties' submissions and considered their arguments regarding the preliminary, threshold issue, I find that the filing of the petition in this matter was untimely, and that the petitioner has presented no basis to overlook this deficiency. Turning to the merits of Warren's otherwise untimely petition, and assuming that his habeas claim is deemed to have been properly exhausted, when considered with the requisite deferential standard as a backdrop, I find that the state court's rejection of that claim is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

I. *BACKGROUND*

On August 4, 1998, at the time faced with as many as nine pending indictments against him, petitioner entered a plea of guilty in St. Lawrence County Court to six separate felony offenses, including attempted escape in the first degree, attempted second degree burglary, criminal possession of marijuana in the second degree, first degree criminal contempt, sexual abuse in the first degree, and driving while intoxicated. *See* Transcript of Plea Hearing, conducted on August 4, 1998, at 2-19. As a result of those pleas, petitioner was sentenced on September 8, 1998 as a second felony offender to various determinate and indeterminate prison terms, some of which were to run concurrently, while others were to be consecutively served, resulting in an aggregate sentence of between nine and ten and one-half years of incarceration.[FN2] Transcript of Sentencing Hearing, conducted on September 8, 1998, at 2-22; *see also People v. Warren,* 280 A.D.2d 75, 76, 721 N.Y.S.2d 152, 152-53 (3d Dep't 2001). Also included as part of the trial court's sentence was the issuance of an order of protection in favor of petitioner's spouse and stepdaughter, both of whom were found to be victims of certain of his crimes. *Warren,* 280 A.D.2d at 76, 721 N.Y.S.2d at 153. Petitioner was represented by counsel both at the time of entry of his plea, and at sentencing.

FN2. The sentence imposed by the trial court included 1) an indeterminate term of imprisonment of between one and one-half and three years for attempted escape in the first degree; 2) a determinate term of three and

one-half years on the charge of attempted second degree burglary, to run consecutively to the sentence for attempted escape; 3) an indeterminate term of between two and four years of incarceration on the drug possession charge, to run concurrently with the sentences for attempted escape and attempted burglary; 4) an indeterminate term of two to four years of imprisonment on the charge of first degree criminal contempt, to run concurrently with the sentences for both attempted escape and attempted burglary; 5) a determinate term of four years of imprisonment on the charge of first degree sexual abuse, to run consecutively to the sentences for attempted escape and attempted burglary, but concurrently with the sentences for marijuana possession and criminal contempt; and 6) an indeterminate term of imprisonment of between two and four years on the charge of driving while intoxicated, to run concurrently with all other sentences. *See* Transcript of Sentencing Hearing, conducted on September 8, 1998, at 16-20. The net result of those sentences required petitioner to serve consecutive sentences of one and one-half to three years for attempted escape, three and one-half years for attempted burglary, and four years for sexual abuse, yielding an aggregate sentence of between nine and ten and one-half years of incarceration.

**\*5** Petitioner appealed his conviction to the New York State Supreme Court Appellate Division, Third Judicial Department, resulting in the issuance by that court of a decision dated March 1, 2001, modifying the conviction in a manner which did not affect his sentence of incarceration, and otherwise affirming the trial court's judgment. *Id.* at 77-78, 721 N.Y.S.2d at 153-54. While rejecting the argument now being made to this court, regarding the cumulative effects of his sentence, in its opinion the Third Department did conclude that the trial court had erred in its issuance of the order of protection, in that it exceeded in duration the maximum period authorized under New York law. *Id.* at 77, 721 N.Y.S.2d at 153. Finding the information necessary to affix an appropriate expiration date to be lacking in the record, the Appellate Division remitted the matter to the trial court for the limited purpose of reissuing an appropriate order of protection with a proper end date. *Id.* at 78, 721 N.Y.S.2d at 153-54. In its decretal paragraph, the Third Department

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

[o]rdered that the judgment is modified, on the law, by reversing so much thereof as fixed the duration of the order of protection; matter remitted to the County Court of St. Lawrence County for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.

*Id.* There is no indication in the record that petitioner sought leave to appeal that determination to the New York State Court of Appeals.[FN3] It was not until on or about July 12, 2004 that the trial court acted upon the remittitur and issued a new order of protection in the case. *See* Petitioner's Memorandum (Dkt. No. 11) Attachment 6.

> FN3. In his petition, Warren asserts that permission for leave to appeal that determination was made, but denied. *See* Petition (Dkt. No. 1) ¶9(e), at 3. There is no support for this assertion, however, either in the state court records provided by respondent's counsel or in the reported history associated with that appeal. Moreover, in a later submission, Warren acknowledged that he did not pursue the matter to the New York State Court of Appeals. *See* Amended Memorandum (Dkt. No. 5) ¶ 3, at 2.

In addition to perfecting a direct appeal from his judgment of conviction, petitioner has pursued efforts to obtain two separate forms of collateral relief from the state courts. On August 31, 2004, Warren filed an application under section 440.20 of the N.Y. Criminal Procedure Law to set aside his sentence. That application was denied by order issued by County Court Judge Kathleen Rogers on October 19, 2004. Leave to appeal that determination to the New York State Court of Appeals was subsequently denied by the Third Department on December 29, 2004.

Petitioner also sought relief in the state courts through the filing on May 6, 2004, in Clinton County Supreme Court, of an application for a writ of habeas corpus pursuant to Article 70 of the N.Y. Civil Practice Law and Rules. By decision and judgment issued on June 7, 2004, Acting Supreme Court Justice S. Peter Feldstein denied petitioner's application for state court habeas relief. That

determination was upheld, on appeal to the Third Department, by decision issued on April 21, 2005. *See* People ex rel. Warren v. Artus, 17 A.D.3d 896, 792 N.Y.S.2d 879 (3d Dep't 2005).[FN4] On June 30, 2005, leave to appeal the denial of habeas relief to the New York Court of Appeals was denied. People ex rel. Warren v. Artus, 5 N.Y.3d 705, 834 N.E.2d 1262 (2005).

> FN4. An application for reargument of the state court's refusal to grant habeas relief was denied on August 26, 2004.

II. *PROCEDURAL HISTORY*

**\*6** Petitioner commenced this proceeding on August 15, 2005. Dkt. No. 1. Appropriately named as the respondent in Warren's petition is Dale Artus, Superintendent of the Clinton Correctional Facility, where petitioner was held at the time of filing. *Id.* Following the filing by petitioner on December 22, 2005 of a legal memorandum in support of his habeas petition, Dkt. No. 5, apparently prompted by a previously-issued order by District Judge Lawrence E. Kahn on November 21, 2005, Dkt. No. 4, respondent Artus, who is represented by the office of the New York State Attorney General, responded by the filing on July 31, 2006 of a motion to dismiss Warren's petition on the basis of the governing one year statute of limitations, and additionally on the merits. Dkt. No. 10. Petitioner has since countered in opposition to that motion. Dkt. No. 11.

Respondent's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. Rule 72(b).

III. *DISCUSSION*

A. *Mootness*

Of its own initiative, the court has made an investigation as to petitioner's current status, and has learned that he was released from custody in October of 2006. *See*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

http://nysdocslookup.docs.state.ny.us. The court must therefore determine whether Warren's release from prison, subsequent to commencement of this proceeding, renders the habeas claims now raised moot.

Habeas corpus relief is available to a state prisoner who is "in custody pursuant to the judgment of a State court ... on the ground that he [or she] is in custody in violation of the Constitution or laws or treaties of the United States". 28 U.S.C. § 2254(a). While on its face this provision contemplates that a habeas petitioner be in custody, section 2254 does not require that a petitioner be physically confined in order for a federal district court to retain jurisdiction over a properly filed habeas petition. *See Maleng v. Cook,* 490 U.S. 488, 491, 109 S.Ct. 1923, 1925 (1989). Thus, for example, a petitioner who, like Warren, has been released from custody after the filing of a habeas petition satisfies the "in custody" requirement of section 2254 if he or she remains subject to adverse collateral consequences which result from the subject conviction. *See Carafas v. LaVallee,* 391 U.S. 234, 237-39, 88 S.Ct. 1556, 1559-60 (1968). Collateral consequences are presumed to persist as a result of a conviction even after an inmate's release from prison.[FN5] *Spencer v. Kemna,* 523 U.S. 1, 12, 118 S.Ct. 978, 985 (1998) ("it is an 'obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences' ") (quoting *Sibron v. New York,* 392 U.S. 40, 55, 88 S.Ct. 1889, 1899 (1968)); *see also, e.g., Barker v. Reynolds,* No. 9:98-CV-0732, 2001 WL 1860929, at *2 (N.D.N.Y. Apr. 19, 2001) (Sharpe, M.J.) (citing *Spencer* and *Sibron); Binder v. Szostak,* No. 96-CV-840, 1997 WL 176353, at *3 (N.D.N.Y. Apr. 11, 1997) (Pooler, J. and DiBianco, M.J.).

> FN5. Examples of such potential collateral consequences can include the inability to serve as a juror, engage in certain businesses, or vote. *Johnson v. Levine,* No. 00 Civ. 8402, 2001 WL 282719, at *1 (S.D.N.Y. Mar. 21, 2001).

*7 In this case, since there is no indication the petitioner no longer suffers from any adverse consequences from his conviction, his claims do not appear to have been rendered moot by his release from prison.

B. *Statute of Limitations*

Enactment by Congress of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), brought about significant changes to the prisoner litigation landscape. One of those was the institution of a one-year statute of limitations for habeas corpus petitions filed after April 24, 1996. 28 U.S.C. § 2244(d).[FN6]

> FN6. That section provides, in relevant part, that
>
> > (1) [a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; * * *
>
> > (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.
>
> 28 U.S.C. § 2244(d).

The obvious starting point for resolving issues surrounding the timeliness of a section 2254 habeas petition is a determination of when the challenged conviction became final. In most cases, including in connection with convictions finalized subsequent to the April 24, 1996 effective date of the AEDPA, a state conviction becomes final when the time to seek review in the Supreme Court by petition for writ of *certiorari* expires. *Williams v. Artuz,* 237 F.3d 147, 151 (2d Cir.), *cert. denied,* 534 U.S. 924, 122 S.Ct. 279 (2001). In this case, however, petitioner did not seek leave to appeal the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

Third Department's determination to the New York State Court of Appeals. Accordingly, Warren's conviction became final on March 31, 2001, upon expiration of the thirty day period within which to seek review by that court of the Appellate Division's decision affirming his conviction. *Bethea v. Girdich,* 293 F.3d 577, 578 (2d Cir.2002); *People v. Wooley,* 40 N.Y.2d 699, 700-01, 358 N.E.2d 493, 494 (1976); *see* N.Y. Criminal Procedure Law § 460.10(5)(a).

In his opposition to respondent's motion, petitioner argues that because of the fact that the Appellate Division remitted the matter to the sentencing court for the issuance of an amended order of protection, an act which did not occur until July of 2004, the Third Department's decision was not immediately appealable, and thus his conviction was not final, until after the amended order of protection was issued. In making that argument, Warren places heavy reliance upon the Ninth Circuit's decision in *United States v. Colvin,* 204 F.3d 1221 (9th Cir.2000). In that case the two judge majority of the panel hearing the case, over a spirited dissent, concluded that an appellate decision which affirmed the defendant's conviction on two of three counts, but reversed as to the third and remanded the matter to the trial court with directions to strike the conviction on the third count and make a corresponding reduction in the special assessment imposed, was not a final determination which sufficed to trigger commencement of the applicable period for seeking habeas review, in that case under 28 U.S.C. § 2255.[FN7] *Id.* at 1222-26.

FN7. 28 U.S.C. § 2255 prescribes a mechanism for a sentenced federal prisoner to challenge his or her continued custodial status by seeking to vacate, set aside or correct the sentence, thereby partially supplanting earlier jurisprudence relying upon 28 U.S.C. § 2241 to accomplish such an end. *Cephas v. Nash,* 328 F.3d 98, 103-04 (2d Cir.2003).

Unfortunately for Warren, the Ninth Circuit's decision in *Colvin* has not been universally accepted, and in fact was recently rejected by the Second Circuit in *Burrell v. United States,* 467 F.3d 160 (2d Cir.2006). In *Burrell,* after reviewing the applicable caselaw, which was noted to be in conflict, including the Ninth Circuit's decision in

*Colvin,* the Second Circuit concluded that when a portion of a criminal judgment is reversed and the matter is remanded to the trial court solely for the purpose of performing a "strictly ministerial task of correcting the judgment" in a manner not affecting the defendant's sentence, the appellate decision is not thereby deprived of finality. *Id.* at 169.

*8 In order to determine whether *Burrell* is controlling in this case, it is necessary to understand the interplay between the petitioner's judgment of conviction and the order of protection issued by the trial court. New York law defines the term "judgment" as being "comprised of a conviction and the sentence imposed" by the court. N.Y.Crim. Proc. Law § 1.20(15) (McKinney 2003); *People v. Hernandez,* 93 N.Y.2d 261, 267, 689, 711 N.E.2d 972, 975 (1999). A criminal defendant has the right to appeal a "judgment." N.Y.Crim. Proc. § 450.10 (McKinney 2005); *People v.. Nieves,* 2 N.Y.3d 310, 314, 778 N.Y.S.2d 751, 811 N.E.2d 13, 16 (2004); *Hernandez,* 93 N.Y.2d at 269, 711 N.E.2d at 976. Under New York Law, an order of protection is not a form of punishment or a component of sentencing, but is instead a measure taken to protect victims and witnesses. *Nieves,* 2 N.Y.3d at 316, 811 N.E.2d at 17. An order of protection issued at the time of sentencing is, nonetheless, "part of the final adjudication of the criminal action involving [the] defendant." *Id.* at 315, 811 N.E.2d at 16.

In *Nieves,* the court drew an analogy between an order of protection and a certification as a sex offender under the Sex Offender Registration Act, codified at N.Y. Correction Law § 168 *et seq. Id.* at 315, 811 N.E.2d at 16-17. The court held that while neither is a component of sentencing, both are part of the final judgment of conviction in a criminal case. *Id.* Accordingly, a defendant has the right to appeal an order of protection entered at sentencing. *Id.* Applying a similar line of reasoning, in *Hernandez* the court held that the defendant's certification as a sex offender "was unmistakably part of the court's final adjudication with respect to defendant's crimes," and that the certification, along with the order of protection entered against the defendant, "formed an integral part of the conviction and sentencing." 93 N.Y.2d at 267, 711 N.E.2d at 975. It is thus apparent that under New York law, the issuance of an order of protection entered at sentencing, while not affecting a defendant's sentence, is part of the final judgment entered in a criminal case.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

The circumstances now presented are closely analogous to those before the court in *Burrell.* As in *Burrell,* the Third Department remitted the matter to the trial court for the sole purpose of performing a ministerial task, in this case to recalculate the duration of its order of protection. In doing so the Third Department issued specific directives for the court to follow when affixing the duration of the order of protection, instructing it that "the maximum duration of the order of protection is three years from the date of the expiration of the four-year maximum" of the sentences imposed upon the criminal contempt and sexual abuse convictions. *Warren,* 280 A.D.2d at 77-78, 721 N.Y.S.2d at 153. While the trial court unmistakably retained the discretion to issue an order of protection of a shorter duration, it had already plainly evidenced its intention to issue one to remain in effect for the maximum allowable period. On remand, the trial court was thus left to perform a mere arithmetic calculation, using as guidance the specific instructions provided by the Third Department. That calculation thus was one which " 'involv[ed] obedience to instructions ... instead of discretion, judgment, or skill,' " and was therefore a ministerial duty. *Burrell,* 467 F.3d at 164 (*quoting* Blacks Law Dictionary 1017 (8th Ed.2004)). Because the remand was clearly for "ministerial purposes," it did not delay the "judgment's finality." *Id.* Based upon these circumstances I find that petitioner's judgment of conviction became final thirty days following issuance of the Third Department's decision, or on March 31, 2001.

**\*9** Once the appropriate limitation period commencement date is established, it is next necessary to determine whether there are any intervening tolling periods resulting from applications by the petitioner for collateral review. Under the AEDPA, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending" is properly excludable from the one year limitation period, and results in its tolling. 28 U.S.C. § 2244(d)(2). Because the applicable statute speaks in terms of tolling, however, any such collateral or other review application filed within the otherwise applicable one year statute of limitations merely serves to toll the limitation period; such an event does not have the effect of resetting the one year clock. *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.) *(per curiam), cert. denied,* 531 U.S. 840, 121 S.Ct. 104 (2000); *see also* Stokes v. Miller, 216 F.Supp.2d

169, 172 N.3 (S.D.N.Y.2000) ("It is well-settled that post-conviction or other collateral review does not start the one year statute of limitations to run anew") (citing *Smith).*

The petitioner in this case filed two applications for collateral review, one by way of an application under section 440.20 to vacate his sentence, and the other in the form of a petition seeking state court habeas review under Article 70 of the N.Y. Civil Practice Law and Rules. Since both of those applications were filed in 2004, and thus after expiration of the one year limitation period, they did not effect any tolling of that period.[FN8] Consequently, even giving petitioner the benefit of the prison mailbox rule, in light of his *pro se* inmate state status, *see* Noble v. Kelley, 246 F.3d 93, 97 (2d Cir.), *cert. denied,* 534 U.S. 886, 122 S.Ct. 197 (2001), and assuming that the petition was conveyed to prison officials on August 12, 2005, the day on which it was signed, it was untimely absent a basis to overlook its lateness.

> **FN8.** Although a timely application under section 440.20 filed within one year after petitioner's judgment of conviction became final would have served to toll the application limitations period, *see* King v. Cunningham, 442 F.Supp.2d 171, 180 (S.D.N.Y.2006), the situation is less clear with regard to his habeas petition. *See* Martino v. Berbary, No. 03-CV-0923, 2005 WL 724133, at *2 (W.D.N.Y. Mar. 30, 2005) (collecting cases and noting a split among courts within the circuit on this issue).

C. *Equitable Tolling*

While Warren's petition is facially time-barred, the Second Circuit has cautioned that a habeas petition which would otherwise be subject to dismissal in light of the AEDPA's statute of limitations may nonetheless be considered by a district court where the court determines that the statute of limitations should be equitably tolled. *See* Smith, 208 F.3d at 17-18. And, although the Second Circuit has acknowledged that the "question remains open" as to whether the United States Constitution requires that an "actual innocence' " exception be engrafted onto the AEDPA's statute of limitations, *see* Whitley v. Senkowski,

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

317 F.3d 223, 225 (2d Cir.2003), that court has nevertheless directed district courts to consider a properly raised claim of actual innocence as a basis for invoking equitable tolling before dismissing a habeas petition as untimely filed. *Id.; see also Doe v. Menefee*, 391 F .3d 147, 161 (2d Cir.2004).

1. *Traditional Tolling*

**\*10** Equitable tolling applies "only in the 'rare and exceptional circumstance[ ].' " *Smith*, 208 F.3d at 17 (quoting *Turner v. Johnson*, 177 F.3d 390, 391-92 (5th Cir.), *cert. denied*, 528 U.S. 1007, 120 S.Ct. 504 (1999)) (alteration in original). Under traditional tolling principles, the equitable tolling of the AEDPA's statute of limitations is only available when " 'extraordinary circumstances' prevent a prisoner from filing a timely habeas petition." *Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir.2000) (quoting *Smith*, 208 F.3d at 17); *see also Agramonte v. Walsh*, No. 00 CV 892, 2002 WL 1364086, at *1 (E.D.N.Y. June 20, 2002). "To merit application of equitable tolling, the petitioner must demonstrate that he acted with 'reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances 'beyond his control' prevented successful filing during that time." *Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir.2001) (quoting *Smith*, 208 F.3d at 17); *cert. denied*, 535 U.S. 1017, 122 S.Ct. 1606 (2002); *see also Warren*, 219 F.3d at 113 (citing *Smith*, 208 F.3d at 17).

In this instance, petitioner does seemingly request equitable tolling, arguing that his lack of access to sufficient books and legal assistance, as well as the fact that he did not receive (or even request) a copy of his sentencing minutes until April of 2004, provide a basis for equitable tolling. Such circumstances, however, are insufficiently unusual or compelling to warrant a finding of equitable tolling in this case. *Gant v. Goord*, 430 F.Supp.2d 135, 139 (W.D.N.Y.2006) ("In general, the difficulties attendant on prison life, such as transfers between facilities, solitary confinement, lockdowns, restricted access to the law library, and an inability to secure court documents, do not by themselves qualify as extraordinary circumstances."); *Peck v. United States,* No. 06-CV-0822, 03-CR-496, 2006 WL 3762001, at *5 (N.D.N.Y. Dec. 20, 2006) (finding no basis for equitable

tolling where petitioner claimed that he had inadequate access to legal books and legal assistance).

2. *Actual Innocence Tolling*

To ameliorate the harshness of the AEDPA's one year procedural bar to seeking habeas review in the unusual case where the petitioner appears to be the victim of a fundamental miscarriage of justice and is actually innocent of the crime of conviction, courts, including the Second Circuit, have suggested that the presentation of a credible claim of actual innocence may provide a basis for equitable tolling, provided that the petitioner can also show that he or she pursued the claim with reasonable diligence. *Doe*, 391 F.3d at 161; *Whitley*, 317 F.3d at 225. Addressing the tension which such an exception would potentially present with respect to the considerations of comity and finality underpinning the AEDPA's limitations requirement, the Second Circuit observed that "[b]ecause credible claims of actual innocence are 'extremely rare,' federal court adjudication of constitutional challenges by petitioners who may be actually innocent prevents miscarriages of justice, but does not threaten state interests in finality." *Doe*, 391 F.3d at 161 (citing *Schlup v. Delo*, 513 U.S. 298, 321-22, 115 S.Ct. 851, 864-65 (1995)). Drawing upon the Supreme Court's decision in *Schlup*, which addressed the actual innocence exception to a petitioner's ability to file successive or otherwise procedurally defaulted habeas petitions in federal courts, the Second Circuit in *Doe* required that the claim of actual innocence be supported "with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Doe*, 391 F.3d at 161 (quoting *Schlup*, 513 U.S. at 324, 115 S.Ct. at 865).

**\*11** In this instance Warren does not allege that he is actually innocent of the crimes of his conviction, which was the product of his guilty plea and concomitant admission of having committed those offenses. Accordingly, Warren has not provided any compelling grounds for the court to apply the *Whitley* test and recommend that the AEDPA statute of limitations be tolled based upon a claim of actual innocence. *See, e.g., Catala v. Bennett*, 273 F.Supp.2d 468, 473-74 (S.D.N.Y.2003) (acknowledging *Whitley's* application to claims of actual innocence but declining to apply it when

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

the petitioner in that case did not attempt an actual innocence claim).

In sum, I recommend against the invocation of equitable tolling to salvage Warren's otherwise untimely petition.

D. *Merits of Warren's Petition*

As has been noted, petitioner apparently did not pursue the direct appeal of his conviction to the State's highest court. He did, however, assert arguments surrounding his sentencing, and specifically his claim that the resulting term of incarceration was unlawful, in the context of both his motion to vacate his sentence, pursuant to section 440.20 of the N.Y. Criminal Procedure Law, and by way of his petition for state habeas relief. Since both of those resulting determinations were pursued through to the Appellate Division, and a request was made for leave to appeal to the Court of Appeals from the denial of his state habeas petition, respondent does not contest Warren's petition on the procedural basis of failure to exhaust and, consequently, I will assume that he has fulfilled his obligation to pursue his claims to the highest state court before seeking to elicit this court's habeas intervention, and will turn to the merits of his claim.

1. *Standard of Review*

Critical to a review of the merits of Warren's petition is recognition of his deferential standard which this court must apply. Enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), brought about significant new limitations on the power of a federal court to grant habeas relief to a state court prisoner under 28 U.S.C. § 2254. Under the AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also* Boyette v. Lefevre, 246 F.3d 76, 88 (2d Cir .2001) (quoting § 2254(e)(1)) (internal quotes omitted). Significantly, a federal court may not grant habeas relief to a state prisoner on a claim

that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**\*12** 28 U.S.C. § 2254(d); *see also* Noble v. Kelly, 246 F.3d 93, 98 (2d Cir.), *cert. denied,* 122 S.Ct. 197 (2001); Boyette, 246 F.3d at 88. When applying this test, the Second Circuit has noted that

> [u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: 1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz,* 237 F.3d 147, 152 (2d Cir.2001) (citing *Williams v. Taylor* and *Francis S. v. Stone,* 221 F.3d 100, 108-09 (2d Cir.2000)).

Because the AEDPA's restriction on federal habeas power was premised in no small part upon the duty of state courts to uphold the Constitution and faithfully apply federal laws, the AEDPA's exacting review standards apply only to federal claims which have been actually adjudicated on the merits in the state court. *Washington v. Shriver,* 255 F.3d 45, 52-55 (2d Cir.2001). Specifically, as the Second Circuit explained in *Sellan v. Kuhlman,* "[f]or the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." 261 F.3d 303, 312 (2001); *see* Jimenez v. Walker, 458 F.3d 130, 140 (2d Cir.2006). Significantly, the Second Circuit further held that when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim-*even if the state court does not explicitly refer to either the federal claim or to relevant federal case law."* Sellan, 261 F.3d at 312 (emphasis added).FN9,FN10

> FN9. In the past, when wrestling with interpretation and application of the AEDPA's deference standard the Second Circuit had suggested, although leaving open the question, that deference under section 2254(d) is not mandated if a state court decides a case without citing to federal law or otherwise making reference to a federal constitutional claim in a manner adequate to justify deference under AEDPA, in which case pre-AEDPA standards would apply. Washington, 255 F.3d at 52-55; *see also* Noble, 246 F.3d at 98. That court clarified in *Sellan,* however, that the question of whether or not a state court makes specific reference to a constitutional principle is not controlling.

> FN10. In his opinion in *Sellan,* Chief Judge Walker acknowledged that enlightenment in state court decisions as to the manner of disposition of federal claims presented would greatly enhance a federal court's ability, on petition for habeas review, to apply the AEDPA deference standard. Sellan, 261 F.3d at 312. He noted, however, that a state court's failure to provide such useful guidance does not obviate a federal court's duty to make the analysis and pay appropriate deference if the federal claim was adjudicated on the merits, albeit tacitly so. *Id.*

When a state court's decision is found to be decided "on the merits", that decision is "contrary to" established Supreme Court precedent if it applies a rule that contradicts Supreme Court precedent, or decides a case differently than the Supreme Court on a set of materially indistinguishable facts. Williams, 529 U.S. at 405-06, 120 S.Ct. at 1519-20. Moreover, a federal court engaged in habeas review must also determine not whether the state court's determination was merely incorrect or erroneous, but instead whether it was "objectively unreasonable". Sellan, 261 F.3d at 315 (quoting Williams, 529 U.S. at 409, 120 S.Ct. at 1521 (O'Connor, J.)). The Second

Circuit has noted that this inquiry admits of "[s]ome increment of incorrectness beyond error", though "the increment need not be great [.]" Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir.2000).

*2. Clearly Established Supreme Court Precedent*

Warren's petition asserts a single ground, alleging that the net affect of the various sentences imposed in connection with the six crimes of connection was to render the sentence unlawful, in derogation of his right to be free from double jeopardy.

**\*13** The double jeopardy clause, which forms an integral part of the Fifth Amendment to the United States Constitution, provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb...." U.S. Const. Amend. V. The essence of controlling double jeopardy jurisprudence has been summarized as follows by the Second Circuit:

> [t]he Double Jeopardy Clause protects, among other things, against multiple punishments for the same offense. *See* North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.E.d.2d 656 (1969). When two acts violate the same statute, ... the Supreme Court has distinguished between a statute that punishes a continuous offense and one that punishes distinct acts. *See* Blockburger v. United States, 284 U.S. 299, 303, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (two drug sales to the same person on different days punishable as separate offenses). The Court looked to see if lawmakers had intended to criminalize each act. " 'The test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately.... If the latter, there can be but one penalty.' " *Id.* at 302, 52 S.Ct. 180.

> McCullough v. Bennett, 413 F.3d 244, 246 (2d Cir.2005).

It should be noted that the charging of multiple offenses based upon the same conduct does not *per se* violate the double jeopardy clause. United States v. Cavanaugh, 948 F.2d 405, 413 n. 8 (8th Cir.1991) *(citing* Ohio v. Johnson,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))

467 U.S. 443, 449, 104 S.Ct. 2536, 2540-41 (1984)).
Instead, the question becomes whether, by enacting the
particular criminal provision, the respective legislative
body intended that facts underlying the potentially
overlapping counts constitute separate " 'units' of
prosecution". *United States v. Ansaldi,* 372 F.3d at 118,
124 (2d Cir.2004) *(citing Bell v. United States,* 349 U.S.
81, 83-84, 175 S.Ct. 620, 622 (1955)).

Petitioner's double jeopardy argument is perplexing. The
operative crimes for which he received consecutive
sentences included attempted escape, attempted burglary,
and sexual abuse. The court has reviewed the transcribed
minutes of petitioner's plea hearing and finds no basis to
conclude that in accepting pleas to those three charges,
and imposing consecutive sentences in connection with
those pleas, punished the petitioner twice for the same
criminal conduct. [FN11]

> **FN11.** In his memorandum in opposition to
> respondent's dismissal motion, petitioner
> intimates that the sentence that he received may
> have resulted in a breach of a plea agreement
> which included assurances as to the sentence to
> be imposed by the court. *See* Petitioner's
> Memorandum (Dkt. No. 11) at 12-22. If such a
> claim is being made it is not apparent from the
> face of Warren's petition. Moreover, it does not
> appear that such a claim has ever been fairly
> presented to the state courts prior to being raised
> in this proceeding, and therefore is not properly
> exhausted. *Fama v. Comm'r of Corr. Servs.,* 235
> F.3d 804, 808-09 (2d Cir.2000) ("To have
> exhausted claims in state court, petitioner must
> have "fairly presented" each federal claim to the
> highest state court.") (citation omitted).

Accordingly, I find no basis to conclude that the state
courts' determination that no double jeopardy violation has
occurred, arising from his sentencing, was either contrary
to or an unreasonable application of clearly established
Supreme Court precedent.

IV. *SUMMARY AND RECOMMENDATION*

Based upon the circumstances now presented, it appears
that petitioner's conviction became final when his time to
seek leave to appeal to the Court of Appeals from the
Third Department's decision affirming his conviction
expired, notwithstanding the fact that the matter was
remitted to the trial court for an essentially ministerial act,
in the nature of substituting a new order of protection
which was compliant with the applicable legal provisions
under which it was issued for the prior, invalid order.
Since the petition in this matter was filed more than a year
after that date, and having been presented with no proper
basis to conclude that the governing limitation period
should be equitably tolled, I recommend a finding that the
petition is time barred and should be dismissed on this
procedural basis, without reaching the merits. In the event
that the court finds that the petition was timely filed and
should be considered on its merits, I find that the state
courts' determination rejecting Warren's sentence claims
was neither contrary to nor an unreasonable application of
clearly established Supreme Court precedent, and find no
other basis to conclude that he was the subject of a
constitutional deprivation.

**\*14** Based upon the foregoing it is hereby

RECOMMENDED that respondent's motion to dismiss the
petition in this matter [Dkt. No. 10] be GRANTED, and
the petition be DISMISSED in all respects.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties
have ten (10) days within which to file written objections
to the foregoing report-recommendation. Any objections
shall be filed with the clerk of the court. FAILURE TO
OBJECT TO THIS REPORT WITHIN TEN (10) DAYS
WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. §
636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,*
984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve
a copy of this report and recommendation upon the parties
in accordance with this court's local rules.

N.D.N.Y.,2007.
Warren v. Artus
Not Reported in F.Supp.2d, 2007 WL 1017112

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
(Cite as: 2007 WL 1017112 (N.D.N.Y.))


(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Anthony MEDINA, Petitioner,
v.
Michael MCGINNIS, Respondent.
**No. 04 Civ.2515 SHS AJ.**

Sept. 20, 2004.

*REPORT AND RECOMMENDATION*

PECK, Chief Magistrate J.

**\*1** Petitioner Anthony Medina, represented by counsel, seeks a writ of habeas corpus from his May 14, 1999 conviction in Supreme Court, Bronx County, of first degree manslaughter, and sentence of twelve-and-a-half to twenty five years imprisonment. (Dkt. No. 1: Pet. ¶¶ 1-4.) *See People v. Medina, 284 A.D.2d 122, 122, 725 N.Y.S.2d 199, 199 (1st Dep't 2001), leave to appeal denied,* 96 N.Y.2d 732 N.Y.S.2d 639 (2001).

Medina's habeas petition alleges that: (1) he was denied effective assistance of counsel (Pet.¶ 12(A)); (2) he was denied due process because he was not competent at the time of trial (Pet.¶ 12(B)); and (3) he was denied due process because new evidence demonstrates his actual innocence (Pet.¶ 12(C)).

For the reasons set forth below, Medina's habeas petition should be DENIED.

*FACTS*

*The Prosecution Case at Trial*

Around 9:15 p.m. on May 3, 1996, Anthony Medina and Jose Cardenas were inside an illegal social club located at 932 Intervale Avenue in the Bronx. (State Opening: Trial Transcript ["Tr."] 17-18.) Medina shot Cardenas with a .22 caliber gun, exited the club and handed the weapon to an unidentified woman. (State Opening: Tr. 18.) When arrested, he asked, " 'who snitched me out.' " (State Opening: Tr. 19.) Medina was charged with two counts of second degree murder, first degree manslaughter, first degree reckless endangerment, and second degree and third degree criminal possession of a weapon. (State Opening: Tr. 14-16.) [FN1]

> FN1. During trial, the Assistant District Attorney moved to dismiss three of the six counts of the indictment, leaving two counts of second degree murder and one count of first degree manslaughter. (Tr. 485.) The trial judge charged the jury on those three counts and also included second degree manslaughter. (Tr. 629-41.)

*May 3, 1996: Eyewitness Cepero's Testimony*

On May 3, 1996 at approximately 9:00 p.m., Eugenio Cepero was in the vicinity of 932 Intervale Avenue, working on a car in front of the parking lot. (Cepero: Tr. 308.) Located at 932 Intervale Avenue was a Cuban Club where people could play pool or dominoes, drink alcohol, or purchase powder cocaine.[FN2] (Cepero: Tr. 310-11.) Cepero described the incident that occurred on that night, as follows:

> FN2. Cepero admitted to entering the club earlier in the evening in order to buy powder cocaine from Cardenas. (Cepero: Tr. 311-14, 361.) Cepero sold the powdered cocaine to another individual and then used the profit to buy crack cocaine at 941 Intervale Avenue. (Cepero: Tr. 315-17, 362.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

[T]here was loud music coming from the Cuban club across the street. So when music between records, when one record finishes, one begins, there was a muffled shot, just one shot, and then the other record became playing and all of a sudden the door flew open and whole mess of people came out of that club. So after everybody came out and they rushed away, two three girls came out and this individual came out, but before he came out, one of the girls told him to hurry up, hurry up. Then he came out. Then they went towards their left and as they rushed away, he passed a shiny object which appeared to be a gun to the girl on his right hand side that was wearing a bubble jacket. They took off down towards Southern Boulevard. (Cepero: Tr. 308-09.) [FN3]

> **FN3.** Although Cepero described the clothing worn by the three girls and their approximate ages (Cepero: Tr. 323-24), he was unable to see their faces because they had their backs turned towards him. (Cepero: Tr. 392-93.)

After hearing the one shot, Cepero "looked around" and "took ... cover." (Cepero: Tr. 321-22, 363.) According to Cepero, about fifteen to twenty people initially exited the club. (Cepero: Tr. 322-23, 331, 364.) Approximately fifteen seconds after the shot was fired, Medina exited the club. (Cepero: Tr. 324, 369.) Cepero identified Medina at trial and testified that he knew Medina by his "[s]treet name Hyper." (Cepero: Tr. 309-10, 325.) Cepero had known Medina for about a year prior to this incident, they were friends, and Cepero had no doubt that Medina was the individual he saw exiting the club. (Cepero: Tr. 333-39).

**\*2** Cepero claimed he could tell that the shiny object passed from Hyper to the girl in the bubble jacket was an automatic, "about the size of a .25" caliber gun. (Cepero: Tr. 325-27, 370. 400-01.) [FN4] After watching Medina hand off the weapon and leave the scene, Cepero "saw the body" and "went home." (Cepero: Tr. 329.) On cross, however, Cepero said he stayed at the scene and observed the police activity. (Cepero: Tr. 354.) Although Cepero spoke to the police later that night, he did not tell them that he could make an identification because he "was scared, afraid," afraid of "[g]etting hurt." (Cepero: Tr. 332, 350, 354, 375.)

> **FN4.** Detective Charles Koch identified the bullet recovered from Cardenas' body as a .22 caliber bullet. (Koch: Tr. 416.) A .22 caliber bullet could not be fired from a .25 caliber semiautomatic weapon. (Koch: Tr. 418, 425.) However, a .22 caliber and .25 caliber gun are "very close" in appearance. (Koch: Tr. 427.)

*Testimony From Law Enforcement Personnel*

On May 3, 1996, Sergeant James Caban and Officer Ricky Santos received a call to report to 932 Intervale Avenue in the Bronx. (Caban: Tr. 109-10, 123-24; Santos: Tr. 145-47, 187, 189.) They approached the scene at approximately 9:30 p.m. (Caban: Tr. 110; Santos: Tr. 187, 189.) Once they arrived at the social club, Sgt. Caban and Officer Santos "saw an open door with a man lying dead on the ground." (Caban: Tr. 110-11; Santos: Tr. 149.) [FN5] Sgt. Caban testified that "[i]t was a very very well lit area." (Caban: Tr. 127; Santos: Tr. 152.) When Officer Santos was asked whether he saw anyone taking off as they approached, he stated, "I believe I didn't see one individual at all. If there was anybody there, it wasn't a major number. It could have been maybe one or two people." (Santos: Tr. 148-49, 157, 161, 190.) Similarly, when Officer Jamie Cuevas arrived at the scene after the original officers, from the time he approached the scene until he left a couple of hours later, he did not see any civilians outside. (Cuevas: Tr. 206-08, 225-26, 229.)

> **FN5.** Dr. Joseph Cohen of the Medical Examiner's Office testified that Cardenas "died as a result of [a] gun wound of the chest which caused perforations of both lungs and his heart causing significant internal bleeding." (Cohen: Tr. 269.) "The bullet passed through the torso and lodged on the left side of the torso. The trajectory was front to back, it was right to left, and very slightly downward." (Cohen: Tr. 260, 270, 280.)

At approximately 10:30 p.m. Detective Shaw of the Crime Scene Unit arrived at 932 Intervale Avenue. (Shaw: Tr. 49, 76.) Det. Shaw did a walk-through of the social club, and saw the body of Jose Cardenas lying on the ground. (Shaw: Tr. 51-53.) Det. Shaw drew a "rough diagram of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

the location itself," took "photographs of the exterior of the location and the interior of the location," and dusted for fingerprints. (Shaw: Tr. 52.) Edward Young, a technician employed by the Bronx District Attorney, videotaped the location the way it appeared at 10:45 p.m. that night. (Young: Tr. 99-100.) Four fingerprints and some cigarette butts were taken from inside the social club.[FN6] (Shaw: Tr. 72-73, 75, 87-92, 96.) There were no empty shell casings or weapons recovered at the scene. (Shaw: Tr. 58-59, 80, 85; Caban: Tr. 112, 119; Santos: Tr. 184, 197-98.)[FN7]

> [FN6.] Medina's fingerprints were never submitted for comparison with those taken. (McKeon: Tr. 475.)

> [FN7.] Det. Koch testified that when an automatic gun is fired, as opposed to a revolver, "it extracts the casing and ejects it from the firearm." (Koch: Tr. 410.) The normal ejection of the casing would be "to the right and to the rear, approximately three to four feet." (Koch: Tr. 412.) However, the casing can bounce or roll after hitting the ground. (Koch: Tr. 412-13.) It is possible that the shell casing could not be ejected because it had jammed in the gun. (Koch: Tr. 422-23, 426.) Defense counsel on cross-examination got Det. Koch to admit that he could only "guess" as to what happened in this case. (Koch: Tr. 423-24.)

*Cepero Informs the Police What He Saw; Medina's Arrest and Statement*

On January 4, 1997, Detective McKeon of the 41st Precinct was assigned to investigate Cardena's murder. (McKeon: Tr. 440.) At about 1:40 a.m., Detective McKeon and two other officers interviewed Medina in the 41st Precinct detective squad interview room. (McKeon: Tr. 442-44.) After Det. McKeon advised Medina of his *Miranda* rights (McKeon: Tr. 445-46), Det. McKeon interviewed Medina (McKeon: Tr. 447). Det. McKeon wrote down the story as Medina stated it and read the statement back to him. (McKeon: Tr. 447-48.) Once Medina agreed the statement was accurate, Det. McKeon had Medina sign it. (McKeon: Tr. 448.) Medina's

statement read:

**\*3** I used to work at 932 Intervale Avenue, social club, about four or five times. I worked at the door and I checked for the cops. This social club sold cocaine.... On the day the old Cuban guy got killed I was at 163 Street and Kelley Street by the bodega and a coworker from the ... club, Rafael ... came up to me on the corner and told me that two male blacks wearing masks came into the social club armed with a .9 millimeter and a Tech 9 [FN8] and demanded money and drugs. Rafael said that there was no money, there was no more drugs in there and they male blacks didn't get nothing and they, male blacks, started shooting. After telling me this I walked to 163 Street and Intervale Avenue and met Danny.... I asked Danny what happened.

> [FN8.] Det. Koch stated that a .22 caliber bullet could not have been fired from a .9 millimeter or Tech 9 weapon. (Koch: Tr. 419.)

Danny said somebody tried to rob the place and there was some shooting. I told Tyson ... that I shot in there, meaning that I killed the guy. I told Tyson this to make myself look big. I didn't kill this guy and I didn't even shoot him there.
(McKeon: Tr. 453-54.) Medina was not placed under arrest after making the statement. (McKeon: Tr. 455.)

On January 21, 1997, Cepero entered 941 Intervale Avenue around 8:30 p.m. in order to buy crack cocaine. (Cepero: Tr. 340-41.) As he walked up the stairway, he overheard Medina say, "why you dissing me, I'll pop you like I popped the Cuban." (Cepero: Tr. 341-42, 346, 384, 385.) Cepero knew that it was Medina because he recognized his voice. (Cepero: Tr. 341.) Cepero left the building, waited for Medina to leave, and then went in to buy drugs. (Cepero: Tr. 342-43, 390.)

Two days after he overheard the conversation in 941 Intervale Avenue, Cepero was arrested. (Cepero: Tr. 376, 383-84.) Having something to gain from the information, Cepero identified Medina as the shooter who was wanted for Cardenas' murder. (Cepero: Tr. 350, 378-80, 383-84.) According to Cepero, Detective McKeon "talked to

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

[Cepero], [and] he said he might be able to get [Cepero] a lighter sentence." (Cepero: Tr. 351.) When questioned further about this exchange on cross-examination, Cepero stated that he told Det. McKeon that he expected a lighter sentence in return for the information and Det. McKeon said "[t]hey [would] see what they [could] do." (Cepero: Tr. 380.) Cepero was allowed to plead to a misdemeanor and received a sentence of 90 days, instead of a felony with a possible sentence of three and a half to seven years. (Cepero: Tr. 377-83.)

Medina was arrested on February 12, 1997. (McKeon: Tr. 441, 456, 475-76.) Det. McKeon informed him that "he was being arrested for the murder of Mr. Cardenas from May 3rd of 1996." (McKeon: Tr. 457.) Detective Peter Tarsnane was present when Medina was placed in the cell at the 41st Precinct. (McKeon: Tr. 459-60, 469-70; Tarsnane: Tr. 497-98.) After McKeon left the room where Medina's cell was located, Det. Tarsnane testified that Medina asked, " 'who snitched me out." ' (Tarsnane: Tr. 499.) Det. Tarsnane told Det. McKeon about what Medina said. (Tarsnane: Tr. 500-01.)

*The Defense Case at Trial*

**\*4** The defense called no witnesses (*see* Tr. 503-06), but made it's case by cross-examining the prosecution's witnesses.

Defense counsel's theme was that "[n]obody's going to dispute there was a shooting and nobody's going to dispute that Mr. Cardenas died as a result of that shooting.... What we are questioning is whether the police got the right person." (Defense Opening: Tr. 26.) In closing argument, defense counsel noted that while motive was not an element of the crime, it was important to consider in determining if Medina was the shooter, and he reminded the jury that no motive evidence was presented. (Defense Closing: Tr. 509-10, 543-44.) He also noted that there was no physical evidence tying Medina to the crime; rather, the entire case was based on Cepero's testimony. (Defense Closing: Tr. 527-32, 543-44.)

Defense counsel argued that Cepero's testimony was unreliable. In addition to referring to Cepero more than

once during summation as a "crack head" (Defense Closing: Tr. 521-23; *see* Cepero: Tr. 300) and questioning his motive for testifying (*e.g.,* Defense Closing: Tr. 536-37), defense counsel also pointed out inconsistencies between Cepero's prior statements and trial testimony.

First, before the grand jury Cepero stated that "seven or eight people ran out" after the shooting (Cepero: Tr. 367-68), but at trial, Cepero changed this number to fifteen or twenty (Cepero: Tr. 322-23, 331, 364). (*See* Defense Closing: Tr. 514.) Second, Cepero stated that the police spoke to him and to about fifteen or twenty people the night of the incident (Cepero: Tr. 332, 354-57), yet none of the testifying police officers recalled seeing or interviewing anyone on that night (Caban: Tr. 119-20; Santos: Tr. 149-50, 157, 161, 183, 190, 194-95; Cuevas: Tr. 220-21, 225). Third, Cepero testified at trial that Medina pulled the shiny object from his waistband (Cepero: Tr. 396), but in a statement taken down by Detective McKeon and signed by Cepero, Cepero stated that Medina had the gun in his hand (Cepero: Tr. 397-99). (*See* Defense Closing: Tr. 520-21.) Fourth, defense counsel pointed out to the jury that while Cepero at trial claimed to overhear Medina say "why you dissing me, I'll pop you like I popped the Cuban" (Cepero: Tr. 341-42, 346, 384-85), on January 23, 1997 Cepero had stated to Det. McKeon that he had heard Medina say, "I'll pop you like the Cuban," which does not say Medina was the shooter. (Cepero: Tr. 387; Defense Closing: Tr. 534-36.) Defense counsel also established through Cepero that Medina liked to brag. (Cepero: Tr. 389.) [FN9]

> FN9. On redirect, however, Cepero said it did not sound like Medina was bragging. (Cepero: Tr. 401.)

Defense counsel also attempted to show that Cepero was too far away from the social club's entrance to see Medina exit with a gun. [FN10] In order to determine this distance, Medina's counsel questioned Cepero and the police officers. When Cepero was asked how far he was located from the front door of the social club, he replied "[f]ifty, fifty-five feet. I don't know, I never measured it." (Cepero: Tr. 372.) Defense counsel asked, "[s]o if somebody had come in here and testified that it was a hundred and sixty feet, you would say that that person's incorrect; is that right?" (Cepero: Tr. 372-73.) Cepero answered that he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

would not know. (Cepero: Tr. 373.) Defense counsel walked to back of the courtroom and asked Cepero if that was about how far away he was from Medina on the night of the incident. (Cepero: Tr. 373.) Cepero said that the distance from the car to the front door was further by "[a]bout half a courtroom more." (Cepero: Tr. 373.) In contrast to Cepero's guestimate, on cross-examination by the defense, Officer Santos testified that the distance from the fence near the parking area (Cepero's location) to the front door of 932 Intervale Avenue was about 160 yards, or the length of about two football fields. (Santos: Tr. 200-01, 203.) On redirect by the prosecution, Officer Santos stated that when measuring, he found the distance to be about 150 paces. (Santos: Tr. 202.) During summation, Medina's counsel gave police officer Santos the "benefit of the doubt" that he probably had meant to say 160 feet instead of yards. (Defense Closing: Tr. 518.)
[FN9]

FN10. Cepero stated that a .25 caliber automatic handgun is about three-and-a-half to four inches long. (Cepero: Tr. 371.)

FN11. Det. McKeon testified that the distance from a light pole, located in about the same area as the fence, to the front of 932 Intervale is 109 feet. (McKeon: Tr. 463.) In order to measure this distance, Det. McKeon "actually paced off the feet." (McKeon: Tr. 463.)

*5 Defense counsel also argued that since no shell casing was found at the crime scene, it was more reasonable to believe the shooter used a revolver than the automatic that Cepero said he saw Medina give to a girl. (Defense Closing: Tr. 515-17.)

*Verdict and Sentence*

On April 22, 1999, the jury found Medina not guilty on both counts of second degree murder and found him guilty of first degree manslaughter. (Verdict: Tr. 659-62.)

On May 14, 1999, Medina was sentenced to twelve-and-a-half to twenty-five years imprisonment. (Dkt.

No. 1: Pet. ¶ 3; Dkt. No. 5: A.D.A. Markoe Aff. ¶ 5.)

*Direct Appeal*

On appeal to the First Department, represented by different, appointed appellate counsel, Medina argued that: (1) the judge improperly assisted the prosecution during a pre-trial hearing (Medina 1st Dep't Br. at 12-14); (2) the prosecutor failed to prove Medina's guilt beyond a reasonable doubt and the verdict was against the weight of the evidence (*id.* at 15-16); (3) the prosecutor improperly elicited testimony that Medina did not make a statement following his arrest (*id.* at 16-18); and (4) Medina's sentence should be reduced in the interest of justice to the minimum permissible term (*id.* at 18-20).

On June 5, 2001, the First Department affirmed Medina's conviction, holding:

The verdict was based on legally sufficient evidence and was not against the weight of the evidence. Issues of credibility were properly presented to the jury and there is no reason to disturb its determinations.

Defendant's claim that the court improperly assisted the prosecutor during the suppression hearing is not preserved for appellate review and we decline to review it in the interest of justice. Were we to review this claim, we would find that the court's advice to the prosecutor that he should elicit additional testimony was entirely appropriate.

We perceive no basis for reduction of sentence.

Defendant's remaining contentions are unpreserved and we decline to review them in the interest of justice. Were we to review these claims, we would reject them.

*People v. Medina,* 284 A.D.2d 122, 122-23, 725 N.Y.S.2d 199, 199 (1st Dep't 2001) (citations omitted).

The New York Court of Appeals denied leave to appeal on

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

August 15, 2001. *People v. Medina,* 96 N.Y.2d 922, 732
N.Y.S.2d 639 (2001).

*Medina's C.P.L. § 440 Motion*

On October 11, 2002, represented by his present counsel,
Medina filed a C.P.L. § 440.10 motion to vacate his
conviction on the following grounds: (1) the trial court
erred in failing to order a competency hearing (10/11/02
Medina C.P.L. § 440 Br. at 5-9), and (2) trial counsel
rendered ineffective assistance by failing to (a) properly
investigate the crime scene, (b) request a competency
examination, (c) investigate Medina's medical and
psychiatric history, (d) interview a potentially exculpatory
witness, (e) thoroughly impeach the prosecution's primary
witness, and (f) inform Medina of his right to testify (*id.* at
9-16).

**\*6** On June 16, 2003, Medina's counsel filed a
supplemental motion pursuant to C.P.L. § 440.10(1)(g),
asserting that a written recantation from Cepero
constituted newly discovered evidence which proved
Medina's actual innocence. (6/16/03 Medina Supp. C.P.L.
§ 440 Motion.) [FN12]

> [FN12.] The motion was based on an affidavit
> from a private investigator and a handwritten
> statement signed by Cepero, stating that Cepero
> had told police he saw a "shiny object" in
> Medina's hands but Det. McKeon told him to say
> it was a gun. (*Id.,* Exs. B-C.)

Justice Joseph Fisch denied Medina's C.P.L. § 440
motions in their entirety on October 22, 2003. (10/22/03
Justice Fisch Order.) As to Medina's mental competence,
Justice Fisch held that "[t]he record, in the instant case, is
devoid of any information that would have suggested to
this Court that the defendant was not fit to proceed. In
fact, the record demonstrates the contrary, and reveals
many instances of the defendant's obvious participation in
the proceedings and awareness of what was taking place."
(10/22/03 Justice Fisch Order at 3.) Justice Fisch
elaborated:

In the instant case, the defendant's purported mental state
was never brought to the attention, nor obviously apparent
to the trial Court, thus failing to raise a doubt regarding
the defendant's competence. The defendant did not
manifest by words or actions any reason for this Court to
believe nor even suspect that he was not competent to
stand trial. The defendant's appearance was that of an
active, rational participant throughout his entire trial, in
full comprehension of the proceedings. He executed a
written waiver of his right to be present during sidebar
conferences, consulted with his attorney regarding jury
selection and actions to be taken with regard to specific
jurors. He prepared written questions for his attorney to
use during cross examination, consulted with his attorney
regarding the introduction of evidence during trial and had
his attorney inform the court of his personal needs during
trial. All these actions demonstrated to the Court that the
defendant understood the nature of the proceedings and
was able to assist in his defense. The Court had no
reasonable grounds to believe the defendant was not
competent to stand trial. The defendant's motion pursuant
to CPL § 440.10(1)(e) must, therefore, be denied in its
entirety.

(*Id.*)

Justice Fisch also denied Medina's ineffective assistance
claim. (*Id.* at 4-8.) Based on defense counsel's affidavit,
Justice Fisch found that while defense counsel was aware
that Medina "suffered from a variety of psychiatric
maladies, these ailments never led [defense counsel] to
believe the defendant was unable to understand the nature
of the proceedings against him nor to assist in his own
defense." (*Id.* at 4-5.) Justice Fisch found defense
counsel's vigorous cross-examination of Cepero to have
been effective. (*Id.* at 6.) Justice Fisch concluded that he
was "hard pressed to find the trial strategy of [defense
counsel] deficient when the defendant was acquitted of the
top charge of Murder," and in general, found counsel's
zealous advocacy and vigorous cross-examination to have
provided meaningful representation. (*Id.* at 7-8.) Finally,
as to Medina's new evidence claim, Justice Fisch found
that "Cepero's affidavit is not of such character that it will
probably change the result or verdict, if a new trial were
granted." (*Id.* at 8.) The Cepero affidavit was "of an
unreliable nature" (*id.* at 8-9); "[t]here is no form of proof
so unreliable as recanting testimony" (*id.* at 9).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

**\*7** On November 17, 2003, Medina moved pro se to reargue and renew his § 440 motion. Justice Fisch denied the motion to reargue on February 9, 2004. (2/9/04 Justice Fisch Order.)

The First Department denied leave to appeal denial of Medina's § 440 motion on February 20, 2004. (2/20/04 1st Dep't Order.) The First Department denied leave to appeal Medina's motion to reargue on May 11, 2004. (Dkt. No. 5: A.D.A. Markoe Aff. Ex. 3: 5/11/04 1st Dep't Order.)

*Medina's Current Federal Habeas Corpus Petition*

Represented by Gary Farrell, the same counsel who represented him in his C.P.L. § 440 motions, Medina's federal habeas corpus petition alleges that: (1) he was denied effective assistance of counsel (Pet.¶ 12(A)); (2) he was denied due process because he was not competent at the time of trial (Pet.¶ 12(B)); and (3) he was denied due process because new evidence demonstrates his innocence (Pet.¶ 12(C)).

*ANALYSIS*

I. *THE AEDPA REVIEW STANDARD* [FN13]

FN13. For additional decisions by this Judge discussing the AEDPA review standard in language substantially similar to that in this entire section of this Report & Recommendation, *see Smalls v. McGinnis,* 04 Civ. 0301, 2004 WL 1774578 at \*11-13 (S.D.N.Y. Aug. 10, 2004) (Peck, M.J.); *Gillespie v. Miller,* 04 Civ. 0295, 2004 WL 1689735 at \*6-8 (July 29, 2004) (Peck, M.J.); *Castro v. Fisher,* 04 Civ. 0346, 2004 WL 1637920 (S.D.N.Y. July 23, 2004) (Peck, M.J.); *Del Pilar v. Phillips,* 03 Civ. 8636, 2004 WL 1627220 at \*7-9 (S.D.N.Y. July 21, 2004) (Peck, M.J.); *Peakes v. Spitzer,* 04 Civ. 1342, 2004 WL 1366056 at \*8-10 (S.D.N.Y. June 16, 2004) (Peck, M.J.), *report & rec. adopted,* 2004 WL 1656568 (S.D.N.Y. July 23 2004) (Berman, D.J.); *Brown v. Fischer,* 03 Civ. 9818, 2004 WL 1171277 at \*4-6 (S.D.N.Y. May 27, 2004)

(Peck, M.J.); *Rodriguez v. Goord,* 02 Civ. 6318, 2004 WL 540531 at \*10-13 (S.D.N.Y. Mar. 19, 2004) (Peck, M.J.); *Rodriguez v. Senkowski,* 03 Civ. 3314, 2004 WL 503451 at \*22-24 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); *Hernandez v. Filion,* 03 Civ. 6989, 2004 WL 286107 at \*8-10 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.), *report & rec. adopted,* 2004 WL 555722 (S.D.N.Y. Mar. 19, 2004) (Berman, D.J.); *Gomez v. Duncan,* 02 Civ. 0846, 2004 WL 119360 at \*14-16 (S.D.N.Y. Jan. 27, 2004) (Peck, M.J.); *Montalvo v. Annetts,* 02 Civ. 1056, 2003 WL 22962504 at \*12-14 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); *Maldonado v. Greiner,* 01 Civ. 0799, 2003 WL 22435713 at \*15-17 (S.D.N.Y. Oct. 28, 2003) (Peck, M.J.); *McPherson v. Greiner,* 02 Civ. 2726, 2003 WL 22405449 at \*12-14 (S.D.N.Y. Oct. 22, 2003) (Peck, M.J.); *Wilder v. Herbert,* 03 Civ. 0397, 2003 WL 22219929 at \*4-6 (S.D.N.Y. Sept. 26, 2003) (Peck, M.J.); *Besser v. Walsh,* 02 Civ. 6775, 2003 WL 22093477 at \*14 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.), *report & rec. adopted,* 2003 WL 22681429 (S.D.N.Y. Nov. 13, 2003) (Kaplan, D.J.); *Guzman v. Fischer,* 02 Civ. 7448, 2003 WL 21744086 at \*7-9 (S.D.N.Y. July 29, 2003) (Peck, M.J.); *Skinner v. Duncan,* 01 Civ. 6656, 2003 WL 21386032 \*11-13 (S.D.N.Y. June 17, 2003) (Peck, M.J.); *Quinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at \*16-18 (S.D.N.Y. June 3, 2003) (Peck, M.J.); *Wilson v. Senkowski,* 02 Civ. 0231, 2003 WL 21031975 at \*5-6 (S.D.N.Y. May 7, 2003) (Peck, M.J.); *Naranjo v. Filion,* 02 Civ. 5449, 2003 WL 1900867 at \*5-7 (S.D.N.Y. Apr. 16, 2003) (Peck, M.J.); *Hediam v. Miller,* 02 Civ. 1419, 2002 WL 31867722 at \*8-10 (S.D.N.Y. Dec. 23, 2002) (Peck, M.J.); *Dickens v.. Filion,* 02 Civ. 3450, 2002 WL 31477701 at \*6-8 (S.D.N.Y. Nov. 6, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003) (Cote, D.J.); *Figueroa v. Greiner,* 02 Civ. 2126, 2002 WL 31356512 at \*5-6 (S.D.N.Y. Oct. 18, 2002) (Peck, M.J.); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at \*6-8 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); *Velazquez v. Murray,* 02 Civ. 2564, 2002 WL 1788022 at \*12-14 (S.D.N.Y. Aug. 2, 2002) (Peck, M.J.); *Soto v. Greiner,* 02 Civ. 2129, 2002 WL 1678641 at \*6-7 (S.D.N.Y. July

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

24, 2002) (Peck, M.J.); *Green v. Herbert,* 01 Civ. 11881, 2002 WL 1587133 at *9-11 (S.D.N.Y. July 18, 2002) (Peck, M.J.); *Bueno v. Walsh,* 01 Civ. 8738, 2002 WL 1498004 at *10-11 (S.D.N.Y. July 12, 2002) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *14 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002) (Scheindlin, D.J.), *aff'd,* No. 02-2540, 368 F.3d 179 (table), 2004 WL 1094269 (2d Cir. May 18, 2004); *Jamison v. Berbary,* 01 Civ. 5547, 2002 WL 1000283 at *8-9 (S.D.N.Y. May 15, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *12-13 (S.D.N.Y. May 8, 2002) (Peck, M.J.); *Jamison v. Grier,* 01 Civ. 6678, 2002 WL 100642 at 8-9 (S.D.N.Y. Jan. 25, 2002) (Peck, M.J.); *Thomas v. Breslin,* 01 Civ. 6657, 2002 WL 22015 at *4-5 (S.D.N.Y. Jan. 9, 2002) (Peck, M.J.); *Thomas v. Duncan,* 01 Civ. 6792, 2001 WL 1636974 at *7 (S.D.N.Y. Dec. 21, 2001) (Peck, M.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at *6 (S.D.N.Y. Dec. 11, 2001) (Peck, M.J.); *Rodriguez v. Lord,* 00 Civ. 0402, 2001 WL 1223864 at *16 (S.D.N.Y. Oct. 15, 2001) (Peck, M.J.); *James v. People of the State of New York,* 99 Civ. 8796, 2001 WL 706044 at *11 (S.D.N.Y. June 8, 2001) (Peck, M.J.), *report & rec. adopted,* 2002 WL 31426266 (S.D.N.Y. Oct. 25, 2002) (Berman, D.J.); *Ventura v. Artuz,* 99 Civ. 12025, 2000 WL 995497 at *5 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Mendez v. Artuz,* 98 Civ. 2652, 2000 WL 722613 at *22 (S.D.N.Y. June 6, 2000) (Peck, M.J.), *report & rec. adopted,* 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000) (McKenna, D.J.), *aff'd,* 303 F.3d 411, 417 (2d Cir.2002), *cert. denied,* 537 U .S. 1245, 123 S.Ct. 1353 (2003); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *10 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,* No. 01-2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,* 538 U.S. 978, 123 S.Ct. 1787 (2003).

Before the Court can determine whether Medina is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." *Williams v. Taylor,* 529 U.S. 362, 403, 120 S.Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[FN14]

FN14. *See also, e.g., Dallio v. Spitzer,* 343 F.3d 553, 559-60 (2d Cir.2003), *cert. denied,* 124 S.Ct. 1713 (2004); *Eze v. Senkowski,* 321 F.3d 110, 120 (2d Cir.2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners." ') (quoting *Lainfiesta v. Artuz,* 253 F.3d 151, 155 (2d Cir.2001), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1611 (2002)); *Christie v. Hollins,* 01 Civ. 11605, 2003 WL 22299216 at *2 (S.D.N.Y. Oct. 7, 2003) (Mukasey, D.J.) ("As Magistrate Judge Peck explained, the 'unreasonable application' clause, and AEDPA more generally, imposes a heavy burden on habeas petitioners.").

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." *Williams v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

*Taylor,* 529 U.S. at 404-05, 120 S.Ct. at 1519.[FN15] Both, however, "restrict[ ] the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams v. Taylor,* 529 U.S. at 412, 120 S.Ct. at 1523.[FN16] "That federal law, as defined by the Supreme Court, may either be a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller,* 289 F.3d at 42. "A petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." *Yung v. Walker,* 296 F.3d at 135; *accord, e.g., DelValle v. Armstrong,* 306 F.3d at 1200.

> FN15. *Accord, e.g., Parsad v. Greiner,* 337 F.3d 175, 181 (2d Cir.2003), *cert. denied,* 124 S.Ct. 962 (2003); *Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000); *Lurie v. Wittner,* 228 F.3d 113, 125 (2d Cir.2000), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1404 (2001); *Clark v. Stinson,* 214 F.3d 315, 320 (2d Cir.2000), *cert. denied,* 531 U.S. 1116, 121 S.Ct. 865 (2001).

> FN16. *Accord, e.g., Yarborough v. Alvarado,* 124 S.Ct. 2140, 2147 (U.S.2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.' "); *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 2534 (2003); *Lockyer v. Andrade,* 538 U.S. 63, 72, 123 S.Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.' "); *Tueros v. Greiner,* 343 F.3d at 591, 591 (2d Cir.2003), *cert. denied,* 124 S.Ct. 2171 (2004); *Parsad v. Greiner,* 337 F.3d at 181; *DelValle v. Armstrong,* 306 F.3d 1197, 1200 (2d Cir.2002); *Yung v. Walker,* 296 F.3d 129, 135 (2d Cir.2002); *Kennaugh v. Miller,* 289 F.3d 36, 42 (2d Cir.), *cert. denied,* 537 U.S. 909, 123 S.Ct. 251 (2002); *Loliscio v. Goord,* 263 F.3d 178, 184 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 309 (2d Cir.2001).

**\*8** As to the "contrary to" clause:

A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases.... A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

*Williams v. Taylor,* 529 U.S. at 405-06, 120 S.Ct. at 1519-20.[FN17]

> FN17. *Accord, e.g., Price v. Vincent,* 538 U.S. 634, 123 S.Ct. 1848, 1853 (2003); *Lockyer v. Andrade,* 123 S.Ct. at 1173-74; *Tueros v. Greiner,* 343 F.3d at 591; *DelValle v. Armstrong,* 306 F.3d at 1200; *Yung v. Walker,* 296 F.3d at 135; *Kennaugh v. Miller,* 289 F.3d at 42; *Loliscio v. Goord,* 263 F .3d at 184; *Lurie v. Wittner,* 228 F.3d at 127-28.

In *Williams,* the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. at 413, 120 S.Ct. at 1523.[FN18] However, "[t]he term 'unreasonable' is ... difficult to define." *Williams v. Taylor,* 529 U.S. at 410, 120 S.Ct. at 1522. The Supreme Court made clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.*[FN19] Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor,* 529 U.S. at 409, 120 S.Ct. at 1521.[FN20] "Objectively unreasonable" is different from "clear error." *Lockyer v. Andrade,* 538 U.S. at 75, 123 S.Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."). However, the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

mark as to suggest judicial incompetence." ' *Jones v. Stinson,* 229 F.3d at 119 (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).[FN21] "[T]he range of reasonable judgment can depend in part on the nature of the relevant rule." *Yarborough v. Alvarado,* 124 S.Ct. at 2149.[FN22]

FN18. *Accord, e.g., Wiggins v. Smith,* 123 S.Ct. at 2534-35; *Parsad v. Greiner,* 337 F.3d at 181.

FN19. *See also, e.g., Yarborough v. Alvarado,* 124 S.Ct. at 2150; *Wiggins v. Smith,* 123 S.Ct. at 2535; *Price v. Vincent,* 123 S.Ct. at 1853 ("As we have explained, 'a federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly." ') (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24-25, 123 S.Ct. 357, 360 (2002)); *Lockyer v. Andrade,* 538 U.S. at 75, 123 S.Ct. at 1175; *Eze v. Senkowski,* 321 F.3d at 124-25; *DelValle v. Armstrong,* 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

FN20. *Accord, e.g., Yarborough v. Alvarado,* 124 S.Ct. at 2150; *Wiggins v. Smith,* 123 S.Ct. at 2535; *Price v. Vincent,* 123 S.Ct. at 1853; *Lockyer v. Andrade,* 538 U.S. at 75, 123 S.Ct. at 1174-75; *Woodford v. Visciotti,* 537 U.S. at 25-27, 123 S.Ct. at 360-61; *Eze v. Senkowski,* 321 F.3d at 125; *Ryan v. Miller,* 303 F.3d 231, 245 (2d Cir.2002); *Yung v. Walker,* 296 F.3d at 135; *Loliscio v. Goord,* 263 F.3d at 184; *Lurie v. Wittner,* 228 F.3d at 128-29.

FN21. *Accord, e.g., Eze v. Senkowski,* 321 F.3d at 125; *Ryan v. Miller,* 303 F.3d at 245; *Yung v. Walker,* 296 F.3d at 135; *Loliscio v. Goord,* 263 F.3d at 184; *Christie v. Hollins,* 2003 WL 22299216 at *3.

FN22. The Supreme Court explained:

[T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough v. Alvarado,* 124 S.Ct. at 2149.

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." *Kennaugh v. Miller,* 289 F.3d at 45.[FN23]

FN23. *Accord, e.g., Tueros v. Greiner,* 343 F.3d at 591; *Yung v. Walker,* 296 F.3d at 135; *see Yarborough v. Alvarado,* 124 S.Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision. There is force to this argument. Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." *Yung v. Walker,* 296 F.3d at 134.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

*9 For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim-even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

*Sellan v. Kuhlman,* 261 F.3d at 312; *accord Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); *Francolino v. Kuhlman,* 365 F.3d 137, 141 (2d Cir. Apr. 20, 2004) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims," ' AEDPA deference applies.); *Jenkins v. Artuz,* 294 F.3d 284, 291 (2d Cir.2002) ("In *Sellan,* we found that an even more concise Appellate Division disposition-the word 'denied'-triggered AEDPA deference.").[FN24] "By its terms, § 2254(d) requires such deference only with respect to a state-court 'adjudication on the merits,' not to a disposition 'on a procedural, or other, ground.' Where it is 'impossible to discern the Appellate Division's conclusion on [the relevant] issue,' a federal court should not give AEDPA deference to the state appellate court's ruling." *Miranda v. Bennett,* 322 F.3d 171, 177-78 (2d Cir.2003) (citations omitted).[FN25] Of course, "[i]f there is no [state court] adjudication on the merits, then the pre-AEDPA, *de novo* standard of review applies." *Cotto v. Herbert,* 331 F.3d at 230.

FN24. Accord, e.g., *Dallio v. Spitzer,* 343 F.3d at 559-60; *Parsad v. Greiner,* 337 F.3d at 180-81; *Cotto v. Herbert,* 331 F.3d 217, 230 (2d Cir.2003); *Eze v. Senkowski,* 321 F.3d at 121; *Ryan v. Miller,* 303 F.3d at 245; *Aeid v. Bennett,* 296 F.3d 58, 62 (2d Cir.), *cert. denied,* 537 U.S. 1093, 123 S.Ct. 694 (2002); *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir.2002); *Aparicio v. Artuz,* 269 F.3d 78, 93 (2d Cir.2001).

The Second Circuit "recognize[d] that a state court's explanation of the reasoning underlying its decision would ease our burden in applying the 'unreasonable application' or 'contrary to' tests." *Sellan v. Kuhlman,* 261 F.3d at 312. Where the state court does not explain its reasoning, the Second Circuit articulated the analytic steps to be followed by a federal habeas court:

We adopt the Fifth Circuit's succinct articulation of the analytic steps that a federal habeas court should follow in determining whether a federal claim has been adjudicated "on the merits" by a state court. As the Fifth Circuit has explained, "[W]e determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Mercadel v. Cain,* 179 F.3d 271, 274 (5th Cir.1999).

*Sellan v. Kuhlman,* 261 F.3d at 314; *accord, e.g., Cotto v. Herbert,* 331 F.3d at 230; *Eze v. Senkowski,* 321 F.3d at 121-22; *Norde v. Keane,* 294 F.3d at 410; *Aparicio v. Artuz,* 269 F.3d at 93; *see also Dallio v. Spitzer,* 343 F.3d at 560.

FN25. The Second Circuit in *Miranda v. Bennett* continued: "Generally, when the Appellate Division opinion states that a group of contentions is either without merit 'or'

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

procedurally barred, the decision does not disclose which claim in the group has been rejected on which ground. If the record makes it clear, however, that a given claim had been properly preserved for appellate review, we will conclude that it fell into the 'without merit' part of the disjunct even if it was not expressly discussed by the Appellate Division." *Id.* at 178.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence." ' *Parsad v. Greiner,* 337 F.3d at 181 (quoting § 2254(e)(1)).

Here, Medina's habeas claims were decided on the merits by the § 440 court, and hence AEDPA deference applies.

II. *THE STATE TRIAL JUDGE'S FAILURE TO ORDER A COMPETENCY EXAMINATION DID NOT DEPRIVE MEDINA OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL*

A. *The Applicable Law* [FN26]

> FN26. For a prior decision by this Judge discussing the applicable law regarding a criminal judge's duty with respect to a criminal defendant's mental competence to stand trial, *see Johnson v. Keane,* 974 F.Supp. 225, 236-40 (S.D.N.Y.1997) (Preska, D.J. & Peck, M.J.).

It is black letter law that subjecting a mentally incompetent defendant to trial violates the defendant's due process rights. Indeed, the Supreme Court has explained that this right has been recognized since the time of *Blackstone's Commentaries:*

It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial. Thus, Blackstone wrote that one who became 'mad' after the commission of an offense should not be arraigned for it 'because he is not able to plead to it with that advice and caution that he ought.' Similarly, if he became 'mad' after pleading, he should not be tried, 'for how can he make his defense?' 4 W. Blackstone Commentaries, *24.... [T]he prohibition is fundamental to an adversary system of justice....

**\*10** In *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), we held that [a state's] failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial.

*Drope v. Missouri,* 420 U.S. 162, 171-72, 95 S.Ct. 896, 903-04 (1975). [FN27] Since convicting an incompetent defendant is a fundamental constitutional error, "[i]t follows as a corollary that the failure to hold a required competency hearing deprives a defendant of his constitutional right to a fair trial and renders the conviction void." *Nicks v. United States,* 955 F.2d 161, 167, 168 (2d Cir.1992); *accord, e.g., Harris v. Kuhlmann,* 346 F.3d 330, 350 (2d Cir.2003); *Griffin v. Lockhart,* 935 F.2d 926, 929 (8th Cir.1991); *Cruz v. New York,* 03 Civ. 9815, 2004 WL 1516787 at *5-6 (S.D.N.Y. July 6, 2004); *Armstrong v. Duncan,* 03 Civ. 930 & 1442, 2003 WL 22339490 at *8 (S.D.N.Y. Oct. 14, 2003). Accordingly, the federal courts have granted habeas corpus petitions where a potentially incompetent defendant was tried without a competence hearing. *E.g., Pate v. Robinson,* 383 U.S. 375, 386, 86 S.Ct. 836, 842 (1966); *Silverstein v. Henderson,* 706 F.2d 361, 369 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195 (1983).

> FN27. *Accord, e.g., United States v. Gabb,* No. 02-1273, 80 Fed. Appx. 142, 144-45, 2003 WL 22533190 at *2 (2d Cir. Nov. 7, 2003); *United States v. Quinteri,* 306 F.3d 1217, 1232-33 (2d Cir.2002). *cert. denied,* 539 U.S. 902, 123 S.Ct. 2246 (2003); *Thomas v. New York,* No. 97-2317, 133 F.3d 907 (table), 1998 WL 2373 at *2 (2d Cir. Jan. 6, 1998); *United States v. Vamos,* 797 F .2d 1146, 1150 (2d Cir.1986), *cert. denied,* 479 U.S. 1036, 107 S.Ct. 888 (1987).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

Under New York law, an " '[i]ncapacitated person' means a defendant who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense." C.P.L. § 730.10(1). Similarly, in federal court, in determining a defendant's competency to stand trial, the "test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 789 (1960); accord, e.g., United States v. Gabb, 2003 WL 22533190 at *2; United States v. Zedner, No. 01-1172, 29 Fed. Appx. 711, 712-13, 2002 WL 257224 at *1 (2d Cir. Feb. 21, 2002); United States v. Gomes, No. 00-1435, 229 F.3d 1136 (table), 2000 WL 1476151 at *1 (2d Cir. Oct. 2, 2000); United States v. Patterson, No. 99-1014, 189 F.3d 462 (table), 1999 WL 710216 at *1 (2d Cir. Sept. 2, 1999), cert. denied, 528 U.S. 1097, 120 S.C. 839 (2000); United States v. Nichols, 56 F.3d 403, 410, 412 (2d Cir.1995); Hernandez v. Ylst, 930 F.2d 714, 716 & n. 2 (9th Cir.1990); United States v. Oliver, 626 F.2d 254, 258 (2d Cir.1980); Newfield v. United States, 565 F.2d 203, 206 (2d Cir.1977); Etoria v. Bennett, 292 F.Supp.2d 456, 467 (E.D.N.Y.2003) (Weinstein, D.J.); Mead v. Walker, 839 F.Supp. 1030, 1033 (S.D.N.Y.1993) ("The state test for incompetency" under C.P.L. § 730.10 "appears to parallel the federal one" set out in Dusky ). "The inquiry involves an assessment of whether the accused can assist 'in such ways as providing accounts of the facts, names of witnesses, etc.' ... But it is not sufficient merely that the defendant can make a recitation of the charges or the names of witnesses, for proper assistance in the defense requires an understanding that is 'rational as well as factual." ' United States v. Hemsi, 901 F.2d 293, 295 (2d Cir.1990).

**11** Criminal Procedure Law § 730 establishes the procedures by which New York courts determine whether a defendant is mentally competent to stand trial. See Mead v. Walker, 839 F.Supp. at 1034. C.P.L. § 730.30 provides in pertinent part that:

1. At any time after a defendant is arraigned upon an accusatory instrument other than a felony complaint and before the imposition of sentence, or at any time after a defendant is arraigned upon a felony complaint and before he is held for the action of the grand jury, the court wherein the criminal action is pending must issue an order of examination when it is of the opinion that the defendant may be an incapacitated person.

2. When the examination reports submitted to the court show that each psychiatric examiner is of the opinion that the defendant is not an incapacitated person, the court may, on its own motion, conduct a hearing to determine the issue of capacity, and it must conduct a hearing upon motion therefor by the defendant or by the district attorney. If no motion for a hearing is made, the criminal action against the defendant must proceed. If, following a hearing, the court is satisfied that the defendant is not an incapacitated person, the criminal action against him must proceed; if the court is not so satisfied, it must issue a further order of examination directing that the defendant be examined by different psychiatric examiners designated by the director.

A defendant being tried in federal court is afforded similar protection by 18 U.S.C. § 4241:

(a) Motion to determine competency of defendant.-At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

(b) Psychiatric or psychological examination and report.-Prior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court....

18 U.S.C. § 4241, see, e.g., United States v. Gabb, 2003 WL 22533190 at *2; United States v. Quintieri, 306 F.3d at 1232.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

While there is some variation in the procedures used in the New York and federal courts,[FN28] the standard to be employed by the trial judge under New York or federal case law is the same. "[W]hen the demeanor of the defendant or other evidence raises doubt as to [the defendant's] competence to stand trial, it is the trial court's duty to order a hearing sua sponte." *Silverstein v. Henderson,* 706 F.2d at 367. Expressed another way, "the trial court must order a hearing when there is 'reasonable ground' for believing that the defendant may be incompetent to stand trial." *Id.* at 369; *accord, e.g., Pate v. Robinson,* 383 U.S. at 385, 86 S.Ct. at 842 (error for state trial court to have failed to hold a competence hearing where evidence of incompetence was presented); *United States v. Gabb,* 2003 WL 22533190 at *2; *Harris v. Kuhlmann,* 346 F.3d at 350; *United States v. Quinteri,* 306 F.3d at 1232; *United States v. Nichols,* 56 F.3d at 414 ("Neither ... 18 U.S.C. 4241 nor the Due Process Clause requires a hearing in every instance; a hearing is required only if the court has 'reasonable cause' to believe that the defendant has a mental defect rendering him incompetent."); *United States v. Kirsh,* 54 F.3d 1062, 1070 (2d Cir.), *cert. denied,* 516 U.S. 927, 116 S.Ct. 330 (1995); *Nicks v. United States,* 995 F.2d at 168; *Cruz v. New York,* 2004 WL 1516787 at *5-6; *Galandreo v. Perlman,* No. 02-CV-6799, 03-MISC-0066, 2003 WL 23198790 at *17 (E.D.N.Y. Oct. 31, 2003) (Weinstein, D.J.) ("As noted by the Court of Appeals for the Second Circuit, New York provides the same procedural protections required under Supreme Court law" as to competency to stand trial.); *Etoria v. Bennett,* 292 F.Supp.2d at 467-68; *Rollins v. Leonardo,* 733 F.Supp. 763, 767-68 (S.D.N.Y.1990), *aff'd,* 938 F.2d 380, 382 (2d Cir.1991); *People v. Tortorici,* 92 N.Y.2d 757, 765, 686 N.Y.S.2d 346, 350-51, *cert. denied,* 588 U.S. 834, 120 S.Ct. 94 (1999); *People v. Morgan,* 87 N.Y.2d 878, 880, 638 N.Y.S.2d 942, 943 (1995); *People v. Armlin,* 37 N.Y.2d 167, 171, 371 N.Y.S.2d 691, 695 (1975); *People v. Gonzalez,* 20 N.Y.2d 289, 293, 282 N.Y.S.2d 538, 541 (1967), *cert. denied,* 390 U.S. 971, 68 S.Ct. 1093 (1968); *People v. Smyth,* 3 N.Y.2d 184, 187, 164 N .Y.S.2d 737, 739 (1957); *People v. McPhee,* 161 Misc.2d 660, 662, 614 N.Y.S.2d 884, 885-86 (Sup.Ct. Queens Co.1994).

FN28. For example, in New York a psychiatric examination is required if the court believes the defendant may be incapacitated, while in federal court an examination before a competency hearing is discretionary. *Compare* C.P.L. § 730.30(1) *with* 18 U.S.C. § 4241(a).

**\*12** Conversely, of course, there is no requirement to order a competency examination or hearing if the trial court has not been given reasonable cause to believe that a defendant may be incompetent. *See, e.g., United States v. Quinteri,* 306 F .3d at 1234 & n. 10; *United States v. Nichols,* 56 F.3d at 414-15; *United States v. Kirsh,* 54 F.3d at 1070 ("the failure to conduct a full competency hearing is not a ground for reversal when the defendant appeared to be competent during trial"); *Hernandez v. Ylst,* 930 F.2d at 716 & n. 3 ("A *Pate* hearing is not required, however, absent a 'substantial' or 'bona fide' doubt of competency."); *United States v. Vamos,* 797 F.2d at 1150; *United States ex rel. Roth v. Zelker,* 455 F.2d 1105, 1108 (2d Cir.) (competency hearing not mandated "if the evidence does not warrant one"), *cert. denied,* 408 U.S. 927, 92 S.Ct. 2512 (1972); *Rollins v. Leonardo,* 733 F.Supp. at 768; *Dennis v. Turner,* 729 F.Supp. 15, 16 (S.D.N.Y.1990); *People v. Morgan,* 87 N.Y.2d at 880, 638 N.Y.S.2d at 943; *People v. Armlin,* 37 N.Y.2d at 171, 371 N.Y.S.2d at 695. Otherwise, the statute could be abused to provide an automatic continuance of the trial date at a defendant's request. *See, e.g., United States v. Nichols,* 56 F.3d at 415 ("Such a rule would allow a manipulative defendant (as Judge Korman suspected Mason to be) to bring the trial to a halt at his whim."); *United States v. Hall,* 523 F.2d 665, 667 (2d Cir.1975).

The requirement that the trial judge determine whether a defendant is competent to stand trial if there is reasonable ground for believing the defendant incompetent is required not only by the New York and federal statutes, but also by the Constitution's due process clause. *E.g., Harris v. Kuhlmann,* 346 F.3d at 349-50; *United States v. Quintieri,* 206 F.3d at 1232; *United States v. Nichols,* 56 F.3d at 416; *Nicks v. United States,* 955 F.2d at 168 (citing *Pate v. Robinson,* 383 U.S. at 385, 86 S.Ct. at 842); *United States v. Day,* 949 F.2d 973, 982 (8th Cir.1991) ("The issue framed by *Pate* and *Drope* is not whether the defendant was competent to stand trial or plead guilty, but whether the absence of a hearing on the question of his competency amounted, in the circumstances of the case, to a denial of due process."), *cert. denied,* 114 S.Ct. 2140 (1994); *Hernandez v. Ylst,* 930 F.2d at 716; *United States v. Auen,* 846 F.2d 872, 877 (2d Cir.1988); *Galandreo v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

*Perlman,* No. 02-CV-6799, 03-MISC-0066, 2003 WL 23198790 at *17 (E.D.N.Y. Oct. 31, 2003) (Weinstein, D.J.).

The determination of whether there is "reasonable cause" to believe a defendant may be incompetent rests in the discretion of the trial judge. *See, e.g., United States v. Gabb,* 2003 WL 22533190 at *2; *United States v. Quintieri,* 306 F.3d at 1232-33; *United States v. Nichols,* 56 F.3d at 414; *United States v. Vamos,* 797 F.2d at 1150; *Newfield v. United States,* 565 F.2d at 206; *People v. Tortorici,* 92 N.Y.2d at 766, 686 N.Y.S.2d at 351; *People v. Morgan,* 87 N.Y.2d at 89, 638 N.Y.S.2d at 943.[FN29]

> FN29. For the procedural safeguards required by statute and Constitutional due process to be effective, however, the trial court "must necessarily exercise its discretion and make findings on the record concerning the defendant's competency where the facts presented to the court warrant such an inquiry." *United States v. Auen,* 846 F.2d at 877-78; *see also, e.g., United States v. Garrett,* 903 F.2d 1105, 1116 (7th Cir.1990).

**\*13** The Supreme Court has recognized that there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." *Drope v. Missouri,* 420 U.S. at 180, 95 S.Ct. at 908.[FN30] The Supreme Court, however, has recognized some of the factors that the trial court should consider: "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but even one of those factors standing alone may, in some circumstances, be sufficient." *Drope v. Missouri,* 420 U.S. at 180, 95 S.Ct. at 908; *see also, e.g., United States v. Gabb,* 2003 WL 22533190 at *2 ("[A] district court must consider many factors when determining whether it has 'reasonable cause' to order a competency hearing.... 'A district court also often orders and reviews psychiatric records when determining whether to hold a hearing.' "); *United States v. Estrada,* Nos. 00-1189, 03-1139, 59 Fed. Appx. 372, 374, 2003 WL 562291 at *2 (2d Cir. Feb. 28, 2003), *cert. denied,* 124 S.Ct. 552 (2003); *United States v. Quinteri,* 306 F.3d at 1233 ("A district court also often orders and reviews

psychiatric records when determining whether to hold a hearing."); *United States v. Nichols,* 56 F.3d at 411 ("In making a determination of competency, the [trial] court may rely on a member of factors, including medical opinion and the court's observation of the defendant's compartment."); *United States v. Day,* 949 F.2d at 982 (factors include "any evidence of [defendant's] irrational behavior, his demeanor before the trial court, available medical evaluations, and whether trial counsel questioned the defendant's competency before the court."); *United States v. Hemsi,* 901 F.2d at 295-96 ("the court may take account of a number of factors, including the defendant's comportment in the courtroom."); *Etoria v. Bennett,* 292 F.Supp.2d at 467 ("Three relevant areas of inquiry include defendant's irrational behavior, his demeanor at trial, and medical opinion."); *People v.. Tortorici,* 92 N.Y.2d at 766, 686 N.Y.S.2d at 351; *People v. Morgan,* 87 N.Y.2d at 880-81, 638 N.Y.S.2d at 943-44.

> FN30. *Accord, e.g., Harris v. Kuhlmann,* 346 F.3d at 350; *United States v. Quintieri,* 306 F.3d at 1233; *Silverstein v. Henderson,* 706 F.2d at 369.

In addition, "deference is owed to the [trial] court's determinations based on observation of the defendant during the [pretrial and trial] proceedings." *United States v. Vamos,* 797 F.2d at 1150; *see also, e.g., United States v. Gabb,* 2003 WL 22533190 at *2; *Harris v. Kuhlmann,* 346 F.3d at 355; *United States v. Quintieri,* 306 F.3d at 1233; *United States v. Nichols,* 56 F.3d at 414; *United States v. Kirsh,* 54 F.3d at 1070 (trial court's "view of the defendant's competency based on its observations at trial is entitled to deference"); *United States v. Oliver,* 626 F.2d at 259 (trial judge "justifiably relied on his extended observations of [the defendant] in deciding that he had sufficient mental capacity to stand trial").[FN31]

> FN31. This is especially so where the trial judge questions the defendant (outside the jury's presence) to explore defendant's competency. *See, e.g., United States v. Oliver,* 626 F.2d at 259; *People v. Russell,* 74 N.Y.2d 901, 902, 549 N.Y.S.2d 646, 647, 548 N.E.2d 1297, 1298 (1989) (trial judge's direct questioning of the defendant along with his overall ability to observe defendant at trial, supported finding of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

competence).

**\*14** Defense counsel's opinion as to defendant's competence or incompetence also is an important factor to consider. As the Second Circuit has pointed out, "since competency involves an inability to assist in the preparation of a defense or rationally to comprehend the nature of the proceedings, failure by trial counsel to indicate the presence of such difficulties provides substantial evidence of the defendant's competence." *United States v. Vamos,* 797 F.2d at 1150; *see, e.g., Drope v. Missouri,* 420 U.S. at 177 n .13, 95 S.Ct. at 906 n. 13 ("Although we do not, of course, suggest that courts must accept without question a lawyer's representation concerning the competence of his client, ... an expressed doubt in that regard by one with 'the closest contact with the defendant' ... is unquestionably a factor which should be considered."); *United States v. Gabb,* 2003 WL 22533190 at \*3; *United States v. Estrada,* 2003 WL 562291 at \*2; *United States v. Quintieri,* 306 F.3d at 1233; *United States v. Kirsh,* 54 F.3d at 1071 (quoting *Vamos* ); *United States v. Day,* 949 F.2d at 982 (factors include "whether trial counsel questioned the defendant's competency before the court"); *Griffin v. Lockhart,* 935 F.2d at 930, 931; *Hernandez v. Ylst,* 930 F.2d at 718 ("While the opinion of [defendant's] counsel certainly is not determinative, a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings."); *United States v. Renfroe,* 825 F.2d 763, 767 (3d Cir.1987) ("Other factors [besides the factors listed in *Drope* ] relevant to the [competency] determination may include an attorney's representation about his client's competency."); *United States ex rel. Roth v. Zelker,* 455 F.2d at 1108 (the "opinion of a defendant's attorney as to his ability to understand the nature of the proceedings and to cooperate in the preparation of his defense, is indeed significant and probative.").[FN32]

> **FN32.** *See also, e.g., Lopez v. Walker,* 239 F.Supp.2d 368, 374 (S.D.N.Y.2003) ("[G]iven the frequency and nature of contact between attorney and client, an attorney has perhaps the greatest opportunity to notice any behavior that might signify incompetence in his client. Thus, defense counsel's inaction with regard to his client's competency is particularly strong evidence of defendant's mental state."); *People v. Morgan,* 87 N.Y.2d at 880, 638 N.Y.S.2d at

943-44, 662 N.E.2d at 261-62 (counsel's opinion is a factor but it does not "serve as an automatic substitute for the court's statutory discretion"); *People v. Gelikkaya,* 84 N.Y .2d 456, 460, 618 N.Y.S.2d 895, 897, 643 N.E.2d 517, 519 (1994) (noting that "defense counsel ... was in the best position to assess defendant's capacity").

Finally, the Supreme Court has held that even when a defendant is deemed competent at the beginning of the case, a trial court must always be aware of circumstances pointing to a change in defendant's competency. *Drope v. Missouri,* 420 U.S. at 182, 95 S.Ct. at 908 ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.").[FN33]

> **FN33.** *See, e.g., United States v. Mason,* 52 F.3d 1286, 1292-93 (4th Cir.1995) (defendant's suicide attempt after first phase of defendant's trial required court to hold competency hearing not only as to defendant's competence to continue trial but also as to his competence at already concluded first part of trial); *United States v. Auen,* 846 F.2d at 878; *United States v. Renfroe,* 825 F.2d at 766 (because "statute permits motions to determine competency 'at any time after the commencement of prosecution for an offense and prior to the sentencing of the defendant ...,' [t]he request for a hearing to determine [defendant's] competency at trial was, therefore, timely and should have been addressed by the [trial] court."); *Etoria v. Bennett,* 292 F.Supp.2d at 468; *People v. Colon,* 128 A.D.2d 422, 423, 512 N.Y.S.2d 809, 810 (1st Dep't 1987).

B. *Application of These Legal Principles to Medina's Habeas Claim*

Medina's habeas petition, as did his C.P.L. § 440 motion, claims that his prison medical records show that he was incompetent at the time of trial. (*E.g.,* Dkt. No. 1: Pet. ¶ 12(B) ("The prison medical records clearly state the various severe psychiatric problems of the defendant and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

the regimen of powerful p[s]ychotropic drugs being taken by the defendant that rendered him incapacitated before and during trial and sentencing.").)

**\*15** The problem with Medina's argument-implicitly recognized in his ineffective assistance claim-is that it is undisputed that this medical evidence was not before the trial judge at the time of trial and/or sentencing, and thus cannot be considered on habeas review. *See, e.g., United States v. Gabb,* No. 02-1273, 80 Fed. Appx. 142, 144-45, 2003 WL 22533190 at *2 (2d Cir. Nov. 7, 2003) ("[T]he question of competency and reasonable cause to doubt it must focus on the defendant's abilities *at the time of trial,* not any conduct discovered or analyzed after the fact."); *Harris v. Kuhlmann,* 346 F.3d 330, 350 (2d Cir.2003) ("Of course, '[i]t is axiomatic that in reviewing whether this obligation [to order a competency hearing] was properly discharged only evidence before the court at the time its decision was made is pertinent."); *Graham v.. Portuondo,* Nos. 03-MISC-0066, 01-CV-6911, 2003 WL 23185715 at *7 (E.D.N.Y. Oct. 30, 2003) (Weinstein, D.J.) ("In order to find abuse of discretion in failing to order a competency hearing, a reviewer must evaluate the record and evidence available to the trial judge."); *United States v. Berger,* 188 F.Supp.2d 307, 325 (S.D.N.Y.2002); *Collazo v. United States,* 98 Civ. 7059, 1999 WL 335146 at *4-5 (S.D.N.Y. May 26, 1999).

This Court therefore looks to the information that was before the trial judge. As noted above, defense counsel's opinion as to defendant's competence or incompetence is an important factor to consider. (*See* cases cited at pages 30-31 above.) Here, Medina's trial counsel did not ask the trial court to hold a C.P.L. § 730.30 hearing as to Medina's competency. To the contrary, Medina's trial counsel found Medina to be competent to assist in his defense, as he explained in the affidavit he submitted in response to Medina's C.P.L. § 440 motion:

19. As regards the first question, the Court should be assured that, from the beginning of my representation, I was not unmindful of the fact that Defendant Mr. Medina had psychological problems. From speaking with various family members, I learned of his psychiatric history. I learned that he suffered from a variety of psychiatric maladies. I also learned, however, that while these various maladies may have manifested themselves in different

ways, none of these ailments ever led me to believe in any manner whatsoever that Mr. Medina was unable to understand the nature of the proceedings or to assist in his own defense.

....

21. From the outset, Mr. Medina indicated to me that he fully understood the proceedings that were taking place. He knew why he had been charged. He knew with what he had been charged. He specifically recalled the night of the shooting. And though at various times over the course of my representation, Mr. Medina provided me with a number of different alibis and with a number of possible defenses and/or excuses for his actions, neither his words or action exhibited to me that he lacked, in any way whatsoever, an understanding of his case and of his situation.

**\*16** 22. Likewise, all through the proceedings, and particularly at trial, Mr. Medina attempted to assist in his own defense. As I recall, he was familiar with most of the people who were mentioned in the various police reports provided in discovery. For example, when we discovered that an individual named "Irizarry" was likely to be called a witness against him, Mr. Medina prepared a list of questions for me to ask this person upon cross-examination. I have annexed a copy of Mr. Medina's cross-examination questions for this individual as Exhibit "B".

23. Your honor should be aware that Mr. Medina was fully cognizant of all of the sentencing possibilities that the case presented. Review of my notes indicates that, at least at one point, Mr. Medina stated to me that he would accept a negotiated disposition which carried with it a term of ten years' incarceration. When the prosecutor would not agree, however, we did not broach the subject again.

24. What was evident, at least to my untrained eye, was that Mr. Medina had no sense of the gravity of the crime. Upon reflection brought on by my review of my file in preparation of the affirmation, I recall that Mr. Medina never referred to the victim of the crime as anything other than "the Cuban," or "the Old Cuban." His attitude always

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

seemed to be, at least in my discussions with him, that neither the police nor the prosecutors were as smart as he was.

25. During my representation of Mr. Medina, I was not unmindful, however, that Mr. Medina did possess some psychiatric problems. I knew of some of his history through speaking with him as well as certain friends and family members. Indeed, at one point, I was considering some type of "diminished capacity" defense. Early on in the case, I consulted with a psychiatrist, Dr. Sanford Drab. After Dr. Drab's review of the case, I made the decision to proceed with a more straightforward defense.

26. The Court should note, however, that *at no time* during my meetings with Mr. Medina prior to or during trial, did he appear to me to be in a "subdued torpor" (Memorandum submitted in support of Defendant's 440.10 Motion, page 6). Nor do I recall him ever appearing to be in a "heavily medicated and sedated state" (memorandum, page 6), or a "stupefied state" (Memorandum, page 7).

(1/24/03 Affidavit of Medina's trial counsel, Anthony R. Dellicarri, ¶¶ 19-26, attached as Ex. 1 to 3/5/03 Aff. of A.D.A. Zaharah R. Markoe in Opposition to Medina C.P.L. § 440 Motion.) *See, e.g., Graham v. Portuondo,* Nos. 03-MISC-0066, 01-CV-6911, 2003 WL 23185715 at *7 (E.D.N.Y. Oct. 30, 2003)* (Weinstein, D.J.); *Collazo v. United States,* 98 Civ. 7059, 1999 WL 335146 at *4-5 (S.D.N.Y. May 26, 1999).

The trial judge nevertheless would have had a duty to *sua sponte* order a competency examination of Medina, if Medina's demeanor or other evidence raised doubt as to his competence. (*See* cases cited at pages 26-27 above.) The fact that defense counsel did not request such a hearing is one factor. Justice Fisch made clear in denying Medina's C.P.L. § 440 motion that he had no reason to question Medina's competency:

*17 The record, in the instant case, is devoid of any information that would have suggested to this Court that the defendant was not fit to proceed. In fact, the record demonstrates the contrary, and reveals many instances of the defendant's obvious participation in the proceedings

and awareness of what was taking place....

In the instant case, the defendant's purported mental state was never brought to the attention, nor obviously apparent to the trial Court, thus failing to raise a doubt regarding the defendant's competence. The defendant did not manifest by words or actions any reason for this Court to believe nor even suspect that he was not competent to stand trial. The defendant's appearance was that of an active, rational participant throughout his entire trial, in full comprehension of the proceedings. He executed a written waiver of his right to be present during sidebar conferences, consulted with his attorney regarding jury selection and actions to be taken with regard to specific jurors. He prepared written questions for his attorney to use during cross examination, consulted with his attorney regarding the introduction of evidence during trial and had his attorney inform the court of his personal needs during trial. All these actions demonstrated to the Court that the defendant understood the nature of the proceedings and was able to assist in his defense. The Court had no reasonable grounds to believe the defendant was not competent to stand trial.

(10/22/03 Justice Fisch Order at 3.) *See, e.g., Collazo v. United States,* 1999 WL 335146 at *4 ("A court's determination that a defendant is competent may be based on ... the court's own observations of the defendant, even where there is evidence of the defendant's low intelligence, prior history of heavy drug use, lapses of memory, and unresponsiveness."); *People v. Tortorici,* 92 N.Y.2d 757, 765, 686 N.Y.S.2d 346, 350 (1999) (A "defendant's history of psychiatric illness does not in itself call into question defendant's competence to stand trial.").

As noted above, deference is owed to the trial court's determination based on observation of the defendant at the time of trial. (*See* cases cited at pages 30-31 above.) The record is clear-and essentially Medina does not claim otherwise-that there was no information before the trial judge at the time of trial and/or sentencing that would have required him to order a competency hearing for Medina. *See, e.g., United States v. Gabb,* No. 02-1273, 80 Fed. Appx. 142, 145-46, 2003 WL 22533190 at *2-3 (2d Cir. Nov. 7, 2003); *Harris v. Kuhlmann,* 346 F.3d 330, 355 (2d Cir.2003); *United States v. Quintieri,* 306 F.3d 1217, 1233 (2d Cir.2002); *United States v. Nichols,* 56 F.3d 403,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

414 (2d Cir.1995); *United States v. Kirsh,* 54 F.3d 1062, 1070 (2d Cir.1995); *United States v. Oliver,* 626 F.2d 254, 259 (2d Cir.1980).

While Medina's habeas petition, as did his C.P.L. § 440 motion, relies on a "chronology" based on his medical records (Dkt. No. 1: Farrell Aff. ¶ 7; Medina C.P.L. § 440 Motion, Farrell Aff. ¶ 9), the medical records were obtained only after the trial, via a F.O.I.L. request. (*See* Medina C.P.L. § 440 Motion Ex. 1: Medina 9/16/02 Aff. ¶¶ 2-3.) A review of the medical records, moreover, reveals assessments that Medina was alert, cooperative and fully oriented, with "logical," "relevant" and "goal directed" thought processes. [FN34] Medina's habeas petition, like his C.P.L. § 440 motion, also relies on an affidavit from Dr. Richard Dudley, who did not examine Medina but reviewed Medina's medical records. (Medina C.P.L. § 440 Motion Ex. 2: Dudley 9/30/02 Aff. ¶ 5.) Dr. Dudley does not come to any conclusion with a reasonable degree of medical (psychiatric) certainty. Rather, his opinion is that certain things were "likely" to or "could have" affected Medina. (*See* Dudley Aff. ¶¶ 6, 9.) This Court finds Justice Fisch's analysis persuasive:

> FN34. *E.g.,* Medina C.P.L. § 440 Motion, Medical Records, Ex. B (3/3/97 at p. 413-18), Ex. C (2/15/97 at p. 430-33), Ex. I (2/24/98 at p. 502-09), Ex. N (1/30/99 at p. 574 (Medina alert, making progress and looking to the future)), Ex. N (2/17/99 at p. 580 (Medina alert and cooperative, stable in general population housing)), Ex. O (3/16/99 at p. 587 (Medina "clinically & mentally stable")), Ex. V (5/9/99 to 6/1/99 at p. 615-20 (shortly after sentencing, Medina is "stable on medication," "speech clear & coherent. Judgment & impulse control adequate.").

*18 Another argument proffered by the defendant is that he was so heavily medicated he was unable to understand the nature of the proceedings. To support this claim, defendant has attached medical records as well as an affidavit from Dr. Richard G. Dudley regarding his mental state. While a review of the medical records does indicate that the defendant was medicated at various times, Dr. Dudley never personally examined nor observed the defendant in this medicated condition. Dr. Dudley's

assessment of the defendant's mental state, at the time of the trial, is based solely on a review of medical records. Such records contain many entries, on various dates, in the months immediately prior to the hearing and trial where the observation notes reveal the following: Defendant was alert, his speech was "clean and coherent," he had "good eye contact," and no "delusions." On March 16, 1999, shortly before the pre-trial hearings began, the medical records indicate the defendant "appeared to be clinically and mentally stable and not distressed." While there are requests for medication by the defendant during the time period of these observations, at most they refer to the defendant being anxious and depressed but not mentally incompetent. All of these observation notes were made by medical professionals who had direct contact with the defendant, thus providing them the best opportunity to assess his medical condition.... The defendant, despite the medication, assisted in his defense.

(10/22/03 Justice Fisch Order at 5-6.) *See, e.g., United States v. Gabb,* 2003 WL 22533190 at *3 ("The district court's contemporaneous assessment of the appellant's competence can, within the discretion afforded to it, outweigh the reliability of a report produced by a psychiatrist who first met with the appellant seven months after conviction, such that the district court could find no reasonable cause to trigger the hearing requirement of § 4241."); *United States v. Zelker,* 355 F.Supp. 1002, 1008 (S.D.N.Y.1972) (The court-appointed psychiatrist's "examination of petitioner consisted of a review of petitioner's past history, the court records, and interviews with petitioner years after the events in question took place. He admitted that the Bellevue finding of 'no psychosis' was not consistent with his own findings.... It seems clear that petitioner was fit to stand trial ..."), *aff'd,* 474 F.2d 1336 (2d Cir.1973). In addition, the Court risks repetition but notes that neither the medical records nor Dr. Dudley's affidavit were presented to the trial judge (or known to Medina's trial counsel) at the time of trial and sentencing. Thus, even if Dr. Dudley's analysis of the medical records were correct, since the information was not presented to the trial judge before (or during) trial, the trial judge was not required to order a competency hearing.

Medina also argues that he was incompetent at the time of his sentencing on May 14, 1999, because he was on both Thorazine and Zyprexa, which in combination (according to Dr. Dudley) act as sedatives. (*See* Dkt. No. 1: Farrell Aff. at 24; *see also* Medina C.P.L. § 440 Motion Ex. 2:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

Dudley Aff. ¶ 9.) Medina cites *Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810 (1992), in making his argument. (Dkt. No. 1: Farrell Aff. at 24-25.) As Justice Kennedy noted in his concurring opinion in *Riggins:*

**\*19** [S]erious prejudice could result if medication inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character.

*Riggins v. Nevada,* 504 U.S. at 143-44, 112 S.Ct. at 1819 (Kennedy, J., concurring). "Certainly, the improper administration of psychiatric medicine can render an individual temporarily incompetent." *United States v. Quintieri,* 306 F.3d 1217, 1233 (2d Cir.2002). Medina points to the fact that at sentencing, the judge noted that Medina made "no demonstration to either the Probation Department ... or a statement to me to make any type of contrition or any remorse for what happened." (Dkt. No. 1: Farrell Aff. at 24, quoting Sentencing Transcript at 20, which has not been provided to the Court.) In this case, however, there was no evidence before Justice Fisch at the time of Medina's sentencing to indicate that Medina was sedated by medication or otherwise incompetent. (Indeed, Medina's lack of expression of remorse is also consistent with his continued claim of innocence.) *See, e.g., United States v. Quintieri,* 306 F.3d at 1233-34 (Assurances by defense counsel, "combined with the court's own observations, overcome any reasonable doubt as to the defendant's competence that may have been raised by his statement that he felt dizzy" at time of sentencing.); *Chichakly v. United States,* 926 F.2d 624, 631-32 (7th Cir.1991) (Despite defendant's allegations that he was incompetent due to psychiatric medications, "[t]here is certainly no need to conduct a competency hearing when there is no evidence before the Court of incompetency and when the defense attorney failed to request one and neither the prosecuting attorney nor the judge saw a need for one."); *Lopez v. Walker,* 239 F.Supp.2d 368, 374 (S.D.N.Y.2003) (Defendant's "pre-sentence report made reference to his prior suicide attempts, hospitalization, and use of the drug Sinequan." However, "in spite of the information contained" in the report, the court was not required to make a further inquiry into defendant's competency since the defendant presented himself as "coherent and rational, as well as an active participant in

his own case."); *Thomas v. Senkowski,* 968 F.Supp. 953, 956 (S.D.N.Y.1997) (Petitioner found fully competent to plead guilty although under the influence of heavy anti-psychotic drugs at the time.).

Finally, this Court must review Justice Fisch's determination under the deferential AEDPA review standard. The Court cannot say that Justice Fisch's determination that there was no evidence requiring him to *sua sponte* order a competency hearing was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," as required by the AEDPA, 28 U.S.C. § 2254(d)(2), nor an unreasonable application of clearly established Supreme Court precedent, 28 U.S.C. § 2254(d)(1). *See, e.g., Harris v. Kuhlmann,* 346 F.3d 330, 352, 355 (2d Cir.2003) ("Considering all of the evidence before the state trial court at the time of the October 17, 1984 hearing, we cannot conclude that it was objectively unreasonable for the court to have denied Harris's motion for a competence hearing."); *Armstrong v. Duncan,* 03 Civ. 930, 2003 WL 22339490 at *9 (S.D.N.Y. Oct. 14, 2003) (" 'The determination of whether reasonable doubt exists as to a defendant's fitness to stand trial ... has generally been held to be an issue of fact entitled to deference by a federal habeas corpus court.' ... In light of the trial court's 'superior opportunity' to observe the Petitioner in court, ... the contents of the psychiatric reports, and defense counsel's own failure to raise concerns about Petitioner's competency, this Court cannot say that the state court unreasonably applied federal law in determining that Petitioner was fit to stand trial."). *Lopez v. Walker,* 239 F.Supp.2d at 375 ("The determination of competency is an issue of fact, entitled to deference upon federal habeas review."); *Bisnett v. Kelly,* 221 F.Supp.2d 373, 388 (E.D.N.Y.2002) (Raggi, D.J.); *see also* cases cited at pages 29-31 above.

**\*20** Accordingly, Medina's habeas claim that he was denied due process because he was not competent at the time of trial and sentencing (Pet.¶ 12(B)) should be *DENIED.*

III. *MEDINA'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS SHOULD BE DENIED*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

A. *Strickland v. Washington Standard On Ineffective Assistance of Counsel* [FN35]

> FN35. For additional decisions authored by this Judge discussing the *Strickland v. Washington* standard for ineffective assistance of counsel in language substantially similar to this section of this Report & Recommendation, *see Smalls v. McGinnis,* 04 Civ. 0301, 2004 WL 1774578 at *13-15 (S.D.N.Y. Aug. 10, 2004) (Peck, M.J.); *Gillespie v. Miller,* 04 Civ. 0295, 2004 WL 1689735 at *14-16 (S.D.N.Y. July 29, 2004) (Peck, M.J.); *Rodriguez v. Senkowski,* 03 Civ. 3314, 2004 WL 503451 at *39 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); *Gomez v. Duncan,* 02 Civ. 0846, 2004 WL 119360 at *27 (S.D.N.Y. Jan. 27, 2004) (Peck, M.J.); *Montalvo v. Annetts,* 02 Civ. 1056, 2003 WL 22962504 at *22-24 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); *Maldonado v. Greiner,* 01 Civ. 799, 2003 WL 22435713 at *26-28 (S.D.N.Y. Oct. 28, 2003) (Peck, M.J.); *Besser v. Walsh,* 02 Civ. 6775, 2003 WL 22093477 at *32-34 (S.D.N .Y. Sept. 10, 2003) (Peck, M.J.); *Guzman v. Fischer,* 02 Civ. 7448, 2003 WL 21744086 at *9-12 (S.D.N.Y. July 29, 2003) (Peck, M.J.); *Skinner v. Duncan,* 01 Civ. 6656, 2003 WL 21386032 at *33-35 (S.D.N.Y. June 17, 2003) (Peck, M.J.); *Quinones v. Miller,* 01 Civ. 10752, 2003 WL 21276429 at *18-19 (S.D.N.Y. June 3, 2003) (Peck, M.J.); *Hediam v. Miller,* 02 Civ. 1419, 2002 WL 31867722 at *14-16 (S.D.N.Y. Dec. 23, 2002) (Peck, M.J.); *Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at *26-28 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.); *Dickens v. Filion,* 02 Civ. 3450, 2002 WL 31477701 at *13-14 (S.D.N.Y. Nov. 6, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 1621702 (S.D.N.Y. Mar. 28, 2003) (Cote, D.J.); *Aramas v. Donnelly,* 99 Civ. 11306, 2002 WL 31307929 at *9-11 (S.D.N.Y. Oct. 15, 2002) (Peck, M.J.); *Larrea v. Bennett,* 01 Civ. 5813, 2002 WL 1173564 at *16-19 (S.D.N.Y. May 31, 2002) (Peck, M.J.), *report & rec. adopted,* 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002) (Scheindlin, D.J.); *Jamison v. Berbary,* 01 Civ. 5547, 2002 WL 1000283 at *9-11 (S.D.N.Y. May 15, 2002) (Peck, M.J.); *Cromwell v. Keane,* 98 Civ. 0013, 2002 WL 929536 at *15-17 (S.D.N .Y. May 8, 2002) (Peck, M.J.); *Rivera v. Duncan,* 00 Civ. 4923, 2001 WL 1580240 at *9 (S.D.N.Y. Dec. 11, 2001) (Peck, M.J.); *Ennis v. Walker,* 00 Civ. 2875, 2001 WL 409530 at *15-16 (S.D.N.Y. Apr. 6, 2001) (Peck, M.J.); *Fluellen v. Walker,* 97 Civ. 3189, 2000 WL 684275 at *11 (S.D.N.Y. May 25, 2000) (Peck, M.J.), *aff'd,* No. 01-2474, 41 Fed. Appx. 497, 2002 WL 1448474 (2d Cir. June 28, 2002), *cert. denied,* 123 S.Ct. 1787 (2003); *Dukes v. McGinnis,* 99 Civ. 9731, 2000 WL 382059 at *8 (S.D.N.Y. Apr. 17, 2000) (Peck, M.J.); *Cruz v. Greiner,* 98 Civ. 7939, 1999 WL 1043961 at *16 (S.D.N.Y. Nov. 17, 1999) (Peck, M.J.); *Lugo v. Kuhlmann,* 68 F.Supp.2d 347, 370 (S.D.N.Y.1999) (Patterson, D.J. & Peck, M.J.); *Santos v. Greiner,* 99 Civ. 1545, 1999 WL 756473 at *7 (S.D.N.Y. Sept. 24, 1999) (Peck, M.J.); *Franza v. Stinson,* 58 F.Supp.2d 124, 133-34) (S.D.N.Y.1999) (Kaplan, D.J. & Peck, M.J.); *Torres v.. Irvin,* 33 F.Supp.2d 257, 277 (S.D.N.Y.1998) (Cote, D.J. & Peck, M.J.); *Boyd v. Hawk,* 965 F.Supp. 443, 449 (S.D.N.Y.1997) (Batts, D.J. & Peck, M.J.).

**1. *Strickland and Trial Counsel***

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064; *accord, e.g., Wiggins v. Smith,* 123 S.Ct. 2527, 2535 (2003). This performance is to be judged by an objective standard of reasonableness. *Strickland v. Washington,* 466 U.S. at 688, 104 S.Ct. at 2064.[FN36]

> FN36. *Accord, e.g., Wiggins v. Smith,* 123 S.Ct. at 2535; *Bell v. Cone,* 535 U.S. 685, 695, 122 S.Ct. 1843, 1850 (2002).

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction.... A fair

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted).[FN37]

> FN37. *Accord, e.g., Bell v. Cone,* 535 U.S. at 698, 122 S.Ct. at 1852; *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir.2001); *Sellan v. Kuhlman,* 261 F.3d 303, 315 (2d Cir.2001).

Second, the defendant must show prejudice from counsel's performance. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064. The "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068-69. Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.[FN38]

> FN38. *See also, e.g., Wiggins v. Smith,* 123 S.Ct. at 2542; *Bell v. Cone,* 535 U.S. at 695, 122 S.Ct. at 1850; *Aparicio v. Artuz,* 269 F.3d at 95; *Sellan v. Kuhlman,* 261 F.3d at 315; *DeLuca v. Lord,* 77 F.3d 578, 584 (2d Cir.), *cert. denied,* 519 U.S. 824, 117 S.Ct. 83 (1996).

"[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068; *accord, e.g., Wiggins v. Smith,* 123 S.Ct. at 2542. The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not." *Strickler v. Greene,* 527 U.S. 263, 289-91, 119 S.Ct. 1936, 1952-53 (1999); *Kyles v. Whitley,* 514

U.S. 419, 434, 115 S.Ct. 1555, 1565-66 (1995); *Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 998 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland"* ); *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility." *Strickler v. Greene,* 527 U.S. at 291, 119 S.Ct. at 1953; *cf. id.* at 297-301, 119 S.Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

The Supreme Court has counseled that these principles "do not establish mechanical rules." *Strickland v. Washington,* 466 U.S. at 696, 104 S.Ct. at 2069. The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process. *Id.*

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.' " *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001) (quoting *Strickland v. Washington,* 466 U.S. at 695-96, 104 S.Ct. at 2069); *accord, e.g., Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991).

**\*21** The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland v. Washington,* 466 U.S. at 697, 104 S.Ct. at 2069.[FN39]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

FN39. *Accord, e.g., Smith v. Robbins,* 528 U.S. 259, 286 n. 14, 120 S.Ct. 746, 764 n. 14 (2000).

In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.... In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington,* 466 U.S. at 690-91, 104 S.Ct. at 2066.FN40

FN40. *See also, e.g., Yarborough v. Gentry,* 124 S.Ct. 1, 5-6 (2003); *Engle v. Isaac,* 456 U.S. 107, 134, 102 S.Ct. 1558, 1575 (1982) ( "We have long recognized ... that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); *Jackson v. Leonardo,* 162 F.3d 81, 85 (2d Cir.1998) ("In reviewing *Strickland* claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on ... counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), *cert. denied,* 513 U.S. 820, 115 S.Ct. 81 (1994).

As the Second Circuit noted: "The *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane,* 239 F.3d at 199.

**2.** *Strickland and the AEDPA Review Standard*

For purposes of this Court's AEDPA analysis, "the *Strickland* standard ... is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.' " *Aparicio v. Artuz,* 269 F.3d at 95 & n. 8 (quoting 28 U.S.C. § 2254(d)(1)).FN41 "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.' " *Aparicio v. Artuz,* 269 F.3d at 95 n. 8. "For [petitioner] to succeed, however, he must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.... Rather, he must show that the [First Department] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone,* 535 U.S. at 698-99, 122 S.Ct. at 1852; *see also Yarborough v. Gentry,* 124 S.Ct. 1, 4 (2003).

FN41. *See also, e.g., Wiggins v. Smith,* 123 S.Ct. 2527, 2535 (2003); *Bell v. Cone,* 535 U.S. 685, 698, 122 S.Ct. 1843, 1852 (2002); *Sellan v. Kuhlman,* 261 F.3d at 315.

**B.** *Medina's Ineffective Trial Counsel Claims Should Be Denied*

Medina asserts that his trial counsel erred by failing to: (1) request a C.P.L. § 730.20 competency hearing; (2) investigate Medina's medical and psychiatric history, (3) retain a private investigator, (4) interview a potentially exculpatory witness, and (5) properly impeach the prosecution's key witness, Cepero. (Dkt. No. 1: Pet. ¶ 12(A); *see* Dkt. No. 1: Medina Br. at 11-22.)

In denying Medina's C.P.L. § 440 motion, Justice Fisch stated:

The defendant has failed to establish the representation he received throughout the trial was so deficient that his attorney was not functioning within the acceptable

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

professional standards required for counsel. The Court is hard pressed to find the trial strategy of [defense counsel] Mr. Dellicarri deficient when the defendant was acquitted of the top charge of Murder in the Second Degree and found guilty of the lesser charge of Manslaughter in the First Degree. Although the Court is mindful of the defendant's argument that it is the combination of errors that rise to the level of ineffectiveness, based on the trial record and the factual allegations contained in this motion, the defendant has not met his burden. It is apparent from the affidavit of Mr. Dellicarri, a seasoned practitioner, with over twenty years of criminal trial experience, as well as from the observations of this Court that the defendant was an active participant in his defense. He participated both in and out of Court, never presenting his attorney or this Court reason or pause to question his mental state. Mr. Dellicarri engaged in vigorous cross examination of the main prosecution witness which likely played a role in the defendant's acquittal on the top charge of Murder in the Second Degree. Mr. Dellicarri also made a strategic decision not to call a witness to testify to the mere fact that she did not hear a gunshot since there was no disputed issue regarding the cause of death. The Court will not confuse the strategic trial decisions made by Mr. Dellicarri, as a zealous advocate on behalf of the defendant, with deficient representation. A review of the evidence, the law and the circumstances of the case at the time of representation, clearly compels the finding that defendant received meaningful representation.

*22 (10/22/03 Justice Fisch Order at 7-8; *see also id.* at 4-7.) FN42

FN42. In addition to the trial court's description of Dellicarri as a "zealous advocate," Medina sent Dellicarri a letter in order to "tell [Dellicarri] thanks [Medina] felt [he] was represented perfect ." (3/5/03 A.D.A. Markoe Aff. in Opp. to Medina C.P.L. § 440 Motion, Ex. 1: Dellicarri Aff. Ex. A: Letter from Medina.) Medina also wrote to Delicarri, "your [sic] a wonderful lawyer" and "I think your [sic] the best." (*Id.*)

For the reasons discussed below, Medina's ineffective assistance of trial counsel claim should be *DENIED.*

1. *Defense Counsel's Alleged Failure to Request a Competency Hearing and Investigate Medina's Medical and Psychiatric History*

Medina asserts that his trial counsel, Dellicarri, "failed to be aware of [Medina's] medical and psychological distress." (Dkt. No. 1: Medina Br. at 18.) Specifically, Medina claims that:

a. Defense counsel told [Medina] to pay attention several times during the pretrial hearing and trial. [Medina] informed defense counsel that [he] could not pay attention and all [he] wanted to do was sleep.

b. Defense counsel never requested information from [Medina] concerning [his] ongoing medical or psychiatric treatment during the course of trial.

c. Defense counsel never investigated [Medina's] medical and psychiatric history prior to incarceration.

d. Defense counsel never requested a psychiatric exam to determine whether [Medina] had a mental disease or defect excluding fitness to proceed.

(Medina C.P.L. § 440 Aff. ¶ 6.) However, defense counsel Dellicarri's affidavit in opposition to Medina's C.P.L. § 440 motion stated that he was aware of Medina's "psychological problems" and "psychiatric history" through conversations with "various family members." (3/5/03 A.D.A. Markoe Aff. in Opp. to C.P.L. § 440 Motion, Ex. 1: Dellicarri Aff. ¶¶ 19, 25.) After considering raising a "diminished capacity" defense and consulting a psychiatrist in this regard, Dellicarri determined that Medina's mental health problems did not rise to the level of incompetency or diminished capacity. (Dellicarri Aff. ¶¶ 19, 25.) Dellicarri stated that "none of these [psychiatric] ailments ever led [him] to believe in any manner whatsoever that Mr. Medina was unable to understand the nature of the proceedings or to assist in his own defense.... From the outset, Mr. Medina indicated to [Dellicarri] that he fully understood the proceedings that were taking place.... Likewise, all through the proceedings, and particularly at trial, Mr. Medina attempted to assist in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

his own defense." (Dellicarri Aff. ¶¶ 19, 21, 22.)

According to Justice Fisch:

Mr. Dellicarri asserts that [Medina] never indicated he did not understand the proceedings, and indeed made efforts to assist in his defense, both prior to, and during trial. [Medina] suggested several alibis to be used for his defense, participated in plea negotiations, and prepared cross examination questions for a witness. During the trial, [Medina's] appearance never gave defense counsel cause for concern. Counsel refutes the claims in [Medina's] motion that [Medina] was in a 'subdued torpor' or in a 'heavily medicated or sedated state,' during trial.

(10/22/03 Justice Fisch Order at 5.) Since Dellicarri was able to communicate with Medina and Dellicarri had no reason to suspect that Medina's mental disease rose to the level of incompetence, it was not unreasonable for Dellicarri not to request a competency hearing. *See, e.g., Etoria v. Bennett,* 292 F.Supp.2d 456, 472 (E.D.N.Y.2003) (Weinstein, D.J.) (defendant "did not act unusually during the proceedings and he did nothing either volitionally or involuntarily to alert his lawyer to the fact that he was not competent."); *Dennis v. Turner,* 729 F.Supp. 15, 17 (S.D.N.Y.1990) ("Given the absence of any evidence indicating Dennis' competency was in doubt at the time of trial, counsel for Dennis obviously will not be presumed to have represented Dennis deficiently in failing to request a competency hearing."). As discussed in Point II.B above, Medina's arguments based on the medical records and Dr. Dudley's affidavit must be rejected because defense counsel did not have that information, and this Court agrees with Justice Fisch that based on defense counsel's knowledge, he was not ineffective for not investigating Medina's psychological problems more than he did. Moreover, even if this Court would rule otherwise if it had been the C.P.L. § 440 court (which it would not), under the deferential AEDPA review standard, this portion of Medina's ineffective assistance of counsel claim should be *DENIED.*

2. *Counsel's Alleged Failure to Retain a Private Investigator and Properly Investigate*

*23 Medina claims that his trial counsel erred by failing to hire a private investigator to measure the distance between Cepero and 932 Intervale Avenue on the night of the incident, which Medina alleges would have cast doubt upon Cepero's ability to see Medina leave the club with a gun. (Dkt. No. 1: Medina Br. at 13-15.)

Medina relies on *Thomas v. Kuhlman,* 255 F.Supp.2d 99 (E.D.N.Y.2003) (Weinstein, D.J.), to support his claim that Dellicarri should have pursued a more in depth investigation in a one-witness homicide. (*See* Dkt. No. 1: Medina Br. at 12-13.) That case is distinguishable. In *Thomas v. Kuhlman,* trial counsel failed to investigate the crime scene where a key witness testified that she saw the petitioner standing on a fire escape of the murder victim's building shortly before the victim was killed. *Thomas v. Kuhlman,* 255 F.Supp.2d at 101. It was later undisputedly determined that "it was physically impossible for the witness to have seen defendant at the victim's window, since ... [it] was not visible from her vantage point." *Id.* Judge Weinstein found that "under the circumstances of [that] case," where the defendant was "[c]harged with second-degree murder ... and the case against him hinged crucially on the testimony of one eyewitness [t]hat circumstance alone should have been enough to put counsel on notice that he had an obligation to see for himself what the crime scene looked like." *Id.* at 110. In *Thomas,* "[i]f defense counsel had made a proper investigation prior to trial ... he would have been able to deal significant blows to the prosecution's case...." *Id.* at 109.

Medina's case is clearly distinguished from *Thomas v. Kuhlman* because defense counsel Dellicarri thoroughly examined the issue of Cepero's distance from the social club during trial and established through cross-examination of Cepero and the police officers that Cepero was two or three times as far away from the social club as he claimed he was. (*See* pages 9-10 above.) During Cepero's cross-examination, Dellicarri walked to the back of the courtroom in order to ascertain whether he was standing as far away from Cepero as Medina was on the night of the incident. (*See* pages 9-10 above.) Cepero responded that his distance from Medina on that night was about "half a courtroom" more. (*See* page 10 above.) In addition to questioning Cepero about how far he was standing from the entrance of 932 Intervale Avenue, Dellicarri also asked Detective McKeon and Officer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

Santos to approximate this distance. Detective McKeon testified that the distance was about 109 feet. (*See* page 10 n. 11 above.) Even assuming that Officer Santos had meant to say feet instead of yards during his cross-examination testimony, he approximated Cepero's distance from the social club at 160 feet. (*See* page 10 above.) Medina claims that further investigation proved that the actual distance from the club's front door to the parking lot fence was 157.5 feet and thus to where Cepero was standing was "at least 160 feet away from the club's front door." (Medina C.P.L. § 440 Motion Ex. 7: Giretti Aff. ¶¶ 5-6.) The distance which the investigation would have determined, therefore, is not materially different from Officer Santos' testimony of 160 feet, which Dellicarri established on cross-examination and focused on during his closing argument. (*See* pages 9-10 above.) [FN43] In short, defense counsel developed at trial through cross-examination the very fact-Cepero's distance of 160 feet from the social club-that Medina claims he was ineffective for not hiring an investigator to establish. Dellicarri is not ineffective merely because the jury apparently chose to credit Cepero's testimony, despite impeachment as to his distance from the social club's front door.

> FN43. Indeed, the fact that an experienced lawyer like Dellicarri asked these questions would seem to indicate that, unlike the lawyer in *Thomas v. Kuhlman,* Dellicarri had himself visited the scene of the crime.

**\*24** In addition, Medina has not met *Strickland'* s second, prejudice prong (*see* pages 43-44 above), that is, he has not shown that "but for the [supposed] deficiency, the likely outcome of the proceeding would have been different." *See, e.g., United States v. Miceli,* No. 00-1611, 7 Fed. Appx. 131, 133, 2001 WL 363504 at *1 (2d Cir. Apr. 12, 2001); *Bingham v. Duncan,* 01 Civ. 1371, 2003 WL 21360084 at *4 (S.D.N.Y. June 12, 2003) (based on review of the record the court found that "trial counsel's failure to do investigative work ... do [es] not establish that the result of the proceedings would have been different.").

### 3. *Counsel's Alleged Failure to Call a Potentially Exculpatory Witness*

Medina claims that his trial counsel should have called as a trial witness Mirca Martinez, [FN44] who was present in her nearby hair salon at the time of the incident. (Dkt. No. 1: Medina Br. at 15.) According to an interview conducted by the police on May 5, 1996, Martinez stated that "[she] did not hear a gunshot. [She] did see more than twenty men and women come running out of the place that night. The music that they play in the Club is very loud. It's loud enough so that [she] would not hear a gunshot." (Medina C.P.L. § 440 Motion Ex. 7: Police Report of Martinez Interview.)

> FN44. While Medina refers to this individual as Ms. Martinez (*see* Dkt. No. 1: Medina Br. at 15), Justice Fisch refers to her as Ms. Torres (*see* 10/22/03 Justice Fisch Order at 7).

Courts in this Circuit have made clear that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *See, e.g., United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.), *cert. denied,* 484 U.S. 958, 108 S.Ct. 357 (1987); [FN45] *see, e.g., United States v. DeJesus,* No. 01-1479, 57 Fed. Appx. 474, 478, 2003 WL 193736 at *3 (2d Cir. Jan. 28, 2003) ("A trial counsel's 'decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.' *United States v. Smith,* 198 F.3d 377, 386 (2d Cir.1999). Because of this inherently tactical nature, the decision not to call a particular witness generally should not be disturbed." Counsel's decision not to call a character witness was grounded in strategy and not deficient, "even though [defendant] requested that she do so and provided her with contact information for potential witnesses."), *cert. denied,* 123 S.Ct. 2110 (2003). [FN46]

> FN45. *Accord, e.g., Rodriguez v. Senkowski,* 03 Civ. 3314, 2004 WL 503451 at *41 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); *Gomez v. Duncan,* 02 Civ. 0846, 2004 WL 119360 at *31 (S.D.N.Y. Jan. 27, 2004) (Peck, M.J.); *Montalvo v. Annetts,* 02 Civ. 1056, 2003 WL 22962504 at *25 (S.D.N.Y. Dec. 17, 2003) (Peck, M.J.); *Skinner v. Duncan,* 01 Civ. 6656, 2003 WL 21386032 at *37 (S.D.N.Y. June 17, 2003)

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

(Peck, M.J.).

FN46. *See also, e.g., United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002) ("A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel."), *cert. denied,* 123 S.Ct. 1949 (2003); *United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998), *cert. denied,* 526 U.S. 1164, 119 S.Ct. 2059 (1999); *United States v. Schmidt,* 105 F.3d 82, 90 (2d Cir.), *cert. denied,* 522 U.S. 846, 118 S.Ct. 130 (1997); *Nieves v. Kelly,* 990 F.Supp. 255, 263-64 (S.D.N.Y.1997) (Cote, D.J. & Peck, M.J.); *Rodriguez v. Mitchell,* 92 Civ.2083, 1993 WL 229013 at *3, 5 (S.D.N.Y. June 24, 1993) ("Counsel's decision not to call a witness, if supported by valid tactical considerations, does not constitute ineffective assistance of counsel.").

More importantly, "[g]enerally, the decision whether to pursue a particular defense is a tactical choice which does not rise to the level of a constitutional violation.... [T]he habeas court 'will not second-guess trial strategy simply because the chosen strategy has failed ...,' especially where the petitioner has failed to identify any specific evidence or testimony that would have helped his case if presented at trial." *Jones v. Hollins,* 884 F.Supp. 758, 765-66 (W.D.N.Y.1995) (citations omitted), *aff'd,* No. 95-2279, 89 F.3d 826 (table), 1995 WL 722215 (2d Cir. Nov. 30, 1995); *accord, e.g., Rodriguez v. Senkowski,* 2004 WL 503451 at *41; *Gomez v. Duncan,* 2004 WL 119360 at *31; *Montalvo v. Annetts,* 2003 WL 22962504 at *26 ( & cases cited therein); *Skinner v. Duncan,* 2003 WL 21386032 at *37.

**\*25** In this case, Medina alleges that Martinez' testimony would have impeached the credibility of Cepero's testimony. (Dkt. No. 1: Medina Br. at 15.) According to Medina, if Martinez was unable to hear the gunshot, the jury might not believe that Cepero was able to hear the shot from a further distance away. (Medina Br. at 15.) Medina claims that this would be of particular importance because Cepero testified that the reason he had "looked up" and seen Medina hand off the gun because he had heard a gunshot. (Dkt. No. 1: Farrell Aff. ¶ 5.) In addition, Medina states that his trial counsel should have called

Martinez as a witness in order to determine whether Medina was one of the people she witnessed run past the store, and if so, whether or not he was carrying anything "shiny." (Medina Br. at 15.) FN47

FN47. Of course, since the answers to these questions were not contained in the police interview statement, it would have been extremely risky-perhaps ineffective-for defense counsel to blindly ask these questions at trial. This itself was another good reason not to call Martinez as a defense witness.

Dellicarri stated that since the parties did not dispute the fact that Cardenas was killed by a bullet wound, Martinez's testimony, that she did not hear a gunshot, would not have discredited Cepero's testimony, but is a "red herring." (3/5/03 A.D.A. Markoe Aff. in Opp. to C.P.L. § 440 Motion Ex. 1: Dellicarri Aff. ¶ 32.) As Justice Fisch determined, "[t]he fact that [Martinez] may not have heard a shot does not necessarily establish that a shot was not fired or heard by another witness. It can hardly be argued that this testimony presents a strong probability that the outcome of the trial would have changed." (10/22/03 Justice Fisch Order at 7.) This is a classic issue of trial strategy and Dellicarri was not ineffective in his choice of strategy. Moreover, even assuming arguendo that Medina satisfied the first *Strickland* prong, the Court agrees with Justice Fisch that Medina has not shown a "reasonable probability" that Martinez's testimony concerning her inability to hear the shot would have changed the result of trial, and thus Medina has not satisfied the second *Strickland* prong, prejudice. *See, e.g., Mills v. Scully,* 826 F.2d 1192, 1197 (2d Cir.1987) (finding it was "sound trial strategy" and not "ineffective assistance of counsel" for trial counsel to forego use of contradictory testimony to impeach the trial testimony of the only eye witness to the shooting with which the defendant was charged.).

4. *Counsel's Alleged Failure to Properly Impeach Cepero*

Medina claims that Dellicarri did not properly impeach Cepero regarding statements Cepero had made during trial. (Dkt. No. 1: Medina Br. at 15-18.) Specifically, Medina claims that when Cepero incorrectly described

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

Medina as being "in his thirties," Dellicarri should have more vigorously questioned him about this statement. (Medina Br. at 17.) In addition, Medina has a large tattoo prominently displayed across his back (Medina Br. at 16; *see also* Medina § 440 Aff. ¶ 10), but Cepero stated in a pre-trial statement that Medina did not have any tattoos. (Medina § 440 Motion Att.: Cepero Stmt. at 20; Medina Br. at 16.) Medina claims that the jury should have been made aware of this information and that Dellicarri should not have objected to the question posed by the Assistant District Attorney asking whether Cepero had ever seen Medina without clothing. (Medina Br. at 16.)

*26 Medina has failed to establish that Cepero's statements regarding Medina's age and tattoos were material since Cepero had known Medina for a year prior to the incident. Cepero's failure to properly guess Medina's age or notice his tattoos does not suggest that Cepero could not recognize Medina, who he had known for a year.[FN48] Moreover, it was a question of trial strategy as to how best to attack Cepero's ability to identify Medina; defense counsel focused on Cepero's distance, that he was high on crack and that he testified to obtain a favorable deal for himself,[FN49] rather than on discrepancies about Medina's age or whether he had a tattoo (the latter being an issue on which Cepero did not testify at trial). Such issues of trial strategy are left to trial counsel and are not to be Monday morning quarterbacked under *Strickland. See, e.g., United States v. Jennings,* 01 Cr. 0164, 2002 WL 1402090 at *4 (S.D.N.Y. June 28, 2002) ("Many, if not all, of [defendant's ineffective assistance] claims are latter day determinations that a different trial strategy might have been more effective, also known as Monday morning quarterbacking."), *aff'd,* No. 02-1411, 63 Fed. Appx. 35, 2003 WL 21105364 (2d Cir. May 14, 2003), *cert. denied,* 124 S.Ct. 2835 (2004); *Yanez v. Keane,* 16 F.Supp.2d 364, 375 (S.D.N.Y.1998) (Haight, D.J. & Peck, M.J.) ("*Strickland* instructs that hindsight does not convert a reasonable strategy into ineffective assistance."); *Rodriguez v. Hanslmaier,* 982 F.Supp. 279, 286-87 (S.D.N.Y.1997) (Sprizzo, D.J. & Peck, M.J.) (Petitioner's "habeas claim is based on an after-the-fact, Monday-morning quarterback approach.").

FN48. *Cf., e.g., Lee v. Keane,* No. 01-2136, 50 Fed. Appx. 497, 499, 2002 WL 31520115 at *2 (2d Cir. Nov. 13, 2002) (The witness' "description of [petitioner] on the night of the

shooting, however, was unequivocal-she knew [petitioner] from the neighborhood and had seen him in her building.... [S]he had the opportunity to observe him on numerous occasions at a distance of ten to twelve feet. At the lineup, [the witness] was able to identify [petitioner] within seconds. Finally, and most significantly, on the night of the shooting, she was able to identify Lee to the police, by name."), *cert. denied,* 124 S.Ct. 191 (2003); *United States v. Ming,* 02 Cr. 0596, 2002 WL 1949227 at *1 (S.D.N.Y. Aug. 22, 2002) ("[T]he witness knew the defendant from prior encounters and identified him to the government by one of his aliases prior to the identification procedure, thus raising substantial doubt as to whether any suggestiveness of the procedure was undue."); *Poo v. Hood,* 89 Civ. 7874, 1992 WL 30617 at *4 (S .D.N.Y. Feb. 12, 1992) ("That testimony could not be dismissed as a matter of mistaken identity because the witness clearly knew the defendant well and had seen him at close quarters in an elevator.").

FN49. Medina concedes that "[t]here is no question that [defense] counsel sought to impeach Cepero's credibility concerning his criminal record and potential motive to ... curry favor for his own case." (Medina Br. at 15.)

Defense counsel Dellicarri vigorously and thoroughly pointed out a number of inconsistent statements made by Cepero throughout the course of trial. (*See* pages 8-9 above.) As stated by Justice Fisch:

A review of the trial record demonstrates that Cepero was vigorously cross examined in all relevant and material areas including his ability to see, his altered state of mind and his motivation for testifying. Mr. Dellicarri's cross-examination established testimonial inconsistencies bearing on the credibility of witnesses, which were then for the jury to consider.

(10/22/03 Justice Fisch Order at 6.) This Court has reviewed the entire trial transcript and agrees with Justice Fisch's conclusion that the cross-examination of Cepero was effective (albeit not sufficient to convince the jury to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

find Medina not guilty on all counts). Medina's claim of ineffective assistance of counsel should be *DENIED*.

IV. *MEDINA'S CLAIM OF ACTUAL INNOCENCE CANNOT BE REVIEWED ON FEDERAL HABEAS REVIEW*

Medina argues that Cepero's recantation on whether he could see a gun in Medina's hand constitutes newly discovered evidence that would likely have changed the verdict. (Dkt. No. 1: Medina Br. at 25 .)

Medina's "newly discovered evidence" claim goes only to his guilt or innocence, not to the constitutionality of his conviction. The Supreme Court has explained that "newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759 (1963); *accord, e.g., Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 860 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the course of the underlying state criminal proceeding."); *Galandreo v. Perlman,* No. 02-CV-6799, 03-MISC-0066, 2003 WL 23198790 at *12, 20 (E.D.N.Y. Oct. 31, 2003) (Weinstein, D.J.) ("A showing of actual innocence serves merely as a gateway to the airing of the petitioner's defaulted claim and is not itself cognizable in habeas as a free-standing claim.") (citing cases); *Jones v. Spitzer,* 01 Civ. 9754, 2003 WL 1563780 at *47 (S.D.N.Y. Mar. 26, 2003); *Jones v. Duncan,* 162 F.Supp.2d 204, 219-20 (S.D.N.Y.2001) (Peck, M.J.); *White v. Keane,* 51 F.Supp.2d 495, 502 (S.D.N.Y.1999); *Smithwick v. Walker,* 758 F.Supp. 178, 184 (S.D.N.Y.) ("Evidence which goes only to the guilt or innocence of petitioner is not sufficient to require habeas corpus relief."), *aff'd,* 948 F.2d 1278 (2d Cir.1991); *McCool v. New York State,* 29 F.Supp.2d 151, 160 (W.D.N.Y.1990) ( "Newly discovered evidence relevant only to the guilt or innocence of the defendant is not sufficient to grant habeas relief.... For habeas relief to be available, the newly discovered evidence must bear on the constitutionality of the petitioner's conviction."); *Rodriguez v. Hoke,* 89 Civ. 7618, 1990 WL 91739 at *2 (S.D.N.Y. June 25, 1990); *Roberts v. LeFevre,* 88 Civ. 4114 1990 WL 6556 at *6 (S.D.N.Y. Jan. 22, 1990); *United States v. Coughlin,* 657

F.Supp. 433, 436 (S.D.N.Y.1987); *Mapp v. Clement,* 451 F.Supp. 505, 511 (S.D.N.Y .) ("[N]ewly discovered evidence only warrants habeas corpus relief where it bears on the 'constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state petitioner is not a ground for relief on federal habeas corpus' "), *aff'd mem.,* 591 F.2d 1330 (2d Cir.1978), *cert. denied,* 440 U.S. 948, 99 S.Ct. 1428 (1979).

**\*27** "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact." *Herrera v. Collins,* 506 U.S. at 400, 113 S.Ct. at 860 (citing cases). The "fundamental miscarriage of justice exception is available 'only where the prisoner *supplements* his constitutional claim with a colorable showing of factual innocence." *Id.* at 404, 113 S.Ct. at 862 (quoting *Kuhlmann v.. Wilson,* 477 U.S. 436, 454, 106 S.Ct. 2616 2627 (1986)). It has never been extended to "freestanding claims of actual innocence." *Herrera v. Collins,* 506 U.S. at 404-05, 113 S.Ct. at 862-63.

Medina recognizes this principle (Medina Br. at 25), but relies on *Ortega v. Duncan,* where habeas relief was granted on the basis that newly discovered evidence proved that a key witness's material testimony was false. *Ortega v. Duncan,* 333 F.3d 102, 108-09 (2d Cir.2003) ("[W]hen false testimony is provided by a government witness without the prosecution's knowledge, due process is violated 'only if the testimony was material and "the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." ' ") (quoting *United States v. Wallach,* 935 F.2d 45, 456 (2d Cir.1991)). Medina's case is distinguishable because it is not clear that Cepero's trial testimony was false.

Medina asserts that Cepero's alleged "recantation" on whether he could see a gun in Medina's hand constitutes newly discovered evidence showing that Medina is actually innocent. (Medina Br. at 25 .) At trial, Cepero testified that he saw in Medina's hands "a shiny object which appeared to be a gun." (Dkt. No. 5: State Br. at 18.) In a post-trial statement, Cepero allegedly repeated that he saw a "shiny object" in Medina's hands, but allegedly claimed that he was pressured by the police to say that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)
(Cite as: 2004 WL 2088578 (S.D.N.Y.))

object was a gun. (State Br. at 18.) This supposed "newly discovered evidence" is an unsworn statement, rather than a sworn affirmation as required, and Medina cannot show that had it been presented, it would certainly have created a reasonable doubt as to his guilt. *See, e.g., Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 114 (2d Cir.) (To show actual innocence, "a petitioner must present 'new reliable evidence that was not presented at trial' and 'show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.' ") (quoting *Schlup v. Delo,* 513 U.S. 298, 299, 115 S.Ct. 851, 854 (1995)), *cert. denied,* 531 U.S. 873, 121 S.Ct. 175 (2000); *accord, e.g., Elliott v. Kuhlmann,* 97 Civ. 2987, 2004 WL 806986 at *8 (S.D.N.Y. Apr. 9, 2004) ("To show 'actual innocence,' Petitioner must produce new, reliable evidence sufficient to make a 'colorable showing' that 'it is more likely than not that no reasonable juror would have convicted [Petitioner]' in light of the new evidence."). Cepero's trial testimony, stating the object "appeared" to be a gun, is not sufficiently different from his alleged "recantation." Under the deferential AEDPA review standard, this Court cannot say that Justice Fisch's decision denying this claim should be set aside. Medina's habeas claim based on newly discovered evidence should be denied.

*CONCLUSION*

**\*28** For the reasons discussed above, Medina's habeas petition should be *DENIED,* and a certificate of appealability should not issue.

*FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Sidney H. Stein, 500 Pearl Street, Room 1010, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Stein. Failure to file objections will result in a waiver of those objections

for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2004.
Medina v. McGinnis
Not Reported in F.Supp.2d, 2004 WL 2088578 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.